UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS R. AHERN, | : | |
| | : | |
| Plaintiff, | : | C.A. No. |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| SIG SAUER, INC. AND CITY OF | : | |
| CAMBRIDGE, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

## SUMMARY OF ACTION

1.      Plaintiff, Thomas R. Ahern ("Lieutenant Ahern"), resides in the Commonwealth

of Massachusetts and is a Detective Lieutenant with 29 years of service with the Cambridge

Police Department ("CPD").  Lieutenant Ahern served for 26 years in CPD's Special Response

Team ("SRT" or "SWAT"), including the past five years as the Commander of SRT, where he

also served as an SRT sniper and as regional Vice President of the Training and Evaluation

Committee of the United States Department of Homeland Security's Urban Areas Security

Initiative.

2.      Lieutenant Ahern is a CPD firearms instructor and supervises yearly in-service

CPD training.  He is certified by the Commonwealth of Massachusetts Municipal Police Training

Committee as a Firearms Academy Lead Instructor.  Lieutenant Ahern is a certified firearms

armorer for the SIG Sauer P320 pistol, the Remington 870 shotgun, and the Remington 700

sniper rifle.  Lieutenant Ahern has received numerous awards and commendations from the CPD

and has never received any disciplinary action.

3.      This action seeks actual, compensatory, and punitive damages, as well as equitable relief, relating to defendant SIG Sauer, Inc.'s ("SIG Sauer's") negligence, defective design, breach of warranties and unfair and deceptive marketing practices regarding a semi-automatic gun known as the P320 (the "P320") that fired on Lieutenant Ahern without a trigger pull in May 2019.

4.      It also seeks actual, compensatory, and punitive damages and equitable relief against defendant City of Cambridge for violations of 42 U.S.C. § 1983,  and M.G.L. Ch. 149 § 185, arising out of Lieutenant Ahern's protest to CPD senior leadership that it should not use the P320 because it is defective, unreliable, and dangerous due to its history of un-commanded discharges, both before and after his P320 fired un-commanded (i.e., without a trigger pull) on May 19, 2019, and the City of Cambridge's retaliation against him for exercising his First Amendment and whistleblower rights.

5.      Prior to 2018, the CPD used different SIG Sauer firearm models (not the P320). In approximately summer 2017, CPD leadership began discussing transitioning its officers to the P320.  Lieutenant Ahern, among other senior officers, was consulted by CPD leadership about the potential transition to the P320.

6.      The P320 is a striker-fired,[1] semi-automatic pistol that was introduced to the market in 2014.  Its trigger weight ranges between 5.5 and 7.5 pounds.  It is the first striker-fired pistol SIG Sauer manufactured.

---

[1] A striker-fired pistol differs from the traditional "hammer-fired."  It has no external hammer to be pulled back by the thumb; rather, it has an internal "striker" that is held back under spring pressure like a bow and arrow.  Once the slide is moved or "racked" backward, the weapon is fully cocked and ready to fire.  The only component holding the striker back is the weapon's "sear."  In this illustrative photo of a typical striker-fired pistol, the striker, in red, is held back by the sear, in blue.

7.     In January 2014, the SIG Sauer P320 was introduced in North America.  Since its inception, there have been at least fifty-two reported un-commanded discharges of the P320 involving federal agents, state and local police officers, and citizens.  Approximately ten lawsuits brought by individual plaintiffs and three class actions have been filed against SIG Sauer alleging that the P320 is defective and dangerous.

8.     Throughout the summer and fall of 2017, Lieutenant Ahern conducted research on the P320 and expressed to CPD senior leadership his concerns about the safety of the P320 and its history of un-commanded discharges.  Lieutenant Ahern repeatedly warned CPD senior leadership, both orally and in writing, that the P320 was defective, unreliable, and dangerous, and told senior leadership that CPD should not transition to the P320 because it would jeopardize the safety of Massachusetts citizens and CPD officers.



9.      Despite Lieutenant Ahern's objections and warnings, in or about May 2018, the

City of Cambridge and CPD purchased the P320 for members of the SWAT team through a

contract with SIG Sauer.  In or about September 2018, the City of Cambridge and CPD required

all officers to carry the P320.  Lieutenant Ahern continued to warn members of the CPD,

including its senior leadership, that the P320 was defective, unreliable, and dangerous, and that it

posed a risk to CPD officers, their families, and the citizens of Cambridge.

10.      In May 2018, over Lieutenant Ahern's objections, the CPD issued all members of

SRT the full size 9-millimeter "Carry" iteration of the P320 shown below.  In September 2018, it

issued the P320 to all of its approximately 280 officers.



11.      In May 2019, Lieutenant Ahern oversaw the Criminal Investigations Section and

the SRT for CPD.  On May 19, 2019, Lieutenant Ahern was working an overtime shift as Deputy

Incident Commander for the annual MayFair festival near Harvard Square in Cambridge.  While

Lieutenant Ahern was inside a SWAT van with six other individuals, his P320 discharged without a trigger pull (the "May 2019 Discharge Incident").

12.     When his P320 discharged, Lieutenant Ahern was performing a routine function check of his Safariland Level 3 Retention Holster and holding his P320 in the traditional "SUL Position," with his right index finger along the frame of the weapon.  At no time did Lieutenant Ahern touch the trigger, and no other item touched the trigger.  The bullet impacted Lieutenant Ahern's left thigh over his duty pants, deflected off a magnet affixed to his cellphone in his left pocket, entered an equipment bag on the floor of the van, and came to rest inside a ballistic helmet.

13.     Lieutenant Ahern's CPD-issued P320 should not have discharged without a trigger pull.  Indeed, SIG Sauer warranted that it would never do so.  In its "Safety Without Compromise" marketing materials for the P320, SIG Sauer states:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

14.     Despite this express representation, which SIG Sauer has made for approximately seven years, and despite a "voluntary upgrade" program announced in 2017, Lieutenant Ahern's P320 fired without the trigger being pulled.

15.     Prior to transitioning to the P320, the CPD had used the SIG Sauer P228 9MM from approximately 1991 and the SIG Sauer P229 .40 Cal since approximately 2011.  The CPD had no un-commanded discharges reported in the 27 years using those two SIG Sauer firearms. Since the CPD transitioned to the P320 in 2018, the CPD has had three un-commanded discharges reported, and the neighboring city of Somerville, which also uses the P320, has had a report of an additional un-commanded discharge.

16.     Before the sale of the P320s to CPD in or about September 2018, SIG Sauer knew or should have known that, due to three internal defects, the P320 could fire, and, in fact had a long history of firing, without a trigger pull.

17.     For many years since the P320 was first introduced in 2014, SIG Sauer has recklessly failed to recall it, despite knowing of defective discharges throughout the United States and abroad between at least 2016 and 2021, many of which occurred before Lieutenant Ahern's P320 discharged in May 2019.

18.     Many of these defective discharges have inflicted severe physical and emotional wounds on law enforcement officers and civilians, including a fellow officer in the CPD in October 2019.

19.     SIG Sauer's negligence has been the direct and proximate cause of substantial economic and non-economic harm to Lieutenant Ahern.

20.     In addition, the City of Cambridge illegally retaliated against Lieutenant Ahern because he continually objected to CPD purchasing the P320 due to safety concerns with the firearm, including after CPD purchased it for all its officers, and refused to accept CPD's "disciplinary deal" (which would have required him to falsely admit that he pulled the trigger) after the May 2019 Discharge Incident.  The City of Cambridge's retaliation included, but was

not limited to, retaliatory refusals to promote Lieutenant Ahern.  This retaliation was the direct

and proximate cause of substantial economic and non-economic harm to Lieutenant Ahern.

## JURISDICTION

21.     Lieutenant Ahern alleges claims against SIG Sauer that arise under the laws of the

United States, to wit, violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a).

Jurisdiction over SIG Sauer is therefore proper pursuant to 28 U.S.C. § 1331.

22.     Lieutenant Ahern alleges claims against the City of Cambridge that arise under

the Constitution and laws of the United States, to wit, the First and Fourteenth Amendments of

the United States Constitution and 42 U.S.C. § 1983.  Jurisdiction over the City of Cambridge is

therefore proper pursuant to 42 U.S.C. § 1331.

23.     The Court has supplemental jurisdiction over Lieutenant Ahern's related state law

claims against the defendants pursuant to 28 U.S.C. § 1367(a), because they are so related to the

federal claims in the action that they form part of the same case or controversy under Article III

of the United States Constitution.

## VENUE

24.     The claims asserted in this action arose within this district and the allege damage

occurred in this district.  Venue is therefore proper pursuant to 29 U.S.C. § 2617 and 28 U.S.C.

§ 1391(b)(2) and (3).

## PARTIES

25.     Defendant SIG Sauer, f/k/a "SIGARMS," has a principal place of business in

Newington, New Hampshire.  It markets and distributes its products in 88 countries, according to

one of its own press releases.  "SIG Sauer" is also the brand name used or formerly used by

several sister companies involved in the design and manufacture of firearms.

26.     Defendant City of Cambridge is a city in Middlesex County, Massachusetts, and part of the Boston metropolitan area as a major suburb of Boston.  As of July 2019, it was the fifth most populous city in the state, behind Boston, Worcester, Springfield, and Lowell.

27.     Plaintiff Thomas R. Ahern is a 29-year law enforcement veteran with vast firearms experience.  Until resigning in April 2021, Lieutenant Ahern was the Commanding Officer of the CPD's Special Response Team and the regional Vice President of the Training and Evaluation Committee United States Department of Homeland Security's Urban Areas Security Initiative.  Lieutenant Ahern is a CPD firearms instructor and supervises yearly in-service CPD training.  He is certified by the Commonwealth of Massachusetts Municipal Police Training Committee as a Firearms Academy Lead Instructor.  Lieutenant Ahern is a certified firearms armorer[2] for the P320, the Remington 870 shotgun, and the Remington 700 sniper rifle.  Lieutenant Ahern has received numerous awards and commendations from the CPD and has never received any disciplinary action.

## FACTUAL ALLEGATIONS

I.     **Lieutenant Ahern Raised Constitutionally-Protected Safety Concerns Regarding the P320 Before and After the May 2019 Discharge Incident**

28.     Almost two years before the May 2019 Discharge Incident, the CPD considered whether to transition its standard firearm to the P320, pursuant to which all CPD officers would be required to carry the P320.  Upon learning of the potential transition, Lieutenant Ahern researched the P320 and learned that it had a history of discharging without a trigger pull, including but not limited to so-called "drop fires."  Based on his research, Lieutenant Ahern

---

[2] SIG states on its website that its Armorer Certification "enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty."  It further states that "[u]pon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years."  *See* SIG Sauer Academy, Armorer Certification, *available at* https://www.sigsaueracademy.com/course/armorer-certification.

concluded that the P320 was unsafe and would pose a danger to CPD police officers, their families, and citizens of Cambridge.

29.     Throughout 2017, Lieutenant Ahern had numerous conversations with CPD patrol man, CPD officers, members of CPD management, and Cambridge citizens in which Ahern expressed his view that CPD should not contract for the P320 because it is unsafe firearm would pose a danger to CPD police officers, their families, and citizens of Cambridge.  Many of these conversations took place outside of CPD premises.

30.     On or about August 31, 2017, Lieutenant Ahern sent CPD Lieutenant George Sabbey ("Lieutenant Sabbey") and CPD Firearms Instructor Steve Kervick an email questioning the safety of the P320 and attaching a YouTube video showing that the P320 could fire on its own if dropped.

31.     In approximately 2017, Lieutenant Ahern and several CPD SRT members met for a social event at a pub called the Thirsty Scholar in Somerville.  Those in attendance included, but were not limited to, Lieutenant Sabbey and CPD officers Brian Mushlin and Brian Pugliares. During the event, Lieutenant Ahern advocated against the P320, arguing that it posed a danger to CPD officers, their families, and the citizens of Cambridge.

32.     In approximately 2017, the CPD SRT team met for a cookout at the summer home of CPD patrolman Steve Kervick in Scituate.  During the cookout, Lieutenant Ahern had conversations with several CPD SRT team members in which Lieutenant Ahern advocated against CPD arming its officers with the P320, explaining that the P320 was prone to firing without a trigger pull and therefore posed a danger to CPD officers, the families of CPD officers, and the citizens of Cambridge.

33.     In approximately 2017, Lieutenant Ahern attended a social event at the home of his sister, Susan Ahern.  During this social event, Lieutenant Ahern discussed his concerns regarding the safety of the P320 with several people, including but not limited to his brother Stephen Ahern, who at the time was a CPD lieutenant.  Among other things, Lieutenant Ahern stated that he was advocating within CPD that the P320 was dangerous because it could fire without a trigger pull and that CPD therefore should not supply its officers with the P320.

34.     On or about September 1, 2017, Lieutenant Ahern told Lieutenant Sabbey and CPD Superintendent Chris Burke that CPD should not purchase the P320 because the P320 could fire without a trigger pull and therefore posed a risk to police officers, their families, and the citizens of Cambridge.  Lieutenant Sabbey responded that Ahern that did not have a say in the matter.

35.     On or about October 7, 2017, Lieutenant Ahern texted CDP Deputy Paul Ames ("Deputy Ames"), who was in charge of CPD's purchase of the P320.  In the text message, Lieutenant Ahern notified Deputy Ames of the P320 safety issue, sending a screenshot of the P320 manual stating "WARNING – DROPPED PISTOL[:] If dropped, the pistol may fire, keep the chamber empty unless actually firing!"  Lieutenant Ahern wrote, "Sig 320 manual, note keep the chamber empty unless actually firing."  Deputy Ames replied, "Oh, oh."

36.     On or about January 9, 2018, Lieutenant Ahern had another disagreement with Lieutenant Sabbey regarding the safety of the P320.  Lieutenant Ahern again told Lieutenant Sabbey that, because the P320 could fire without a trigger pull, it posed a danger to CPD officers and Cambridge citizens generally.  Lieutenant Sabbey informed Ahern that the P320 had been ordered and would become the CPD's duty weapon.

37.     In approximately late 2017 and early 2018, Lieutenant Ahern had several

conversations with CPD Legal Advisor James Mulcahy ("Mulcahy") in which Lieutenant Ahern

expressed his concerns about the safety of the P320 and urged CPD that the firearm was unsafe.

Lieutenant Ahern told Mulcahy that the P320 was prone to firing without a trigger pull and

therefore posed a safety risk to CPD officers, their families, and the citizens of Cambridge.

Those conversations occurred both before and after CPD contracted for the P320.

38.     As a result of those conversations, Mulcahy contacted SIG Sauer and made

inquiries about the safety of the P320.  By letter dated January 8, 2018 (the "January 2018

Letter"), SIG Sauer responded to Mulcahy's inquires stating, among other things, that SIG Sauer

"certifies that the P320 pistols received by the Cambridge Police Department, Massachusetts on

Atlantic Tactical purchase order # 80288380 have been built with the 100% new and upgraded

components as outlined in SIG's Voluntary Upgrade Progam."

39.     The January 2018 Letter further stated that all materials "pertaining to the above-

mentioned purchase order have been manufactured in accordance with the quality standards and

specifications applied to this purchase order and the performance of said items is complaint with

all performance specifications of this contract."  The January 2018 letter concluded that "[a]ll

items were inspected before being shipped in accordance with SIG SAUER, Inc. acceptance test

procedures."

## II.     The May 2019 Discharge Incident

40.     On May 19, 2019, Lieutenant Ahern was working an overtime shift as Deputy

Incident Commander for the annual MayFair event near Harvard Square.  This event, with its

large crowds, posed the potential risk of terrorist activity.  Lieutenant Ahern was inside a SWAT

van with six other members of the SWAT team.  While inside the van, Lieutenant Ahern's CPD-issued P320 discharged without a trigger pull (the "May 2019 Discharge Incident").

41.     At the time the P320 discharged, Lieutenant Ahern was performing a routine function check of his Safariland Level 3 Retention Holster.  At the time the weapon discharged, Lieutenant Ahern was holding the P320 in the traditional "SUL Position," with his right index finger along the frame of the weapon.

42.     The P320 discharged without a trigger pull and the bullet impacted Lieutenant Ahern's left thigh over his duty pants, deflected off a magnet affixed to his cellphone in his left pocket, entered an equipment bag on the floor of the van, and came to rest inside a ballistic helmet.  The spent casing of the round remained stuck in the weapon's ejection port, demonstrating another defect with the build quality of the P320.

43.     The magnet attached to the back of Lieutenant Ahern's Apple iPhone (pictured below) was the only object that prevented Lieutenant Ahern from incurring severe injury or death:



44.     At no time during his previous 26 years of service had Lieutenant Ahern ever been cited for any firearms infraction.

### III.    The CPD Retaliated Against Lieutenant Ahern for Exercising His First Amendment Rights and Complaining About the Safety of the P320

45.     On May 19, 2019, the same day as the May 2019 Discharge Incident, CDP Deputy Superintendent Robert Lowe ("Superintendent Lowe") asked CPD Sergeant Joseph

Murphy ("Sergeant Murphy") to investigate the shooting. Sergeant Murphy told Superintendent Lowe that, per CPD policy, the investigation should be conducted by someone who is a higher rank than Lieutenant Ahern. As such, Sergeant Murphy, who is a direct report and lower rank to Lieutenant Ahern, should not conduct the investigation. Superintendent Lowe nevertheless assigned Sergeant Murphy to conduct the investigation.

46.     On May 20, 2021, CPD Lieutenant Silverio Ferreira ("Lieutenant Ferreira") informed CPD Superintendent Stephen DeMarco ("Superintendent DeMarco") and Deputy Superintendent Leonard DiPietro ("Superintendent DiPietro") that it was decided "upstairs" to find Lieutenant Ahern in violation for the shooting. "Upstairs" was a reference to the location of the CPD Commissioner's office and Professional Standards Unit. At the time Superintendent DiPietro made this statement, the investigation of the shooting had not yet occurred.

47.     Superintendent DeMarco then told Sergeant Murphy to find Lieutenant Ahern in violation for the shooting. When Sergeant Murphy requested the reason for the violation, Superintendent DeMarco instructed him to find that an incident of "excessive force" had occurred. Sergeant Murphy refused. Superintendent DeMarco then told Deputy Superintendent DiPietro to find Lieutenant Ahern in violation.

48.     CPD Deputy Superintendent Dennis O'Connor ("Deputy Superintendent O'Connor") told Lieutenant Ahern to accept the findings of the "investigation" and that, should Lieutenant Ahern accept discipline, he would remain "viable" for a promotion to Deputy Superintendent. Deputy Superintendent O'Connor also told Lieutenant Ahern that it was a "waste of time" for Lieutenant Ahern to apply for the upcoming Deputy Superintendent vacancy with an investigation pending.

49.     On July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the neighboring police department in Somerville, hitting him in his leg and causing substantial injuries.

50.     On August 19, 2019, Deputy Superintendent O'Connor, who was the Chief of Staff for the CPD Commissioner, met Lieutenant Ahern at Massport Fire Headquarters in Boston where Lieutenant Ahern was attending a training.  Deputy Superintendent O'Connor gave Lieutenant Ahern a discipline resolution letter agreement (the "Letter Agreement") for the May 2019 Discharge Incident.  The Letter Agreement required that Ahern state that he discharged the firearm, and Deputy Superintendent O'Connor informed Lieutenant Ahern that he would need to quit the SRT.  Lieutenant Ahern declined to accept the Letter Agreement because he did not discharge the firearm.

51.     Following the May 2019 Discharge Incident and Lieutenant Ahern's declination of the Letter Agreement, the CPD stripped Lieutenant Ahern of multiple training opportunities, including Personal Radiation Detection in Oakridge, Tennessee; Leadership Development Training for Metro Boston Homeland Security Region in Boston, Massachusetts; and High Threat Environment Training in Jackson Township, New Jersey.  Participating in these types of trainings was a critical prerequisite to any advancement opportunity for Lieutenant Ahern.  By stripping Lieutenant Ahern of the opportunity to participate in these trainings, the CPD effectively denied him any opportunity for advancement.

52.     On October 18, 2019, Deputy Superintendent O'Connor again told Lieutenant Ahern to accept discipline for the May 2019 Discharge Incident pursuant to the terms of the Letter Agreement, including the requirement that Ahern falsely state that he discharged the

firearm.  Ahern again refused.  Deputy Superintendent O'Connor warned Lieutenant Ahern, in sum and substance, that he would face suspension and other consequences.

53.     Later that day, CPD Officer Jacques Desrosiers' ("Officer Desrosiers") P320 discharged without a trigger pull while he was walking down a public street in Cambridge. Lieutenant Ahern responded to the scene along with several other officers and a news helicopter. The shooting severely wounded Officer Desrosiers, who has not returned to the CPD since that date.

54.     On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the CPD, as he was putting on his duty belt.

55.     Following the May 2019 Discharge Incident, Lieutenant Ahern told Deputy Superintendent O'Connor that he hoped to apply for a Deputy Superintendent vacancy.  Deputy Superintendent O'Connor told Lieutenant Ahern not to apply for the position due to the pending investigation due to the May 2019 Discharge Incident.  Deputy Superintendent O'Connor informed Lieutenant Ahern that, to be viable for promotion, Lieutenant Ahern would have to accept CPD's proposed discipline, including the requirement that Lieutenant Ahern falsely state that he discharged the firearm.  CPD's refusal to promote Lieutenant Ahern was directly related to (i) Lieutenant Ahern's complaints about the safety of the P320, both before and after CPD contracted with SIG Sauer to arm CPD's officers with the P320, and (ii) Lieutenant Ahern's refusal to accept discipline for the May 2019 Discharge Incident.

56.     In or about March 2021, Lieutenant Ahern applied for, and was denied, a promotion to the position of Deputy Superintendent.  This denial of promotion was directly related to (i) Lieutenant Ahern's complaints about the safety of P320, both before and after CPD

contracted with SIG Sauer to arm its CPD officers with the P320, and (ii) Lieutenant Ahern's refusal to accept discipline for the May 2019 Discharge Incident.

57.     CPD's failure to promote Lieutenant Ahern has caused Lieutenant Ahern substantial economic and non-economic damages.

**IV.     <u>Marketing of the P320</u>**

58.     Years before the May 2019 Discharge Incident occurred, SIG Sauer expressly warranted that the weapon could not fire without a trigger pull.  In its marketing materials, SIG Sauer states:



### SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

59.     Additional SIG Sauer marketing materials provide:

**Striker Safety:** Prevents the striker from releasing unless the trigger is pulled.

60.     At the same time, SIG Sauer contradictorily warned in the original version of the owner's manual for the P320 that the weapon could fire if dropped:



61.     Upon information and belief, it is standard operating procedure for all U.S. law enforcement agencies, including the U.S. Secret Service, the Federal Bureau of Investigation, and the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, including the Cambridge Police Department, to require their agents and officers to carry pistols with a chambered round.

62.     SIG Sauer was aware that law enforcement officials are routinely required to carry pistols with a chambered rounds when it sold its defective P320s to U.S. law enforcement agencies and departments, including the Cambridge Police Department.

63.     It is widespread practice among civilians who "conceal carry" their pistols to do so with a round in the chamber.  This practice is consistent with the rules of firearm safety, as pistols should not be vulnerable to un-commanded discharges under any circumstances.

64.     SIG Sauer's advertisements for the P320 stress the military and law-enforcement lineage of its firearms and focus on highlighting the modularity, safety, and functionality of the P320 for civilians and law enforcement alike.

65.     Military and law enforcement sales are a significant source of profit for SIG Sauer and are also a powerful marketing tool that SIG Sauer uses to spur additional sales to U.S. law enforcement and civilian markets, as demonstrated in these SIG Sauer marketing materials:





66.     As demonstrated in these marketing materials, SIG Sauer advertised that the P320 would function in a safe manner.

67.     These representations were contained within SIG Sauer's advertisements, packaging, package inserts, and website, and were also delivered to retailers in the form of marketing materials and specifications which were reprinted verbatim and made available to purchasers.

**V.    Early Problems with the P320 and the August 2017 "Voluntary Upgrade Program"**

68.    The P320 is the first striker-fired pistol SIG Sauer ever manufactured.  SIG Sauer assembled it using the same frame and fire control unit from an earlier hammer-fired model, the P250.

69.    In early 2016, while competing for a $580,000,000 contract to supply the U.S. Army with a new service pistol, SIG Sauer's prototype P320s exhibited 200 malfunctions or more during Army testing.  These defects included failure to eject spent casings, firing upon impact with the ground, and failing to fire.

70.    In 2016, the Department of Defense notified SIG Sauer of more than 200 malfunctions with P320 prototypes.  It demanded that SIG Sauer fix all design problems associated with the P320.

71.    In early 2016, SIG Sauer was also warned by a Florida police department that the P320 was capable of firing without a trigger pull.

72.    SIG decided not to publicly disclose the 2016 warnings it had received about the P320's defects.

73.    As early as 2016, if not years before, members of SIG Sauer's management and design teams began a concerted effort to conceal defective discharge events.

74.    This effort involved SIG Sauer employees visiting local law enforcement agencies that had reported defective discharge events and seizing the weapons for inhouse "testing" in New Hampshire.

75.    Rather than seek to learn about P320's tendency to fire without a trigger pull, SIG Sauer actively avoided learning the details of defective discharge events, and instead

recharacterized and concealed them, blaming items such as keys, articles of clothing, seatbelt buckles, foreign objects, and holsters for the discharge events.

76.     In one email exchange, for example, a SIG Sauer employee claiming to investigate a February 2017 defective discharge event in Roscommon, Michigan refrained from even viewing an incident report or a bodycam video, stating in an email that he "did not want to see anything [the police department] did not want me to see."

77.     The SIG Sauer employee sent to Roscommon, Thomas Mechling, eventually watched the bodycam video and noted that the officer in question exclaimed "tell me how a gun would fire still in the holster" after the discharge.  This discharge did not involve the weapon being dropped.

78.     SIG Sauer has since falsely claimed that the Roscommon Police Department "investigated" the incident, and "found" that the officer's seat belt buckle (i) plunged from its normal retracted position into the officer's holster; (ii) worked its way down to the trigger guard; (iii) wrapped itself around the trigger; and (iv) fired the gun as the officer was exiting his vehicle with no trailing seatbelt in sight.

79.     This explanation was suggested and developed by SIG Sauer employees, including Al Larochelle.

80.     SIG Sauer has also provided items of value to officers and police departments with knowledge of P320 defective discharges, claiming internally that the endangered officers showed no distrust in the P320, and currying favor with them by leaving SIG Sauer trinkets such as hats, pins and handcuff keys.

81.     The disconnect between SIG Sauer's public representations and its private knowledge shows a conscious disregard for the lives and safety of members of law enforcement

officers and the public.  At all times relevant to this Complaint, SIG Sauer employed a skillful

public relations campaign, internet marketing, and in-person reassurances of the P320's alleged

safety that was designed to maximize profit at the expense of safety.

82.     At the same time, SIG Sauer has privately struggled to find an engineering

solution that would prevent the P320 from unintentionally firing on civilians and law

enforcement officers without trigger pulls.

83.     On August 4, 2017, a Stamford, Connecticut SWAT officer sued SIG Sauer in the

United States District Court for the District of Connecticut (hereinafter, "the Connecticut Suit")

for damages relating to a P320 that shot him in the knee when it fell from a distance of less than

three feet and hit the ground.

84.     The Stamford discharge resulted in a wave of national negative media publicity

and attention regarding the safety of the P320, including on television and the internet.

85.     Four days later, SIG Sauer issued a press release stating that the P320 could fire

without a trigger pull under certain conditions but "reaffirmed" the "safety" of the P320 to all

users:

> All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.



PR Contact:
Jordan Hunter
SIG SAUER, Inc.
603-610-3293
jordan.hunter@sigsauer.com

FOR IMMEDIATE RELEASE

### SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017)** — In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

For more information on SIG SAUER, please visit us at sigsauer.com

Follow SIG SAUER on social media, including Facebook at facebook.com/sigsauerinc, Instagram at instagram.com/sigsauerinc, and YouTube at youtube.com/user/sigsauerinc.

**SIG SAUER, Inc.**

SIG SAUER, Inc. is The Complete Systems Provider™, leading the industry in American innovation, ingenuity, and manufacturing. SIG SAUER® brings a dedication to superior quality, ultimate reliability, and unmatched performance that has made it the brand of choice among many of the world's elite military, government and law enforcement units as well as responsible citizens. SIG SAUER offers a full array of products to meet any mission parameter, including handguns, rifles, ammunition, electro-optics, suppressors, ASP (Advanced Sport Pellet) airguns and training. The largest member of a worldwide business group of firearms manufacturers that includes SIG SAUER GmbH & Co. KG in Germany and Swiss Arms AG in

**SIG 000177**

86.     SIG Sauer's claim that its new warnings regarding the capability of the P320 to

fire without a trigger pull upon "shock" or "vibration" were similar to language in other

manufacturers' product manuals was not true.  In fact, it is critical safety requirements that firearms only fire when the trigger is pulled.

87.     On August 14, 2017, SIG Sauer announced a Voluntary Upgrade Program (the "VU Program") for the P320.

88.     The VU Program was created for the stated purpose of "reduc[ing] the physical weight of the trigger, sear, and striker while adding a mechanical "disconnector," allegedly to make the P320 even "better" than it already was.

89.     According to the SIG Sauer website, many of these changes had "nothing to do with drop safety."

90.     The VU Program was intended to correct a defective firing assembly within several hundred thousand P320s, while also denying to consumers, law enforcement, and the general public any dangers inherent in the "non-upgraded" P320-platform firearms.

91.     According to SIG Sauer, these VU Program "changes" represented an "alternate design" of the P320 and attempted to fix design problems.

92.     SIG Sauer declined to label the VU Program a "recall" and expressly stated that all P320s in circulation were safe.

93.     When the VU Program was announced in August 2017, days after the Connecticut Suit was filed, SIG Sauer knew of numerous defects with the firing control unit in the P320 for almost two years, if not longer.

94.     At the time the VU Program was announced, SIG Sauer had also just recently obtained the $580,000,000 U.S. Army contract.

95.     A mandatory recall would have been a public relations calamity for SIG Sauer in light of the recent U.S. Army contract.

96.     The Department of Defense submitted an urgent May 10, 2017, Engineering Change Proposal (the "DoD Engineering Change Proposal") for the prototype of the military version of the P320.  The DoD Engineering Change Proposal provides further corroboration that SIG Sauer well knew of numerous defects with the P320 prior to the VU Program's announcement.

97.     The DoD Engineering Change Proposal demanded that the entire internal firing system for the P320 be replaced.  SIG Sauer complied and made all requested engineering changes.

98.     To avoid the extraordinary costs of a mandatory recall, SIG Sauer continued to assure end users of approximately 500,000 commercial versions of the P320 that they were safe. The commercial versions of the P320 were used by law enforcement agents and civilians.

99.     SIG Sauer has never recalled the P320, despite having recalled other products known to have defects.

100.    SIG Sauer's former German sister company, SIG GMBH, sustained $35 million in financial losses after describing the VU Program it in tax filings with the German government as a "recall."

**VI.     Changes to the P320 Manual**

101.    Sometime after January 2017, SIG Sauer removed the warning from the user manual referenced in paragraph 60 regarding a chambered round, and replaced it with the following dramatically different language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

102.    SIG Sauer had never previously represented that mere "vibration" could cause the weapon to discharge, a statement directly at odds with its warranty that the weapon would only fire if the trigger was pulled.

103.    SIG Sauer had also expressly represented since the P320's manufacture and distribution in 2014 that the weapon possessed a "robust safety system."

104.    In fact, SIG Sauer's original design and manufacture of the P320 in 2014 (or earlier) rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, including any normal carrying, holstering, un-holstering, or rough handling in any altercation or combat.

105.    Specifically, the P320 possessed an inadequate sear-striker connection, an inadequate internal striker safety, and far too much horizontal and vertical "play" with internal parts inside the slide.  In addition, massive amounts of mold injected metal "rollover" on the surfaces of critical internal connecting parts rendered them unstable, and the P320 lacked any external safety or tabbed trigger safety.

VII.    **Chronological History of Other Defective Discharges of the P320**

106.    There have been many prior incidents of defective discharges involving the P320 caused by the weapon merely being handled, accidentally dropped, or holstered or un-holstered.

107.    In February 2016, a holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, police officer's vehicle when the officer motioned to exit the vehicle during a snowstorm.  The incident was captured on the officer's body cam video which shows that no object entered the officer's holster prior to or during the discharge.

108.    In 2016, the police department of Surprise, Arizona, complained to SIG Sauer of two separate incidents of P320s firing without trigger pulls.

109.    In October 2016, a P320 fired un-commanded on retired New York Police Department officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

110.    In November 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

111.    On January 5, 2017, a P320 shot un-commanded, hitting a Stamford SWAT team member in his left knee when the pistol fell to the ground, while fully holstered, from less than three feet.

112.    On February 28, 2017, a P320 discharged un-commanded while in use by the University of Cincinnati Police Department.

113.    On June 14, 2017, a P320 discharged un-commanded in Wilsonville, Oregon.

114.    On June 20, 2017, a P320 discharged un-commanded while in use by the Howell Township Police Department in New Jersey.

115.    In June 2017, SIG Sauer shipped approximately 800 P320s to the Sheriff's Department of Loudoun County, Virginia, privately assuring its leadership, Sheriff David Chapman, that the problems with the weapon would be fixed, but that for the time being it had to use the weapon as it was.  As noted below, three P320s within this shipment, including two "upgraded" versions, later fired without trigger pulls on three Loudon County deputy sheriffs, severely injuring each of them.

116.    On July 28, 2017, a P320 discharged un-commanded in Tarrant County, Texas.

117.    On August 7, 2017, SIG Sauer's Chief Executive Officer ("CEO") released a statement that "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."  This statement was false.  SIG Sauer knew, at the time of the statement, that an officer in Connecticut had been shot by a so-called "drop fire" with the commercial version of the P320 some eight months earlier.

118.    On August 8, 2017, SIG Sauer announced the VU Program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."  This statement was false, or at least intentionally misleading, as there are no federal government standards for gun safety, a fact well known to SIG Sauer when it issued this press release.[3]

119.    The VU Program was presented to the public as purely optional and not urgent or mandatory.  The stated reason for the upgrade was to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnector component, and an improved sear to prevent accidental discharges.

---

[3] No federal agency oversees how firearms are designed or built. Congress exempted firearms from any federal regulation when it created the Consumer Product Safety Commission in 1972 due to Second Amendment concerns.

120.    On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency
order removing the P320 from service.

121.    In October 2017, a P320 discharged un-commanded in a public place in Georgia
when an officer fell to the ground in pursuit of a suspect.  The officer's weapon, which was
holstered, fired without a trigger pull when the officer hit the ground.

122.    On November 12, 2017, a P320 discharged un-commanded in Tyler, Texas.

123.    In January 2018, a P320 discharged un-commanded in Dallas County, Texas.

124.    On February 7, 2018, Loudoun County Virginia Deputy Sheriff Marcie Vadnais's
("Sheriff Vadnais") P320 fired on her un-commanded in Virginia, severing her right femur and
causing catastrophic skeletal injury and deformity.  The resulting injuries necessitated four
general anesthesia surgeries, caused severe emotional distress and trauma, and ended her law
enforcement career.

125.    Computer tomography scanning of Sheriff Vadnais's P320 identified both a
design defect and a manufacturing defect – to wit, crossed sear springs that apply upward spring
pressure to the sear to keep it from falling and releasing the striker.  This defective spring
installation, among other defects, resulted in unequal spring pressure and caused a precarious
engagement between the striker foot and the sear, thereby rendering Sheriff Vadnais's P320
susceptible to un-commanded discharge.

126.    In April 2018, SIG Sauer issued a second "voluntary upgrade" notice to all users
or owners of the P320.  SIG Sauer did not recall the weapon.

127.    In May 2018, civilian Gunter Walker reported to SIG Sauer that his P320 fired on
him un-commanded when he placed the weapon down on his nightstand, shooting him through
the palm of his left hand.

128.    In June 2018, a police officer in Williams County, Ohio, reported that his P320 discharged un-commanded twice in one moment as he was attempting to move the slide backward.  One round grazed the officer's arm; the other blew through his patrol car's driver side door.

129.    In May 2018, a police officer in Rancho Cucamonga, California, reported that his P320 fired un-commanded while he was walking inside his department locker room.  The casing of the round did not eject, as it should have if the firearm were operating properly.

130.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

131.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded, causing severe tunneling wounds to his right leg.

132.    On July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the police department of Somerville, Massachusetts, hitting him in his leg and causing substantial injuries.

133.    On July 24, 2019, a P320 fired un-commanded on Jimmy S.C. Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in permanent nerve damage to his leg.

134.    In August 2019, Philadelphia Transit Officer Craig Jacklyn's ("Officer Jacklyn") P320 fired un-commanded while holstered, nearly hitting a bystander in the subway.

135.    The incident was captured on video, and Officer Jacklyn was returned to duty the next day, with no discipline.  The Philadelphia transit authority replaced all P320s, and fully exonerated Officer Jacklyn of any alleged wrongdoing.

136.    On September 3, 2019, another P320 in use by the sheriff's office in Loudoun County, Virginia fired un-commanded on another deputy sheriff, Carl Costello, hitting him in his leg.

137.    On October 10, 2019, Officer Desrosiers's P320 discharged un-commanded.  The round caused massive and life-changing injuries to Officer Desrosiers.  The spent casing of the round did not eject.

138.    On October 11, 2019, a P320 fired un-commanded on United States Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon.  Upon inspection, it was found that the spent casing did not eject.  The discharge was investigated by Major Peter J. Villani ("Major Villani") of the United States Veterans Affairs police agency, who, like Lieutenant Ahern, is a SIG-certified armorer.

139.    Major Villani's report noted that, due to the design of the P320, "it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear]."

140.    On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette ("Officer Gardette") of the police department in Manteca, California, as he was preparing for work.  The P320 discharged un-commanded inside his holster as Officer Gardette attempted to fasten his duty belt around his waist.  The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door.

141.    On December 2, 2019, a P320 fired un-commanded while in the possession of CPD Detective David Albert as he was in the process of putting on his duty belt.

142.     In January 2020, a fully holstered P320 fired un-commanded on an Army veteran in Utah, penetrating his leg and impacting his femur bone.

143.     On February 27, 2020, a fully holstered P320 fired un-commanded on a retired Tampa police officer, causing catastrophic bone damage to his lower left leg.

144.     In June 2020, a P320 fired un-commanded on an officer in Pasco County, Florida, severely wounding him in his right leg.  This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

145.     In June 2020, a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster, and resulting in a broken bone in the civilian's foot.

146.     On July 14, 2020, a P320 fired un-commanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injury.

147.     On September 21, 2020, a P320 fired un-commanded on a United States Immigration and Customs Enforcement ("ICE") agent at a firing range in Maryland, striking him in the leg and causing serious injury.  The weapon discharged when the ICE agent placed his hand on the grip to the draw gun.

148.     On November 5, 2020, a P320 fired un-commanded on a member of Canada's elite Joint Task Force 2, causing him bodily harm.  In a press release, SIG Sauer blamed the discharge on the weapon's holster.

149.     In December 2020, a P320 fired un-commanded on a second ICE agent at a firing range in Tennessee.  The bullet resulted in a tunnel wound to her right thigh.

150.     On December 1, 2020, a fully holstered P320 discharged un-commanded while inside a sex crimes detective's handbag in Bridge City, Texas.  The bullet entered millimeters

away from her vagina and exited her rear end, leaving inoperable shrapnel near and around her sciatic nerve.

151.    In January 2021, a P320 fired un-commanded on a gun shop manager in Three Rivers, Texas as he cleared the weapon, blowing off one of his fingers.  The weapon was out of battery when it fired.

152.    On May 12, 2021, a P320 fired un-commanded on a second Homeland Security agent conducting firearms training at a range in Cottage Grove, Minnesota without the trigger being pulled.  The bullet left two entry and exit wounds in her right thigh and calf and shattered her fibula.

153.    On May 15, 2021, a fully holstered P320 fired un-commanded on a DC Metro Transit police department officer inflicting thermal burns along her right thigh.

154.    In June 2021, the Pasco County, Florida, Sherriff's Office replaced its entire arsenal of P320s with Glock 19s after four separate incidents of its P320s discharging un-commanded, striking two officers in their respective legs and causing significant injuries.

155.    In June 2021, a P320 fired un-commanded on a police officer at a firing range in Troy, New York, severely injuring his right leg.

156.    Upon information and belief, employees at SIG Sauer's training academy in New Hampshire have admitted to defective discharges causing injury in both 2016 and 2017.

## COUNT I

### (Against Defendant SIG Sauer, Inc.)

### STRICT PRODUCT LIABILITY

157.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 156 of the Complaint, as though fully set forth herein.

158.    SIG Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable because:

    a.   SIG Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by SIG Sauer;

    c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

159.    The P320 was in a defective condition as: (1) the danger contained therein was unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

160.    SIG Sauer breached its duties, by and through its agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

161.    The defective condition of the P320 caused Plaintiff's injuries.

162.    SIG Sauer is therefore strictly liable to Plaintiff.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II

### (Against Defendant SIG Sauer, Inc.)

### NEGLIGENCE

163.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 162 of the Complaint, as though fully set forth herein.

164.    At all relevant times, SIG Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon him merely placing his hand on the weapon's grip before selling the gun and placing it into the stream of commerce.

165.    At all relevant times, SIG Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon gripping the weapon before selling the gun and placing it into the stream of commerce.

166.    At all relevant times, SIG Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.  Upon information and belief, SIG Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

167.   SIG Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i.   By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;
>
> ii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;
>
> iii.   By failing to issue a mandatory recall of the P320 as SIG Sauer had done in the past with other defective products;
>
> iv.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;
>
> v.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Plaintiff, of said defective, hazardous, and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;
>
> vi.   By failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG Sauer, and during which times employees, servants or agents of SIG Sauer had an opportunity to inspect, service and work on the gun;
>
> vii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual, referenced in Paragraph 60, for the gun after several incidents of accidental discharges;
>
> viii.   Other negligent acts and omissions to be developed in the course of discovery.

168.   SIG Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

169.    The gun's defective condition was not visible and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

170.    SIG Sauer's negligence as alleged in this Count directly and proximately caused the May 2019 Discharge Incident and Plaintiff's injuries resulting from the accident.

171.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III

## (Against Defendant SIG Sauer, Inc.)

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

172.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 171 of the Complaint, as though fully set forth herein.

173.    At all relevant times, SIG Sauer was in the business of marketing, selling, and distributing weapons, including the gun causing Plaintiff's injuries.

174.    SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

175.    At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

      i.     Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

      ii.    Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

      iii.   Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

      iv.   Negligently failing to unambiguously warn purchasers and end users of the gun, including Ahern, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

      v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

      vi.   Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

176.    Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG Sauer's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident and Plaintiff's injuries.

177.     As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IV

### (Against Defendant SIG Sauer, Inc.)

### BREACH OF EXPRESS WARRANTY

178.     Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 177 of the Complaint, as though fully set forth herein.

179.     At all times material hereto, SIG Sauer was in the business of marketing, selling, and distributing weapons, including the gun causing Plaintiff's injuries. Upon information and belief, SIG Sauer knew or had reason to know the gun would be situated in holsters that would need to be removed from a law enforcement end user's service belt at the time they sold the gun, and that the purchaser was in fact relying on SIG Sauer's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

180.     Accordingly, SIG Sauer impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster that would need to be removed from service belts from time to time.

181.    At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of SIG Sauer in using and handling the gun and its SIG Sauer-issued holster.

182.    SIG Sauer breached the above-referenced implied warranty as to the gun in that it was unreasonably dangerous and unfit to be removed while in its holster at the time it left SIG Sauer's possession by virtue of:

    i.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

    ii.    Failing to issue a mandatory recall of the P320 as SIG Sauer had done in the past with other defective products;

    iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

    iv.    Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Plaintiff, of said defective, hazardous, and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    v.    Failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG Sauer, and during which times employees, servants or agents of SIG Sauer had an opportunity to inspect, service, and work on the gun;

    vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual referenced in Paragraph 60 for the gun after several incidents of accidental discharges;

    vii.    Expressly warranting that the gun would not fire unless the trigger was pulled.

183.    As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V

### (Against Defendant Sig Sauer, Inc.)

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

184.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 183 of the Complaint, as though fully set forth herein.

185.    By its actions, SIG Sauer knew, or should have known, that the design and/or manufacturing defect in the gun rendered it capable of discharging without the trigger being pulled.  Yet it presented to CPD, Plaintiff, and the general public, in marketing materials that numerous safeties would prevent the gun from firing unless the trigger was pulled.

186.    SIG Sauer's conduct created an unreasonable risk of causing the Plaintiff emotional distress.

187.    SIG Sauer knew or should have known that the P320 was defective and that it had a history of, and was prone to, firing without a trigger pull.  SIG Sauer knew or should have known that the P320 therefore posed a danger to CPD police officers, their families, and the citizens of Cambridge.

188.    SIG Sauer's conduct created an unreasonable risk of causing the Plaintiff
emotional distress.

189.    SIG Sauer's conduct was the direct and proximate cause of Plaintiff's emotional
distress.

190.    As a direct and proximate result of the breaches set forth in this Count, Plaintiff
suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the
enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent
or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendant SIG
Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees,
costs of suit, and all other claims available by law.

## COUNT VI

### (Against Defendant SIG Sauer, Inc.)

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

191.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs
1 through 190 of the Complaint, as though fully set forth herein.

192.    Upon information and belief, SIG Sauer had knowledge of the various defects
with the commercial version of the P320 firearm years before the May 2019 Discharge Incident.

193.    Despite having such knowledge, SIG Sauer failed to issue a mandatory recall of
the P320, despite the ability to do so, which would have prevented Plaintiff's emotional distress.

194.    Had SIG Sauer acted responsibly and repaired the defects in the commercial
version of the P320 before the May 2019 Discharge Incident, Plaintiff's P320 never would have
discharged un-commanded.  The round discharged from Plaintiff's weapon easily could have

taken Plaintiff's life or the life of a fellow officer or civilian, or caused severe injuries to Plaintiff, a fellow officer, or a civilian.

195.    SIG Sauer knew, or should have known, that severe emotional distress was a likely result of its outrageous and irresponsible conduct, which was designed to save in excess of $100 million in repair costs, by implementing a "voluntary upgrade" of the P320 instead of a mandatory recall.

196.    SIG Sauer's conduct was self-serving, deceptive, reckless, intolerable, and outrageous.

197.    SIG Sauer's conduct was the direct and proximate cause of Plaintiff's emotional distress.

198.    The emotional distress sustained by Plaintiff was severe.

199.    As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

# COUNT VII

## (Against Defendant SIG Sauer, Inc.)

## Violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A, §§ 2, 11

200.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 199 of the Complaint, as though fully set forth herein.

201.    At all relevant times, SIG Sauer was engaged in trade or commerce within the Commonwealth of Massachusetts, including the trade or commerce of selling, or causing to be sold, the subject firearms within the Commonwealth of Massachusetts and to the City of Cambridge.

202.    The SIG Sauer firearms used by Plaintiff, including the P320 firearm that malfunctioned on or about May 19, 2019, was sold or caused to be sold by SIG Sauer within the Commonwealth of Massachusetts.

203.    When Plaintiff used the SIG Sauer firearms in question, including the P320 that malfunctioned on or about May 19, 2019, he was acting as an agent or employee of the City of Cambridge.

204.    As a result of SIG Sauer's actions, and in connection with SIG Sauer's sale of firearms within the District of Massachusetts, Plaintiff was harmed and suffered emotional distress due to his SIG Sauer firearm malfunctioning on or about May 19, 2019.

205.    SIG Sauer engaged in unfair or deceptive acts or practices in connection with its sale of firearms to the City of Cambridge.

206.    SIG Sauer is liable to Plaintiff for up to three times the damages that Plaintiff incurred, together with all related court costs, attorneys' fees, and interest.

207.    Although not required, Plaintiff sent SIG Sauer a written demand for relief pursuant to Chapter 93A, Section 9, identifying the claimant and reasonably describing the unfair acts or practices relied upon and the injuries suffered, on or about May 19, 2019.  SIG Sauer did not respond to the written demand.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant SIG Sauer for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VIII

### (Against Defendant City of Cambridge)

### First Amendment Violation under 42 U.S.C. § 1983

208.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 207 of the Complaint, as though fully set forth herein.

209.    Plaintiff's statements regarding the safety of the City of Cambridge's use of the SIG P320 were made in his capacity both as a CPD police officer and a private citizen concerned about the safety of his community, including the safety of CPD officers, their families, and citizens of Cambridge.

210.    Plaintiff's statements regarding the safety of the City of Cambridge's use of the SIG P320 constituted speech on a matter of public concern.

211.    Those individuals delegated with final policymaking authority by the City of Cambridge failed to promote and sought to discipline Plaintiff in retaliation for Plaintiff's exercise of his free speech rights as a private citizen.

212.    Those delegated with final policymaking authority by the City of Cambridge violated Ahern's First Amendment rights by retaliating against him for protected speech

46

involving matters of public concern.

213.    By failing to promote and seeking to discipline Plaintiff in retaliation for his exercise of his free speech rights, those delegated with final policymaking authority by the City of Cambridge are restraining Plaintiff's exercise of his free speech rights.

214.    The violations of Plaintiff's First Amendment rights were proximately caused by a policy or custom of the City of Cambridge and/or through the acts and omissions of those delegated with final policymaking authority with respect to Plaintiff's employment.

215.    The actions of those delegated with final policymaking authority by the City of Cambridge, as alleged herein, violated clearly established constitutional rights.

216.    Those delegated with final policymaking authority by the City of Cambridge knew or should have known that their actions violated clearly established constitutional rights.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant City of Cmabridge for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IX

### (Against Defendant SIG Sauer, Inc.)

### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a)

217.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 216 of the Complaint, as though fully set forth herein.

218.    The P320 is a consumer product as defined in 15 U.S.C. § 2301(1).

219.    Plaintiff is a consumer as defined in 15 U.S.C. § 2301(3).

220.    At all relevant times, SIG Sauer was a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

221.    In connection with the sale of the P320 issued to Plaintiff in 2018, SIG Sauer made implied and express warranties, as defined in 15 U.S.C. § 2301(6), that the P320 was safe for its intended purposes and would not fire un-commanded -- i.e., without a trigger pull.  In fact, Plaintiff's P320 was capable of firing, and did fire, without a trigger pull, contrary to SIG Sauer's warranties.

222.    SIG Sauer breached the warranties it made stating that the P320 was safe for its intended and foreseeable uses and particular purposes.

223.    Staring in 2017, SIG Sauer has attempted to modify and/or disclaim the implied and express warranties it made regarding the safety of the P320 by stating that "vibration," "shock," and dropping on the ground, among other factors, could make the P320 fire without a trigger pull.

224.    SIG Sauer's attempt to modify and/or disclaim its prior warranties regarding the safety of the P320 violate section 2308(a) of the Magnuson-Moss Warranty Act (the "Act").

225.    SIG Sauer's violation of the Act has been the direct and proximate cause of substantial economic and non-economic damages incurred by Plaintiff.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT X

### (Against Defendant City of Cambridge)

### Violation of the Whistleblower Act under M.G.L. Ch. 149 § 185

226.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 225 of the Complaint, as though fully set forth herein.

227.    The City of Cambridge retaliated against Plaintiff for raising legitimate public safety concerns regarding the City of Cambridge's use of the P320 by failing to promote and seeking to discipline Plaintiff.

228.    As a direct and proximate result of the violation set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant for compensatory and punitive damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Assume jurisdiction over this case;

2.      Empanel a jury and, after trial, find Defendants liable for all causes of action herein;

3.      Award Plaintiff damages for his economic losses, including but not limited to damages for lost wages and lost earning capacity, including interest;

4.      Award Plaintiff compensatory damages, including but not limited to damages for emotional distress, mental anguish, inconvenience and loss of enjoyment of life, including interest;

5.      Double or treble the award to Plaintiff of his actual damages pursuant to Mass. Gen. Laws Ch. 93A, §§ 2, 11;

6.      Order Defendant SIG Sauer to issue a recall notice or other enhanced, unambiguous warning to all purchasers of the P320 that the weapon can fire without a trigger pull;

7.      Retain jurisdiction over this case until Defendants have complied with all orders of the Court;

8.      Award Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

9.      Award such equitable, injunctive, or other relief as the Court may deem just and proper.


Plaintiff demands a trial by jury on all counts.

Respectfully submitted,


*/s/ Jeffrey S. Bagnell*
Jeffrey S. Bagnell
Federal Bar No. CT18983
Pro Hac Vice application to be filed
Jeffrey S. Bagnell, Esq., LLC
55 Post Road West
Westport, CT  06880
(203) 984-8820
jeff@bagnell-law.com


*/s/ Peter K. Levitt*
Peter K. Levitt (BBO #565761)
Michelle R. Pascucci (BBO # 690889)
Donnelly Conroy & Gelhaar, LLP
260 Franklin Street, Suite 1600
Boston, MA  02110
(617) 720-2880
pkl@dcglaw.com
mrp@dcglaw.com

Counsel for Plaintiff Thomas R. Ahern

Dated:  June 16, 2021