UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS R. AHERN,<br><br> Plaintiff,<br><br> v.<br><br>SIG SAUER, INC. and CITY OF CAMBRIDGE,<br><br> Defendants. | Case No. 21-cv-11007-DJC |

**PLAINTIFF THOMAS AHERN'S OPPOSITION
TO SIG SAUER, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Thomas Ahern ("Mr. Ahern"), like so many others across the nation, has filed suit against Defendant Sig Sauer, Inc. ("SIG") for physical and emotional injuries caused by his SIG P320 pistol discharging "uncommanded," or without a trigger pull. Mr. Ahern has asserted the following five claims against SIG: (1) negligence; (2) breach of implied warranty of merchantability; (3) negligent infliction of emotional distress; (4) violation of M.G.L. c. 93A §§ 2, 11 ("Chapter 93A"); and (5) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a) ("MMWA"). ECF 42. Each of these claims is based on both a design and manufacturing defect theory -- i.e., that the P320 suffers from an unreasonably dangerous design that can lead the P320 to fire absent a trigger pull and does not meet consumer's reasonable expectations of safety, and also that the P320 suffers from manufacturing defects such that it deviates from SIG's specifications that renders it unreasonably dangerous. ECF 42.

Two courts in the First Circuit have rejected the very issues at the heart of SIG's summary judgment arguments in this case. *See Guay v. Sig Sauer, Inc.*, 610 F. Supp. 3d 423

(D.N.H. 2022) (attached as Ex. A); *Green-Berrios v. Sig Sauer, Inc.*, 3:22-cv-01002, *Report & Rec. re Sig Sauer, Inc's Mot. In Lim. To Exclude Plaintiff's Expert Timothy Hicks*. (D.P.R. Feb. 17, 2024) (attached as Ex. B). Both courts have allowed plaintiffs' claims to proceed to trial over SIG's objections. SIG provides no persuasive reason that this Court should deviate from these decisions and SIG's motion for summary judgment should be denied.[1]

## BACKGROUND

Mr. Ahern was a lieutenant and a seasoned veteran of the Cambridge Police Department ("CPD"), with nearly three decades of experience, and a commander of CPD's elite Special Response Team ("SRT"). CPD Incident Report of J. Murphy ("CPD Incident Report") (attached as Exhibit C); ECF 134-1, City of Cambridge, Ex. A, Ahern Dep. ("ECF 134-1, Ex. A, Ahern Dep.") at 43-44. On May 19, 2019, Ahern was on duty at the MayFair festival in Harvard Square, in Cambridge, Massachusetts. *Id.* at 67-69. As second in command, Mr. Ahern was in the CPD SRT (SWAT) van with six other individuals from CPD and the Cambridge Fire Department. CPD Incident Report, Ex. C.

While in the SRT van, Mr. Ahern performed a routine function check of his Safariland Level III Holster, which held his P320. ECF 134-1, Ex. A, Ahern Dep. at 71; ECF 134-2, City of

---

[1] The *Guay* court noted that a bodycam video of an alleged discharge of a P320 without a trigger pull in Michigan was "persuasive" evidence that the P320 can fire without a trigger pull. *See Guay*, 626 F.Supp.3d at 542. In ruling on the plaintiff's Consumer Protection Act claim, the court also credited the plaintiff's testimony that his SIG P320 pistol discharge without a trigger pull.

> The court found Guay credible in every respect. Specifically, the court credits Guay's testimony that the gun was still fully inside the holster when it discharged. With the gun fully in the holster, Guay could not have accessed the trigger; it would have been impossible for him to have accidentally pulled it. Moreover, as expert testimony revealed, the P320 had a 6.7-pound trigger, meaning that to fire, the user had to exert 6.7 pounds of pressure. The court does not believe that Guay could have applied that amount of force to the trigger inadvertently while the gun was in the holster. In short, the court found Guay's testimony about the gunshot, how it occurred, and his resulting injuries consistent and believable.

*Id.* at 539.

1

Cambridge, Ex. B., Ahern Dep. ("ECF 134-2, Ex. B, Ahern Dep.") at 401-02. As part of the function check, Mr. Ahern worked the mechanism of the holster. Without removing the firearm from the holster, he repeated slightly raising the P320 and re-securing the pistol within the holster. ECF 134-1, Ex. A, Ahern Dep. at 78-79. During this process, the pistol would no longer secure, or "seat," in the holster. *Id.* at 79. A firearm loose in its holster poses a tremendous risk if Mr. Ahern or any of his colleagues were suddenly called to duty, which can happen at any time during a large-scale public event. To assess why the P320 would not secure, Mr. Ahern drew the pistol from the holster. *Id.* at 79. He moved the weapon from his right side to the front of his torso, with the muzzle facing down. *Id.* at 79. Mr. Ahern was in the "Sul" position, with his finger along the slide of the pistol, away from the trigger.[2] *Id.* at 184. Without Mr. Ahern moving his finger, the P320 pistol discharged (the "May 19, 2019 Discharge Incident").[3] ECF 134-2, Ex. B, Ahern Dep. at 210. When the pistol discharged, the bullet struck Mr. Ahern's left pants pocket, ricocheted off his cellphone, and landed in a nearby gear bag in a ballistic helmet. ECF 134-1, Ex. A, Ahern Dep. at 78-79, 88.

    Mr. Ahern did not pull the trigger, and no party has introduced meaningful evidence to the contrary. Mr. Ahern testified that his finger was along the slide of the trigger at all times, including when the firearm discharged and after the discharge. *Id.* at 132-33. None of the six other individuals in the SRT van saw Mr. Ahern pull the trigger, nor did they see any object interfere with the trigger. *See* David Puopolo Dep. at 27-29 (attached as Exhibit E); Greg Gutoski Dep. at 18-19 (attached as Exhibit F); William LaMonica Dep. at 40-41 (attached as

---

[2] The "Sul" position involves holding the firearm with the "muzzle oriented in a straight down, vertical position held with the hand close to the upper chest." Reitz Amended Report at 4 (attached as Exhibit D).

[3] SIG argues that Mr. Ahern's actions violated CPD policy, relying on CPD's findings. CPD's determination is irrelevant to Mr. Ahern's independent claims against SIG. In any event, CPD's findings are addressed in Plaintiff's Oppositions to Cambridge's Motions for Summary Judgment and to Preclude the Testimony of Expert Scott Reitz.

2

Exhibit G); Michael Taylor Dep. at 57-58 (attached as Exhibit H); Lester Sullivan Dep. at 34-35 (attached as Exhibit I); AHERN 000578-000579, Paul Bentubo PSU Interview (attached as Exhibit J). As a result of the discharge, Mr. Ahern suffered physical and emotional injuries, including but not limited to a contusion on his left thigh, panic attacks, loss of sleep, and significant emotional pain. ECF 134-1, Ex. A, Ahern Dep. at 93-95, 138.

Mr. Ahern has identified three expert witnesses, Timothy Hicks, James Tertin, and Peter Villani, each of whom have opined that the P320 is defective due to its susceptibility to discharge without a trigger pull. The experts agree that certain "impulses" like shock, vibration, heavy or repeated drops over the course of the lifetime of the P320 can cause the pistol to discharge without a trigger pull.[4] Hicks Report at 22 (attached as Exhibit K); Tertin Report at 8 (attached as Exhibit L); Villani Report at 2, 14-15 (attached as Exhibit M). So too, SIG's own manuals and patents contain language indicating that these impulses negatively affect the safety components of the P320. *See* Sig Sauer P320 Owner's Manual, City Response Production 3 000940 (attached as Exhibit N); United States Patent, Patent No. US 10,684,087 B2 (attached as Exhibit O)

**ARGUMENT**

Courts may only grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). Summary judgment "is inappropriate 'if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." *Tsai v. McDonald*, 2017 WL 3526252, at *1 (D. Mass. Aug. 16, 2017) (quoting *Pierce v.*

---

[4] Mr. Ahern dropped his pistol a day or two before the May 19, 2019 Discharge Incident. *See* ECF 134-1, Ex. A, Ahern Dep. at 173-74. In addition, on May 15, 2019, while performing gunshot residue testing, Mr. Ahern experienced a dead trigger wherein the P320 did not fire or cycle properly. *Id.* at 60-63; ECF 134-2, Ex. B, Ahern Dep. at 253.

3

*Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014)). "There is no question . . . that [the Court] must resolve all factual disputes in favor of the non-moving party on summary judgment." *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 218 (1st Cir. 2016).

> **I. The Negligence and Breach of Warranty Claims are Supported by Sufficient Evidence, including Expert Testimony, from which a Reasonable Jury could Infer that the P320 Is Defective**

"Manufacturers have a duty to design products with reasonable care and are held to the standard of an ordinary reasonably prudent designer in like circumstances." *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 15 (1st Cir. 2001) (*quoting Fahey v. Rockwell Graphic Sys., Inc.*, 20 Mass. App. Ct. 642 (1985) (overruled on other grounds)). The focus in a negligence action based upon a design defect is not how the product is meant to function, but on whether the product is "designed with reasonable care to eliminate avoidable dangers." *Cigna Ins. Co.*, 241 F.3d at 15, (citing *McIsaac v. Didriksen Fishing Corp.*, 809 F.2d 129, 132 (1st Cir. 1987)).[5]

Under Massachusetts law, a manufacturer may also be held liable for its negligence in the manufacturing process where a "particular product, rather than a line of product[,]" is alleged to be defective as a result of a manufacturer's negligence in the manufacturing process. *See Smith v. Ariens Co.*, 375 Mass. 620, 626-27 (1978). *See also Fertik v. William Stevenson, M.D.*, 186 F. Supp. 3d 98, 102 (2016) (manufacturer can be held liable for negligence in manufacturing process where product "deviates in construction or quality from specifications or planned output in a manner that renders it unreasonably dangerous" [citation and quotation omitted]).

Actions for breach of implied warranty of merchantability in Massachusetts are the functional equivalent of strict liability in other jurisdictions. *See Cigna Ins. Co.*, 241 F.3d at 15.

---

[5] The Court's negligence and breach of warranty inquiries under Massachusetts law are largely congruent. *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 26 (1st Cir. 2004).

4

Thus, Massachusetts law requires "manufacturers and sellers [to warrant] that their products are 'fit for the ordinary purposes for which such goods are used.'" *Gillespie*, 386 F.3d at 26 (citing M.G.L. c. 106 § 2-314(2)(c)). To prevail on a breach of warranty claim based upon a defect theory, a plaintiff must show:

> (1) that the defendant manufactured or sold the product; (2) that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold; (3) that at the time of his injury, the plaintiff was using the product in a manner that the defendant intended or that could reasonably have been foreseen; and (4) that the defect or unreasonably defective condition . . . was a legal cause of the plaintiff's injury.

*Alves v. Mazda Motor of America, Inc.*, 448 F. Supp. 2d 285, 300 (D. Mass. 2006). The defect may be a manufacturing defect, a design defect, or a warning defect.[6] *See Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 422 (2013). "The [MMWA] affords consumers a private cause of action for violations of substantive provisions of the Act and for breach of a written or implied warranty." *Monroe v. Medtronic, Inc.*, 511 F.Supp.3d 26, 36 (D. Mass. 2021). A breach of warranty claim may also give rise to liability under Chapter 93A. *See Machado v. Johnson & Johnson*, Case No. 20-cv-11665-MLW, 2023 WL 2988625, at *8 (D. Mass. Jan. 20, 2023).

The negligence and breach of warranty claims, which are based on a design and manufacturing defect theory, generally require expert testimony. *See Calisi v. Abbott Laboratories*, No. 11-cv-10671-DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (*citing Hochen v. Bobst Grp., Inc.*, 290 F.3d 446, 451 (1st Cir. 2002) (where nature of defect and its casual relation to injury is complex, Massachusetts law requires expert testimony). Mr. Ahern

---

[6] Mr. Ahern is relying upon the theory of design and manufacturing defects, as opposed to a failure to warn defect. A manufacturing defect exists when a product "deviates in its construction or quality from specifications or planned output in a manner that renders it unreasonably dangerous." *Brown v. Husky Injection Molding Sys., Inc.*, 751 F. Supp. 2d 298, 300-01 (D. Mass. 2010). A design defect exists "when the foreseeable risks of harm posed by the produce could have been reduced or avoided by the adoption of a reasonable alternative design . . . and the omissions of the alternative design renders the product not reasonably safe." *Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 424 (2013) (citation and quotation omitted).

5

has three expert witnesses prepared to testify regarding the significant design and manufacturing defects within the P320 pistol that cause the pistol to discharge without a trigger pull.  Their expected testimony is summarized in brief herein and discussed in greater detail in Mr. Ahern's Omnibus Opposition to SIG's Daubert Motions.

Hicks's Expert Opinion

Timothy Hicks is expected to testify that the P320 is defective for a variety of reasons, including that (1) P320's internal components are not properly "secondarily machined"; (2) P320's internal components, based on Hicks's objective calculations, measurements, and observations, do not meet the specifications of SIG's own manufacturing drawings; and (3) according to language from SIG's P320 owner's manual and a patent filed by SIG, impulses imposed on the firearm over the course of its lifetime (such as shock, vibration, heavy or repeated drops) can result in the P320 discharging without a trigger pull.  Hicks Report, Ex. K at 21-22.

As a result of this "sloppy" manufacturing, Hicks opines that these "variables, misalignments, and inconsistencies in the P320's parts" render the P320 defective, such that it is susceptible to an uncommanded discharge.  *Id.* at 22.  Based on his objective calculations, testing, observations of Mr. Ahern's P320 pistol, and comparisons with SIG'S own drawings and specifications, Hicks' expert opinion is that the defects he identified were the cause of the May 2019 Discharge Incident.  *See id.* at 21.

Tertin's Expert Opinion

James Tertin will opine that the following five factors render the P320 defective:  (1) a precarious engagement between the sear and the striker; (2) that the sear and striker are non-qualified MIM parts; (3) a spring charge connection between the striker and the sear; (4) that the

P320 is a single-action pistol; and (5) the lack of an effectively designed safety. Tertin Dep. at 144-146 (attached as Exhibit P). Tertin opines that these five factors contributed to the May 2019 Discharge Incident. *Id.* at 59-60. Tertin's expert opinion is based on objective observations, measurements, and testing of a P320, as well as the opinions and observations contained within Hicks' report and Mr. Ahern's testimony. *Id.* at 9-11, 146; Tertin Report, Ex. L at 2-5.

### Villani's Expert Opinion

Peter Villani is expected to testify that he observed that some internal components of Mr. Ahern's P320 had wear or rounding of their edges, which he described as "rollover." Villani Report, Ex. M at 2. Villani's expert opinion is that this wear results from insufficient contact between internal parts. The parts' surfaces are rough and have excess material, which Villani opines results from the P320's manufacturing process, that is, the parts are cast in MIM process rather than machined. *Id.* at 15. Villani opines that, if the parts were properly machined, they would not wear in the way he observed. Villani adds that machined parts are "finely finished" which provides "better contact." Villani is expected to testify that, if the surfaces of these parts were less rough, there would be more surface area in contact between the parts and therefore a lower likelihood that they slip and allow the gun to fire without a trigger pull. *Id.* at 6.

Each of Mr. Ahern's three experts possesses sufficient technical and specialized knowledge of the inner components of firearms to be qualified under Fed. R. Evid. 702 to render an opinion on the P320's defect. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993) (expert allowed to testify as to scientific, *technical, or specialized knowledge*, so long

as such knowledge will assist the jury).[7]  Furthermore, each expert bases his opinion upon reliable methodology derived from objective observations, measurements, calculations, and testing.[8]  *See Pagliaroni v. Mastic Home Exteriors, Inc.*, 2015 WL 5568624, at *6 (D. Mass. Sept. 22, 2015) (Casper, J.) (based primarily upon review of substantial body of data, calculations, raw material records, and observations of sample wood-plastic composite decks, expert witness's opinion on whether decks suffered from defect was based on reliable methodology).

Any concerns raised by SIG can and should be resolved on cross-examination and are inappropriate for disposition on summary judgment or pursuant to *Daubert*.  *See Daubert*, 509 U.S. at 596 (emphasis added) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" any evidence that allegedly rests upon shaky grounds."); *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) ("*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct.") (quotation and citation omitted).

It is immaterial that Mr. Ahern's experts have not opined that the defects in the P320 are the "definitive cause" of the May 2019 Discharge Incident.  *See One Beacon Ins. Co. v. Electrolux* 436 F. Supp. 2d 291, 295 (D. Mass. 2006) ("A plaintiff need not prove the exact cause

---

[7] The background and qualifications of the three experts are addressed in Plaintiff Thomas Ahern's Omnibus Opposition to [SIG's] Motions to Exclude Evidence and Opinions of Plaintiff's Experts Timothy Hicks, James Tertin, and Peter Villani.

[8] SIG argues that these experts must replicate the discharge of a P320 without a trigger pull to qualify under *Daubert*.  Testing, however, is not a prerequisite to the admission of expert testimony.  *See Quilez-Velar v. Ox Bodies, Inc.*, 823 F.3d 712, 718 (2016) ("[T]his circuit has never adopted a rule that an expert himself must have tested an alternative design, much less by building one.  We decline to adopt either requirement as a bright-line rule or as applied to this case.").  *See also Guay*, 610 F.Supp.3d at 431-32 ("whether Villani's theory is confirmed by specific testing does not necessarily make it inadmissible; rather, it makes it susceptible to cross-examination by Sig Sauer and rebuttal by Sig Sauer's own experts") (citing *Quilez-Velar*, 834 F.3d at 719).

8

of the accident or disprove every possible cause, but he must show that there is a greater likelihood that the accident resulted from the defendant's negligence [or breach of warranty] than that it did not.") (internal quotations and citations omitted).  Absolute certainty is, of course, not required.  *See Ruiz-Troche v. Pepsi Cola of P.R.*, 161 F.3d 77, 86 (1st Cir. 1998) (standard of scientific "certainty" is beyond what *Daubert* envisions, as any such requirement "solicits a level of assurance that science realistically cannot achieve and that *Daubert* does not demand") (citation omitted).

The testimony of Mr. Ahern's experts – collectively or singularly – enables a reasonable jury to infer, if it chooses to do so, that the defect in the P320 was the cause of the May 2019 Discharge Incident and therefore the cause of his injuries.  SIG has presented a competing witness, Derek Watkins, who is expected to testify that the P320 has no defects and Mr. Ahern must have pulled the trigger.  *See* ECF 142-10, Expert Report of Derek Watkins; Watkins Dep. at 92 (attached as Exhibit Q).[9]

> The *Guay* court observed Watkins' testimony and remarked as follows.
>
> To the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive.  As discussed, the court found credible Guay's testimony that he did not pull the trigger, and the video of the Roscommon[, Michigan] incident was persuasive in showing that a P320 can fire without a trigger pull. Furthermore, Watkins admitted that -- despite having read the numerous allegations of misfires (without a trigger pull) in the complaint -- he did not deem them worthy of mention in his expert report.  And Toner testified that he found such misfire allegations unworthy of investigation.  Had Watkins and Toner been

---

[9] Watkins admits that this conclusion is unsupported by testimony.  Watkins Dep., Ex. Q at 96.  Instead, Watkins contends that his conclusion is based only on the "condition" of Mr. Ahern's pistol and "all the testing that has been done on SIG 320 pistols up to this date."  *Id.*  SIG's own internal employee who "inspected" Mr. Ahern's pistol, Al Larochelle, provided CPD with a report that came to a third conclusion -- that some unidentified, foreign object got into the trigger guard, miraculously wrapped itself around the trigger, and then, even more miraculously, pulled the trigger.  *See* Al Larochelle Dep. Exhibit 7 Excerpt (attached as Exhibit R).  Larochelle provided this report notwithstanding his prior statement that he could not "give any type of report because the pistol was looked at by Boston PD which compromised the pistol."  Al Larochelle Dep. Exhibit 8 Excerpt (attached as Exhibit S).

9

> less dismissive of these allegations, the court may have found their testimony more credible.

*Guay*, 626 F. Supp. 3d at 543 n.2.

The competing theories of the parties' respective expert witnesses demonstrates that there exist genuine issues of material fact that are best left to the jury for resolution. *See One Beacon Ins. Co.*, 436 F. Supp. 2d at 293-94 (declining to grant summary judgment on plaintiffs' claims for negligence and breach of implied warranty of merchantability because competing expert testimony generated unresolved genuine issues of material fact best left for a jury to decide).[10] The jury should be given the opportunity to hear all of the expert witnesses, from both sides, so that it can make a fully informed and educated decision. In this spirit, the plaintiff is not seeking to disqualify Watkins.

## II.   The Chapter 93A Claim is not Susceptible to Decision on Summary Judgment

Chapter 93A requires that a defendant acted in an unfair or deceptive fashion for liability to attach. *See Utica Nat. Ins. Grp. V. BMW of N. Am., LLC*, 45 F.Supp.3d 157, 161 (D. Mass. 2014). Liability under Chapter 93A can arise where a plaintiff establishes a breach of warranty in addition to "conduct that would render the breach repugnant to the milieu of the commercial marketplace." *Id.* There is sufficient evidence from which a reasonable jury could infer that SIG's actions "reek of callousness." *See Am. Tel. & Tel. Co. v. IMR Cap. Corp.*, 888 F. Supp. 221, 256 (D. Mass. 1995).

---

[10] *One Beacon Ins. Co.* is instructive. In that case, the court rejected the defendant's argument -- also raised here -- that the expert was required to testify as to the definitive cause of the defect. *Id.* at 295. The defendant also moved to exclude plaintiffs' expert, claiming that the expert lacked the qualifications necessary under FRE 702 to render an opinion as to the product defect. *Id.* at 299. The court rejected this argument, reasoning that, while plaintiffs' expert "lacked detailed expertise in electrical dryers," he nonetheless "possesse[d] sufficient expertise to testify regarding the design, manufacture, assembly, repair and operations of dryers. . . . [Rule] 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony." *Id.*

10

In August 2017, SIG announced its P320 Voluntary Upgrade Program ("VUP"), indicating that it was designed to address "drop-fires." Sean Toner Dep. at 58-60 (attached as Exhibit T). SIG has stated that it issued the VUP rather than a recall because the P320 allegedly "pass[ed] all of the U.S. drop standards." *Id.* at 60.[11] SIG states that the VUP was designed *only* to "eliminate a vulnerability" that was discovered during drop testing based on online videos that demonstrated that dropping the weapon at a certain height and angle would make the firearm discharge. *Id.* at 47. SIG's attendant press release, however, indicates that the VUP addressed safety concerns *beyond* just drop fires and warned consumers that shock or vibration could "have a negative effect on [the P320's] safety mechanisms and cause them not to work as designed." *See* Matt Farkas Dep. Exhibit 8 (attached as Exhibit U) ("[L]ike any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed.").

Indeed, prior to the May 2019 Discharge Incident, there were approximately 22 incidents in which a P320 user alleged that his or her P320 discharged without a trigger pull. Chris Meyer Dep. at 83-103 (attached as Exhibit V). Many of these incidents were not "drop-fires" and in several of these incidents the P320 fired while inside a holster. *Id.* at 86. These incidents pre-dated and post-dated the VUP. *Id.* at 83-103. Despite these incidents, SIG still warranted to CPD that its VUP resolved the issues related to the P320. *See* Thomas Flynn Dep. Exhibit 7 Excerpt, City Response Production 3 000824 (attached as Exhibit W) ("SIG SAUER, Inc. (SIG) here by certifies that the P320 pistols received by the Cambridge Police Department . . . have been built with the 100% new and upgraded components as outlined in SIG's Voluntary Upgrade

---

[11] The decision to issue the "voluntary upgrade program" came from a number of different individuals in "upper management," including SIG's President, Ron Cohen. Toner Dep., Ex. T at 55-56.

11

Program."). *See also* Flynn Dep. at 97, 130-31 (attached as Exhibit X) (CPD employee testified that SIG provided assurances to CPD regarding the safety of the P320 following the VUP).

A reasonable jury could infer that SIG knew of the P320's defect -- i.e. its susceptibility to a discharge without a trigger pull -- after it received approximately 22 complaints in which P320 users alleged that his or her pistol discharged without a trigger pull, including complaints post-dating the VUP. Despite notice that the VUP did not resolve significant concerns, SIG continued to claim to have resolved all safety "vulnerabilities" in the pistol. All 22 of these complaints pre-dated Mr. Ahern's incident, thus supporting a jury's inference that SIG continued to sell the P320 to law enforcement across the country despite knowing that the pistol was susceptible to a discharge without a trigger pull.[12]

SIG's motion for summary judgment should be denied because a reasonable jury could infer that Sig acted with the requisite callousness in continuing to market and sell the P320 despite ample notice as to its defects. *See Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 100-01 (2021) (Chapter 93A claim did not fail as matter of law where defendant sold millions of cars with defective headrests, marketed the cars as safe, received approximately 94 complaints of faulty headrests, and has failed to recall or properly remedy the defect); c*f*. *Utica Nat. Ins. Grp.*, 45 F. Supp. 3d at 162 (where plaintiff could not demonstrate temporal relationship of 19 complaints to plaintiff's incident, so as to support an inference that BMW knew of the defect prior to plaintiff's incident, Chapter 93A claim failed as matter of law).

---

[12] There have been over 200 reported incidents of the P320 discharging without a trigger pull around the country. *See* Meyer Dep., Ex. V at 27, 33. Approximately nine of these incidents have been captured on video, including two of which demonstrate a P320 firing without a trigger pull in a holster. To date, SIG has not issued a formal recall for the P320. Toner Dep., Ex. O at 159-160.

12

### III. The Court Should Deny SIG's Motion for Summary Judgment on the Magnuson-Moss Warranty Act Claim

SIG wrongly contends that the P320 is not a consumer product for the purposes of the Magnuson-Moss Warranty Act. Pursuant to 15 U.S.C. § 2301(1), a consumer product is any "tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." SIG has sold at least approximately 2.8 million P320s throughout the United States and Canada alone. Toner Dep., Ex. O at 44. SIG's highest percentage of sales is to consumers for personal use, greater than its respective sales to law enforcement and the military. *Id.* at 43. SIG also sells the P320 *directly* to consumers in New Hampshire. *Id.* at 40 ("So my understanding is only in New Hampshire is when we sell directly to the consumer"). Outside of New Hampshire, SIG sells the P320 through its nationwide distributors. *See id.*

Mr. Ahern's primary use of the P320 is irrelevant to the analysis because the statute defines a consumer product as "any tangible personal property which is distributed in commerce and which is *normally used* for personal, family, or household purposes." *See* 15 U.S.C. § 2301(1). *See also Goldsmith v. Mentor Corp.*, 913 F. Supp. 56, 63 (D. N.H. 1995) (Magnuson-Moss Act applies only to consumer products, which includes "any tangible personal property which is *normally* used for personal, family, or household purposes." [emphasis added; citation and quotation omitted]). The P320 is plainly a "consumer product" for the purposes of the Magnuson-Moss Warranty Act.

SIG also argues that, even if the P320 is a consumer product, SIG did not attempt to disclaim the implied warranty of merchantability. Pursuant to the Magnuson-Moss Warranty Act:

> No supplier may disclaim or modify (except as provided in [§2308(b)] any implied warranty to a customer with respect to such consumer product if (1) such supplier makes written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

15 U.S.C. § 2308(a).[13]  To state a claim under § 2308(a), the plaintiff must demonstrate: "(1) the defendant provided a written statement (a) relating to the material or workmanship of the product and (b) promising defect-free performance and (2) that the defendant modified or disclaimed that warranty."  *Collette v. Sig Sauer, Inc.*, Civil Action No. 21-11392-FDS, 2021 WL 6052613, at *6 (D. Mass. Dec. 12, 2021) (Saylor, C.J.).  According to the plain language of 15 U.S.C. § 2308(a), no supplier of a consumer product may disclaim any implied warranty, except as provided in § 2308(b), which permits a supplier who provides a written warranty to limit only the duration of the implied warranties to the duration of the written warranty.  *See* 15 U.S.C. §§ 2308(a) & (b).  Here, SIG provided a limited lifetime warranty with the P320, which warrants that the pistol was "manufactured free of defects in material, workmanship, and mechanical function."  Meyer Dep. Exhibit 2, ("SIG Limited Lifetime Warranty") (attached as Exhibit Y).  The plain language of SIG's Limited Lifetime Warranty provided to P320 users *expressly disclaims* any and all implied warranties.  Meyer Dep., Ex. V at 19-20; Limited Lifetime Warranty, Ex. Y (No implied warranties of any kind are made herein. . ..").

Even if SIG had not provided such a warranty, the warning in SIG's owner's manual that subjecting P320s to "shock, vibration, heavy or repeated drops" seeks to improperly disclaim the implied warranty of merchantability in violation of the Magnuson-Moss Warranty Act.  Under the implied warranty of merchantability, a manufacturer guarantees that its products are fit for the ordinary purposes for which such goods are used.  *See Taupier v. Davol, Inc.*, 490 F.Supp.3d

---

[13] 15 U.S.C. § 2308(b) permits a supplier to limit a limited warranty in duration only, i.e. to a "reasonable" duration.

14

430, 439 (2020). SIG's owner's manual attempts to disclaim that warranty by inconspicuously hiding its warning that "vibration" or "shock" can cause the failure of the P320's safety mechanisms at the bottom of page 25 of its 76-page user manual. Sig Owner's Manual, Ex. N. As explained in this motion and others, Plaintiff's experts have opined that vibration, shock, and other impulses *can* lead to the discharge of the P320 without a trigger pull. A P320 that fires without a trigger pull undoubtedly is not fit for its ordinary purposes -- i.e. the product does not meet reasonable consumer expectations regarding the product's intended and foreseeable uses. *See Taupier*, 490 F. Supp. 3d at 439.

For all these reasons, Mr. Ahern's claims under the Magnuson-Moss Warranty Act should continue to trial.

## **CONCLUSION**

For the foregoing reasons, the Court should deny SIG's motion for summary judgment.

    Respectfully submitted,

    PLAINTIFF THOMAS AHERN

    By his attorneys,

    */s/ Peter K. Levitt*
    Peter K. Levitt (BBO #129930)
    Michelle R. Pascucci (BBO #690889)
    Pietro A. Conte (BBO #707055)
    DONNELLY CONROY & GELHAAR LLP
    260 Franklin Street, Suite 1600
    Boston, MA 02110
    Tel: (617)-720-2880
    pkl@dcglaw.com
    mrp@dcglaw.com
    pac@dcglaw.com

    */s/ Jeffrey S. Bagnell*
    Jeffrey S. Bagnell
    Federal Bar No. CT18983

                                                  Jeffrey S. Bagnell, Esq., LLC
                                                  55 Post Road West
                                                  Westport, Connecticut 06880
                                                  Tel: (203)-984-8820
                                                  jeff@bagnell-law.com

Date: April 5, 2024

## **CERTIFICATE OF SERVICE**

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                 */s/ Pietro A. Conte*
                                                 Pietro A. Conte