# EXHIBIT E



1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    ------------------------------------------------

4

5    THOMAS R. AHERN,

6                    Plaintiff,

7         vs.                No. 1:21-cv-11007-DJC

8    SIG SAUER, INC., AND CITY OF CAMBRIDGE,

9                    Defendants.

10   ------------------------------------------------

11

12

13        VIDEOCONFERENCE DEPOSITION of TIMOTHY M.

14   HICKS, taken on February 23, 2024, at 9:11 A.M., in

15   Lisle, Illinois, before Adam Caleb, Digital

16   Reporter and Notary public of the State of New York.

17

18

19

20

21

22

23

24

25

1                    TIMOTHY M. HICKS

2

3    had taken photographs of and working with Mr. Villani

4    on measurements that we were taking together.

5        Q.  Okay.  Did you make any notes of what you

6    observed Mr. Watkins doing during that inspection as

7    well?

8        A.  Yes.

9        Q.  Okay.  And the photographs that you took at

10   the inspection, would you have taken photographs of

11   some of the measurements that you took?

12       A.  I believe I did, but just to finish that

13   answer, most of the measurements I referenced in my

14   report were taken from the CT scan.

15       Q.  And the inspection of the pistol -- when did

16   that take place?

17       A.  I think it was October of 2022.

18       Q.  Was it October 13th?

19       A.  That's what I have in my report.  Yes.

20       Q.  Where did that inspection take place?

21       A.  I'm sorry.  I didn't hear you.

22       Q.  Sorry.  I asked you where the inspection took

23   place.  I mean, was it at NSI in Marlborough?

24       A.  It was.

25       Q.  Okay.  Was Peter Villani at that inspection

1                    TIMOTHY M. HICKS

2

3    with you?

4         A.  Yes.

5         Q.  Was Derek Watkins at that inspection as well?

6         A.  Yes.

7         Q.  Were any other experts at that inspection?

8         A.  I don't believe there were any other experts

9    there.

10        Q.  Okay.  And at that inspection, the pistol

11   went through a CT scan and some 2D X-rays, correct?

12        A.  Yes.

13        Q.  Did you do any testing of the P320 pistol at

14   the inspection?

15        A.  Testing, no.  And that was not the intent of

16   the inspection.  I did cycle the firearm a couple of

17   times just to get a feel for it.

18        Q.  What was the intent of the inspection of the

19   P320 from what you wanted to get out of the

20   inspection?

21        A.  The main takeaway was going to be the CT scan

22   to be able to memorialize the condition of the firearm

23   when it's energized or cocked, and that's all we did.

24   The 2D scans just show the functionality of other

25   components, and then the other main takeaway was to

1                    TIMOTHY M. HICKS

2

3    reviewed his deposition transcripts.  You reviewed

4    some other deposition transcripts, as you've

5    discussed.  Looked at some CT scans of the pistols.

6    You looked at the pistol.  You took some photographs.

7    You took some measurements, looked at some testing

8    that had been produced to you and collected some

9    information about the pistol.  You collected some

10   information about the incident itself, right?  And

11   collected the data that you had.  Is that an accurate

12   statement?

13       A.  Yes.  And -- and the only piece of that that

14   was missing was comparing the other similar incidents,

15   the videos and the reports of other incidents

16   involving the P320.

17       Q.  Sure.  And I think that sort of goes into

18   two, which I was going to get into, which is going

19   into analyze data.  But collecting the data, you

20   gathered the information that you had available to

21   you.

22       A.  Yep.  I'm sorry.

23       Q.  Yeah.  About the P320, right?  So you got

24   information about the model pistol and you got

25   information about the subject incident, and that's

1                    TIMOTHY M. HICKS

2

3       A.  Correct.

4       Q.  And then you have listed the inspection, the

5   CT scans, the Peter Villani inspection photographs,

6   your inspection photographs, and then you have the

7   complaint listed.  So you had this information and

8   then you also had, as you mentioned, the folder that

9   you had of the -- I believe it was seven other P320

10  incident videos, right?

11      A.  Yes.

12      Q.  Okay.  So you have your data that you

13  compiled.  And then too, you analyzed that data, and

14  you set forth your analysis of that data within the

15  body of your report, correct?

16      A.  Yes.

17      Q.  Okay.  And part of your analysis of that data

18  was to take some measurements and make some

19  observations and come to some conclusions about what

20  you've identified as some manufacturing defects as

21  outlined within your report, correct?

22      A.  Yes.  Taken the -- take those measurements,

23  calculating what it means as relative to the drawings,

24  and then that's a testing that I utilized to determine

25  that the parts in the subject firearm do not meet the

1                    TIMOTHY M. HICKS

2

3    were looking at alleged defects within the gun, but

4    you have done no calculations or testing to show that

5    they will actually lead to a discharge without a

6    trigger pull, correct?

7        A.  The testing and calculations I did is to

8    measure the parts and compare it to the drawings.

9        Q.  Right.

10       A.  That's what I did to develop my opinions.

11       Q.  Correct.  And those opinions are that they

12   don't meet the drawings, but you have not done any

13   calculations or testing that that in turn will lead to

14   a discharge without a trigger pull.

15       A.  I'm not sure I agree with that.  The defects

16   that I identify will lead to an uncommanded discharge,

17   so it's not only the assessment of this subject

18   firearm.  It's also the other videos that show the

19   firearm going off when it's in somebody's holster and

20   the other, what, 200 plus incidents reported across

21   the country.

22       Q.  So let's talk about that.  You talk about

23   other incidents reported across the country.  You have

24   been retained as an expert in Hilton v. Sig, right?

25       A.  Yes.

1                        TIMOTHY M. HICKS

2

3      A.  Thank you.

4          MR. MCKENDRY:  Peter, I think you are muted.

5          MR. LEVITT:  Thank you.

6                        EXAMINATION

7   BY MR. LEVITT:

8      Q.  Mr. Hicks, you testified that in your

9   inspection of the Ahern firearm, you identified

10  certain defects, correct?

11     A.  Yes, sir.

12     Q.  And you identified that there were parts that

13  were designed in a way that didn't meet Sig Sauer's

14  drawing specifications?

15     A.  Correct.

16     Q.  And it was a conclusion that because of these

17  defects, the firearm would not necessarily operate as

18  intended; is that correct?

19         MS. DENNISON:  Objection to form.

20         THE WITNESS:  That's correct.

21  BY MR. LEVITT:

22     Q.  Since nobody asked you to do so, why don't we

23  actually identify the defects that you identified that

24  you feel are pertinent to the question of whether the

25  Ahern P320 is susceptible to an uncommanded discharge.

1                    TIMOTHY M. HICKS

2

3         And maybe you could do these by sort of like

4    numbering them, like number 1, number 2 --

5         A.  Okay.

6         Q.  -- in some sort of order.  We're going to

7    pull up your report.  If you want to refer to your

8    report at all in connection with your testimony, you

9    are welcome to do so.

10        A.  Okay.  It's probably best to go to my summary

11   and opinions at the end so we don't belabor all the

12   specific measurements that I took.  So the --

13        Q.  So maybe you could just start though, Mr.

14   Hicks -- if you have got your report --

15        A.  Uh-huh.

16        Q.  -- if you could start with the big picture.

17   What are the -- sort of identify the key points -- the

18   key defects that you identify.

19        A.  Okay.  As I was asked by Ms. Dennison,

20   the -- there is two so called internal safety features

21   of the design of this firearm that Sig has described.

22   Those being the striker to sear interface and then the

23   safety lock.

24        And as I describe in my report, both those have

25   to fail for the uncommanded discharge to occur.  So

1                    TIMOTHY M. HICKS

2

3    that's the high level.  And then the report walks

4    through the analysis of the parts that are part of

5    that analysis.

6        Q.  Okay.  Well, let's start with the striker

7    sear connection.  Your report mentions that these are

8    MIM pieces, MIM parts with no secondary machine.

9        A.  That's correct.

10       Q.  Is that correct?

11       A.  Yes, sir.

12       Q.  What does that mean?

13       A.  MIM is molded -- metal injection molding.

14   People probably have heard of plastic injection

15   molding more than they have with metal injection

16   molding.  But it's a common process that is used out

17   there where they take powdered metal and some

18   binding -- binder materials, inject it into a mold

19   that typically has two halves.  The parts are formed,

20   and they are heat treated after they are formed to

21   bake out the binder and that type of thing.

22       So it's -- those two are MIM parts.  And

23   this -- in some of the literature that I have relied

24   on, the ASM documentation for powder metal components

25   describes a need when there are critical surfaces or

1          TIMOTHY M. HICKS

2

3    critical dimensions on those parts being designed with

4    MIM that they should be secondarily machined.  And

5    they are not in this particular case.

6          Q.  And you are talking about the striker and the

7    sear, correct?

8          A.  That's correct.  The two main, primary

9    components that make up that first feature.

10         Q.  And those are MIM parts that are manufactured

11   somewhere and then essentially dropped into the

12   firearm?

13         A.  That's correct.  Yeah.  SIG purchases those

14   parts from an outside supplier overseas somewhere and

15   then brought into their factory to be assembled into

16   the firearm.

17         Q.  And what is the purpose of secondary

18   machining?

19         A.  It's to control or to ensure that the part

20   meets the design intent.  So if you have a critical

21   dimension or a critical surface on the parts that you

22   are designing, you would use some type of secondary

23   machining, like a actual machining, or grinding.

24   Something to remove the radiused edges and the rough

25   surfaces that exist when there -- the parts are

1                    TIMOTHY M. HICKS

2

3    created with the MIM process.

4        Q.  And were the MIM parts, the striker and the

5    sear, that you inspected in this case, had those been

6    secondarily machined?

7        A.  No.  They have not.

8        Q.  And in any of the firearms, any of the P320's

9    that you have inspected, has the striker and the sear

10   had secondary machining?

11       A.  They have not.  In none of the firearms that

12   I have inspected or have seen from other cases -- none

13   of them have been secondarily machined.

14       Q.  And you have testified about a precarious

15   connection between the striker and the sear.  Can you

16   describe what you mean by that?

17       A.  Sure.  Kristen had asked about the CT scan

18   measurements that I made on that connection.  The

19   lower leg, or -- or step -- I'm sorry.  The leg of the

20   striker pin itself is that first surface, and it's

21   forward edge engages with a step that is molded into

22   the sear to create that engagement between those two

23   parts that occurs when you cock or energize the

24   firearm.

25       And that, by design, is less than a millimeter

1                    TIMOTHY M. HICKS

2

3    overall, as far as the available engagement surface.

4    And neither the striker nor the sear in that area are

5    machined to engage -- to make -- ensure that

6    the -- you are getting the full engagement between

7    those two parts.

8        Q.  And what makes you say that the results of

9    the CT scan and the inspection show that the actual

10   design does not meet the drawing specifications with

11   regard to the striker and the sear connection?

12       A.  Yeah.  And Kristen  had walked me through the

13   CT scan images that I have in the report and then

14   adjacent to those, I have the sections of the Sig

15   drawings that apply to the areas that I am measuring

16   with the CT scan.

17       So I take a measurement on the CT scan.  Those

18   measurements have been verified by the microscope and

19   by the outside lab that did measurements.  And then I

20   take those measurements and compare it to the drawing

21   specs that have been supplied.

22       Q.  So is that a big deal that it doesn't -- that

23   the design doesn't meet the drawing specifications?

24       A.  Well, the --

25           MS. DENNISON:  Objection to the form.

1              TIMOTHY M. HICKS

2

3        THE WITNESS:  -- the designers of this, to

4   begin with, felt it was important to put certain

5   dimensions, and certain features, and certain

6   characteristics on the drawings at the onset.  And the

7   intent is, like I have with the automotive industry

8   for several years, is to get the parts produced that

9   will meet that specification.

10           And most manufacturers will take those parts,

11   and measure them, you know as part of the first

12   articles that are received, and verify that they do

13   meet that spec.

14           If they don't, then it can't be expected to

15   operate as intended.

16   BY MR. LEVITT:

17      Q.  And the way in which the striker and sear

18   engagement fails to meet the drawing specifications,

19   is it your view that that failure makes it more likely

20   or less likely that that engagement would disengage

21   without a trigger pull?

22           MS. DENNISON:  Objection to form.

23           THE WITNESS:  Because of the lack of meeting

24   the drawing specifications -- and I'll just use the

25   radius -- radii as an example.  If you have a larger

1                    TIMOTHY M. HICKS

2

3    radius on the bottom of the striker foot, it will

4    release from the sear earlier than if it was made per

5    the drawing.  So because of that, it will not operate

6    and will release earlier than the design intent -- had

7    intended.

8    BY MR. LEVITT:

9        Q.  So if it had been designed to spec, that

10   connection would have been more solid than it was?

11       A.  That's correct.

12           MS. DENNISON:  Objection to form.

13   BY MR. LEVITT:

14       Q.  Now, so that's the striker and the sear.  You

15   also mentioned the safety lock as another component of

16   the -- sort of the safety design of the firearm; is

17   that correct?

18       A.  Yes.  And again, to use Sig's nomenclature,

19   it's the second internal safety feature that

20   they -- that they claim the firearm exhibits.

21       Q.  And did your inspection -- in your

22   inspection, did you determine whether, with respect to

23   the Ahern firearm, that system was designed to spec?

24       A.  It was not.  We did -- we did verify that

25   with the same process as the other components.

TIMOTHY M. HICKS

3    a lot smaller and a lot lower -- smaller gauge than

4    anything you probably have seen.

5        But that will go into a stamping press, which has

6    a specific dye set manufactured to produce these

7    parts.  And I liken it to, like a cookie cutter.  As

8    it goes into the dye, the first stage will cut out the

9    outline for the part.  And either in that stage or at

10   a secondary stage, you will do any additional forming

11   of the part, such as the tab that engages with

12   the -- with the striker pin.

13       Q.  Why don't we look at figure 11 in your

14   report?  It's at page 12.

15       A.  Okay.

16       MS. DENNISON:  I still have control.  I'll

17   put it up.  Unless you want me to relinquish control

18   to you, but I'm happy to put it up.

19       MR. LEVITT:  Could you give control over,

20   Kristen?

21       MS. DENNISON:  Oh, do you think I'm the kind

22   of person who can give control over, Peter?  I can.  I

23   have to close out of it, and then you can just go in

24   and pop the document up, and you should be able to

25   take control.  Okay.  So I'll close out, and then you

1              TIMOTHY M. HICKS

2

3        A.  Yes, in the right hand image.  That's

4    correct.

5        Q.  Okay.  And is that the -- so what is the sort

6    of -- there is something that looks like kind of like

7    a golf club.

8        A.  That's exactly how I described it.  That is

9    the -- at least a cross section of the safety lock

10   with a tab kind of the -- well, it's supposed to be a

11   horizontal portion at the top in the middle of that

12   yellow circle.

13       Q.  Okay.  So if this were -- and this an example

14   of something that was not designed to spec?

15       A.  Correct.  The angle between the vertical

16   piece and the horizontal piece is supposed to be at 90

17   degrees.

18       Q.  So that sort of golf club is supposed to be

19   flush with no gap in between it and that sort of

20   horizontal wall there?

21       A.  Correct.  In fact, if you look at Mr.

22   Watkins' report and the graphics that they have in

23   there -- and I think Mr. Toner's reports in past

24   cases, it shows a very flush fit and the very end of

25   that golf club area being very close to the vertical

1                    TIMOTHY M. HICKS

2

3  identified in connection with the fire control unit?

4      A.  Yes.  You asked me about figure 12 in my

5  report, which is page 13 at the top.

6      Q.  Yes.

7      A.  This is a slice through looking at

8  the -- from the rear of the firearm.  And the angles

9  and dimensions in yellow on the right hand side are of

10  the so called rails of the -- the main stamping of the

11  fire control unit.  So that stamping is what all the

12  other components in the fire control unit itself are

13  assembled to.  So that whole thing then sits into the

14  grip module.

15      Q.  Okay.  And did you identify particular

16  defects in this respect?

17      A.  Yes.  The main defect are the angles, again,

18  of the -- what is supposed to be a 90 degree bend.

19  But I'm only showing two.  There are two out of four

20  of these tabs or rails that are created that go into

21  the -- or that ride into slots in a slight assembly.

22  They are supposed to be 90.  I had one that is almost

23  20 degrees out of spec, and the other one is what, 13,

24  almost 14 degrees out of spec.  So those are supposed

25  to be 90, and they are much greater than that.

TIMOTHY M. HICKS

3    Q.  And these are stamped --

4    A.  That is a --

5    Q.  -- parts again?

6    A.  Yes.  That is a stamped and formed part also.

7  Correct.

8    Q.  And is figure 11 on page 12 also an example

9  of this?  Or is that --

10    A.  Yes.

11    Q.  -- is that figure 11 on the left?

12    A.  Yes.  With the blue circles is another view

13  of that relationship of the stamping that we were just

14  talking about and the slide rails or the slide

15  assembly.

16    Q.  And those blue circles -- so those parts are

17  supposed to fit neatly into that area at a 90 degree

18  angle?

19    A.  Yes.  They are supposed to fit in there

20  neatly and squarely.  Yes.

21    Q.  So that the end of that piece will be flush

22  against the wall, I guess I'll call it?

23    A.  That's the intent.  Correct.

24    Q.  Okay.

25    A.  Almost flush.  There is going to be some

| | |
|---|---|
| 1 | TIMOTHY M. HICKS |
| 2 | |
| 3 | saying that it cannot be expected to perform as |
| 4 | intended because of those defects. |
| 5 | Q.  And so just so I can sort of try to |
| 6 | understand this as a layperson, if the slide assembly |
| 7 | and the grip -- if the connection between the slide |
| 8 | assembly and the grip module is continuous or there is |
| 9 | variations in it, and it can move, then that could |
| 10 | affect the parts within those two assemblies, i.e. the |
| 11 | striker and the sear, and how they interact? |
| 12 | A.  Correct. |
| 13 | MS. DENNISON:  Object to form. |
| 14 | BY MR. LEVITT: |
| 15 | Q.  And why don't you just -- maybe you can put |
| 16 | that in your own words. |
| 17 | MS. DENNISON:  Object to form.  Go ahead. |
| 18 | THE WITNESS:  Yes.  It's the -- |
| 19 | BY MR. LEVITT: |
| 20 | Q.  My question is, could you put that sort of |
| 21 | interaction into your own words? |
| 22 | A.  Yes.  The -- the -- like I just described the |
| 23 | tabs on this fire control unit stamping that are not |
| 24 | made at 90 degrees.  There are four of these tabs that |
| 25 | are probably a maximum of half inch long, but that's |

1                    TIMOTHY M. HICKS

2

3    just a guess at this point.  I'm not looking at the

4    drawing.

5         But those four locations control the positioning

6    of the slide assembly to the grip module assembly.   So

7    if there is excessive play or slack in between those

8    two parts, and if the parts are not made to the design

9    intent, directly it impacts the positioning of the

10   slide -- I'm sorry -- the striker to the sear, the

11   first defects that we were talking about.

12        So it contributes to the variation of that

13   precarious joint that is at issue here.

14        Q.  So if there is some play or movement between

15   the slide assembly and the grip module, that could

16   impact the connection between the striker and the

17   sear, which already has a precarious connection; is

18   that accurate?

19        MS. DENNISON:  Objection to form.

20        THE WITNESS:  There is excessive play between

21   the two assemblies.  Kristen will probably follow up

22   with a question about what is an appropriate amount of

23   clearance between the two.  It has to have some in

24   order for it to function.  And related to that there

25   would also be a certain amount of lubrication that

1                    TIMOTHY M. HICKS

2

3   manual safety in the P320?

4        A.  Yes, California for sure.  I don't recall

5   specifically if Massachusetts does, but I believe they

6   do also.

7        Q.  So California for sure you know?

8        A.  Yes.

9        Q.  You testified repeatedly that a -- to test

10  the Ahern P320 to try to replicate his uncommanded

11  discharge would not be realistic and practical.  Do

12  you recall that?

13       A.  Yes.

14       Q.  You were never asked why it would not be

15  realistic and practical, so I thought I'd ask you

16  that.  Why would it not be realistic and practical?

17       A.  Well, the first step is you need to collect

18  the data from usage of the firearm for all the

19  different scenarios that we talked about today.  The

20  forces imparted on it in and out of the holster, the

21  firearm -- the loads on the firearm when it's in a

22  holster, you know, on a person, getting in and out of

23  a vehicle, running with it, you know, apprehending

24  suspects, whatever the case may be.

25       And trying to quantify all those inputs into a

1              TIMOTHY M. HICKS

2

3    test.  And then the test would have to be developed to

4    replicate that or reproduce it in that same

5    environment, which would be in a holster, coming in

6    and out of a holster, and all the dynamics that went

7    into the description of the activities of the -- of

8    the firearm being used to generate that test.

9         And to do that realistically, you are probably

10   looking at a several month process of test duration,

11   you know, to get to the point to where this subject

12   firearm was used, and the amount of use, and firing

13   that it actually had put into it.

14        So that's another difficulty in trying to

15   replicate that test.  You also have to stop it to

16   remove the firearm to test fire, you know, so many

17   rounds through it, to field strip it to clean it,

18   lubricate it, put it back in, and continue running the

19   test in order to try to comprehend and test for what

20   lead to uncommanded discharges.

21        So it's just a very complicated and complex

22   process.  And expensive.

23        Q.  Yeah.  I mean, the way that the questions

24   were -- that you were fielding earlier made it sound

25   like it's just a question of shaking it.  You just,

1                    TIMOTHY M. HICKS

2

3    you know, shake the gun and see if it goes off.  But

4    wouldn't that be enough?

5          MS. DENNISON:  Objection to form.

6          THE WITNESS:  No.  For the -- the reasons

7    that I gave Ms. Dennison when she asked me too,

8    it's -- that's only one condition.  You know, the

9    vibration or the shock testing that she asked about,

10   the same firearms and the same fixture, but nobody is

11   firing them in between and nobody is using them.  And

12   that same test does not necessarily comprehend the

13   loads with the firearm in a holster.

14   BY MR. LEVITT:

15      Q.  So I mean, correct me if I'm wrong, what you

16   are saying is that it's not a single impulse or a

17   single vibration that's important here?  It's the life

18   of the firearm that's important?

19      A.  Correct.

20      Q.  And so in order to try to replicate that in a

21   test, you have to try to replicate the life of that

22   firearm?

23          MS. DENNISON:  Objection to form.

24          THE WITNESS:  Correct.  Correct.  And it's

25   the same thing that we did in the automotive industry.

1                    TIMOTHY M. HICKS

2

3    We would collect the data, develop a test, and with a

4    certain level of confidence and reliability hoping

5    that test does replicate the average use of that

6    product.  So the same thing would apply with these

7    firearms.

8    BY MR. LEVITT:

9        Q.  And is it feasible to do that in this context

10    to try to replicate the life of -- well, it would

11    really have to be that specific firearm, right,

12    because you already testified that each of these

13    firearms are going to be different.  The internal

14    parts are going to be different, and the variances are

15    going to be different, correct?

16        A.  That's correct.

17            MS. DENNISON:  Objection to form.

18            THE WITNESS:  Ideally, we --

19    BY MR. LEVITT:

20        Q.  In order to --

21        A.  Yep.  Sorry.

22        Q.  Yeah.  In order to have a reliable test, you

23    would need to have that same firearm with those same

24    predicate defects, correct?

25            MS. DENNISON:  Objection to form.

1              TIMOTHY M. HICKS

2

3       THE WITNESS:  That is correct.  Correct.

4  BY MR. LEVITT:

5       Q.  And then you would have to replicate the life

6  of that particular firearm with whoever was handling

7  it --

8       MS. DENNISON:  Objection to form.

9  BY MR. LEVITT:

10      Q.  -- and however that person was -- let me say

11  however that person was handling it?

12      A.  That -- that's correct.

13      Q.  And is it your view that what happens to

14  these firearms in terms of the connections becoming

15  less tight is something that happens over time, or is

16  it something that happens just in an instant, and

17  that's what causes the discharge?

18      MS. DENNISON:  Objection to form.

19      THE WITNESS:  It's -- it's over time.  You

20  know, the springs are degrading over time as the

21  firearm is used.  There is different levels of

22  contamination or dirt, or even grease and lubricant

23  when they are cleaning the firearms.  And then there

24  is wear of the components in the interfaces that we

25  have been talking about today.  All of that leads to a

1                     TIMOTHY M. HICKS

2

3    degradation of the overall system and maybe to the

4    uncommanded discharge.

5    BY MR. LEVITT:

6        Q.  And then could impulses or impacts that the

7    firearm has had over that long time period contribute

8    to that degradation?

9            MS. DENNISON:  Objection to form.

10           THE WITNESS:  Yes.

11   BY MR. LEVITT:

12       Q.  So if, for example, I think you read that

13   Lieutenant Ahern dropped his firearm a couple of days

14   before the discharge here.  Is that type of impact

15   that could make those connections more precarious?

16       A.  Yes.

17           MS. DENNISON:  Objection to form.

18           THE WITNESS:  All of that leads into the wear

19   and tear on the firearm.

20   BY MR. LEVITT:

21       Q.  So rather than trying to replicate all of

22   those conditions, a manufacturer could do a CT scan of

23   the firearm to see if it meets its own specifications?

24           MS. DENNISON:  Objection to form.

25           THE WITNESS:  Correct.  Correct.

1              TIMOTHY M. HICKS

2

3    BY MR. LEVITT:

4        Q.  Ms. Dennison asked you some questions about

5    holsters and how many holsters are there out there.

6    Would you expect Sig Sauer, when it's manufacturing

7    this firearm, to be testing the safety of the firearm,

8    of the P320, in a holster -- do you remember all of

9    those questions?

10       A.  I do.

11       Q.  Okay.  Isn't the real question whether once

12   Sig Sauer is on notice of numerous allegations of the

13   P320 discharging in a holster, that then might be a

14   good time for them to test the safety of the P320 in a

15   holster?

16           MS. DENNISON:  Objection to form.

17           THE WITNESS:  That certainly makes sense.

18   And that's what we did in the automotive industry.  If

19   you would see a trend with a product outside of what

20   you had expected, you would then do additional

21   testing, additional investigation to address those

22   issues.

23   BY MR. LEVITT:

24       Q.  You were shown the transportation balance

25   test that you say you did.  Do you remember that?

1                    TIMOTHY M. HICKS

2

3      A.  On the new firearm, that's correct, or the 2

4  of the 10 firearms, correct.

5      Q.  But isn't that sort of an example of what

6  you've been talking about that overtime different

7  conditions impact the firearm and make that connection

8  less tight?

9          MS. DENNISON:  Objection to form.

10          THE WITNESS:  Yes.  And -- and, you know, me

11  being the inquisitive engineer, I probably would have

12  wanted to see those two firearms continue on with that

13  test to see if it did beyond that one hour test lead

14  to a disconnecting of those two components.

15          MS. DENNISON:  Peter, how much longer do you

16  think you have?

17          MR. LEVITT:  Not that much longer.

18  BY MR. LEVITT:

19      Q.  And sort of along these lines, there was a

20  host of questions about sort of what impulse caused

21  Lieutenant Ahern's firearm to discharge.  What

22  vibration, what impulse, what shock?  Do you remember

23  all those questions?

24      A.  Yes.

25      Q.  And I think at one point in answering those,

1          TIMOTHY M. HICKS

2

3    thousands of parts in the automotive industry where

4    the vibration is a portion of it, but you also want to

5    have tests that the -- that are representative of

6    other conditions.  It goes beyond just vibration or

7    shock testing.

8       Q.  I think you also said -- when Mr. Levitt was

9    asking you some questions, I think you said that part

10   of -- I mean, you indicated that you would not expect

11   all P320s to have susceptibility to discharge without

12   a trigger pull.  Did I hear that correctly?

13      A.  Some are more susceptible than others, yes.

14   I mean, with two to three million of these things in

15   circulation, there would be enough time in the day for

16   me to investigate all of them if they were all

17   susceptible to it.  There are varying degrees.

18      Q.  And you would have to inspect them to be able

19   to determine whether they exhibited the same types of

20   feedback that you're alleging Mr. Ahern's pistol has,

21   correct?

22      A.  I would expect to find similar issues with

23   the components at issue that we have -- that I have

24   identified in Mr. Ahern's pistol.  I haven't inspected

25   a firearm in these cases yet that had all the