UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS R. AHERN,<br><br>    Plaintiff,<br><br>    v.<br><br>SIG SAUER, INC. and CITY OF CAMBRIDGE,<br><br>    Defendants. | No. 21-cv-11007-DJC |

# PLAINTIFF'S OPPOSITION TO CITY OF CAMBRIDGE'S MOTION FOR SUMMARY JUDGMENT

In 2019, Plaintiff Thomas Ahern ("Mr. Ahern") was a lieutenant employed at Cambridge Police Department ("CPD"). Cambridge's Ex. A, Ahern Dep. at 44. He devoted his career to CPD and steadily rose through its ranks during a tenure of nearly three decades. *Id.* at 44-45. Mr. Ahern served for 26 years in CPD's Special Response Team ("SRT" or "SWAT"), including five years as Commander of SRT, where he also served as an SRT sniper and as regional Vice President of the Training and Evaluation Committee of the United States Department of Homeland Security's Urban Areas Security Initiative. *Id.* at 45-46; Mr. Ahern's Response No. 3 to SIG's Interrogatories (attached as Ex. A). Mr. Ahern's successful career at CPD began deteriorating in 2017 because of his outspoken complaints about the SIG Sauer ("SIG") P320 and his refusal to falsely admit that he pulled the trigger of his firearm during a May 2019 uncommanded discharge.

Prior to CPD's adoption of the SIG P320 as its standard firearm, Mr. Ahern had grave concerns that the P320 was inherently unsafe, and that CPD's use of that firearm jeopardized the safety of officers and the public. He voiced those concerns both inside and outside the office. CPD nevertheless adopted the P320. Mr. Ahern's concerns came to a head at the Mayfair

Festival in May 2019, when Mr. Ahern conducted a routine function check of his holster. Cambridge's Ex. A, Ahern Dep. at 73, 78-79.  Without removing the firearm from the holster, he lifted his CPD-issued P320 within the holster and found that it would not "seat," or re-secure, in the holster.  *Id.*  As a result, if Mr. Ahern were suddenly called for an emergency (as is always a possibility at any high attendance, public event), his firearm would be loose in the holster.  Mr. Ahern withdrew his firearm only to check whether there was an obstruction in the holster and held the firearm in front of him in a "Sul," or low ready, position, in which his firearm was pointed downward with his finger along the side of the firearm, away from the trigger.  *Id.* at 184.  Mr. Ahern did not pull the trigger, yet the P320 discharged, impacting his thigh (the "May 2019 Discharge Incident").  *Id.* at 101.

What followed could only be described as a sham investigation.  From the moment the P320 discharged Mr. Ahern's superiors were intent on finding him responsible for a violation of Cambridge policies and procedures.  Mr. Ahern refused to falsely admit that he pulled the trigger and, rather than censoring himself, amplified his concerns as to the P320.  Mr. Ahern's complaints, combined with his refusal to acknowledge something that never happened, were a determinative cause of Cambridge's unwarranted discipline, exclusion, and stagnation of Mr. Ahern's career at CPD.  Through this action, Cambridge violated Mr. Ahern's First Amendment rights pursuant to 42 U.S.C. § 1983 ("§ 1983") and the Whistleblower Act under Mass. Gen. Laws Ch. 149 § 185 ("Chapter 149").

## **LEGAL FRAMEWORK**

Courts may only grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a).  Summary judgment "is inappropriate 'if the record is sufficiently

open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." *Tsai v. McDonald*, 2017 WL 3526252, at *1 (D. Mass. Aug. 16, 2017) (quoting *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014)). "There is no question . . . that [the Court] must resolve all factual disputes in favor of the non-moving party on summary judgment." *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 218 (1st Cir. 2016).

## ARGUMENT

To prevail on a § 1983 claim, the plaintiff must satisfy a three-step inquiry. First, the employee must "speak[] as a citizen on a matter of public concern." *Bettencourt v. Town of Menton*, 334 F. Supp. 3d 469, 481 (D. Mass. 2018). The inquiry is "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Second, the Plaintiff's "interest in commenting upon these matters" must "outweigh[] defendant's interest in the efficient performance of its public services." *McGunigle v. City of Quincy*, 132 F. Supp. 3d 155, 169 (D. Mass. 2015).[1] Lastly, the Plaintiff's "protected expression" must have been "a substantial or motivating favor in the defendant's adverse employment decision." *Id.* (quoting *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011)). This third inquiry—whether the protected speech constitutes "a motivating or substantial factor in the decision to take an adverse employment action"— raises an issue of fact for the jury. *Id.* at 169-70.

Chapter 149 "protects public employees from retaliation by their employees for disclosing to a supervisor or public body workplace activities, policies, or practices that the employee reasonably believes violates the law, or pose a risk to public health, safety, or the

---

[1] Cambridge does not contend that Mr. Ahern cannot satisfy the second element of this analysis at the summary judgment stage. Nor can it. A reasonable jury could conclude that Mr. Ahern's interest in commenting on Cambridge's use of a firearm that risks the lives of citizens and employees outweighs Cambridge's interest in using that same firearm.

3

environment." *Trychon v. MBTA*, 59 N.E.3d 404, 409 (Mass. App. 2016). There are three elements to a Chapter 149 claim: "that (1) the plaintiff-employee engaged in an activity protected by the act; (2) the protected activity was the cause of an adverse employment action, such that the employment action was retaliatory; and (3) the retaliatory action caused the plaintiff damages." *Edwards v. Commonwealth*, 174 N.E.3d 1152, 1166 (Mass. 2021). Chapter 149 does not contain the "public concern" requirement of § 1983. Cambridge's assertion that Mr. Ahern has not marshaled evidence that his objections pertained to a matter of public concern—which Mr. Ahern refutes, for the reasons discussed below—therefore are irrelevant to the Chapter 149 inquiry.

### A. Section 1983: Mr. Ahern Spoke as a Citizen on a Matter of Public Concern

The "following non-exclusive factors" are relevant in analyzing whether the plaintiff spoke in his capacity as an employee or as a citizen under § 1983:

> (1) whether the employee was commissioned or paid to make the speech in question; (2) the subject matter of the speech; (3) whether the speech was made up the chain of command; (4) whether the employee spoke at his place of employment; (5) whether the speech gave objective observers the impression that the employee represented the employer when he spoke . . . ; (6) whether the employee's speech derived from special knowledge obtained during the course of his employment; and (7) whether there is a so-called citizen analogue to the speech.

*Bettencourt*, 334 F. Supp. 3d at 481 (quoting *McGunigle v*, 132 F. Supp. 3d at 170-71 (D. Mass. 2015)). "A matter of public concern does not '*lose* its importance merely because it arises in an employee dispute.'" *Howcroft v. City of Peabody*, 747 N.E.2d 729, 742 (Mass. App. Ct. 2001) (emphasis in the original) (quoting *Hall v. Ford*, 856 F.2d 255, 260 (D.C. Cir. 1988)).

Cambridge tries to categorize Mr. Ahern's protected conduct in two discrete categories: (1) general complaints regarding the safety of the P320 beginning in 2017; and (2) Mr. Ahern's refusal to accept discipline requiring him to falsely state that he pulled the trigger of the P320 from 2019 onward. This classification is artificial. Mr. Ahern's complaints and refusal to accept

4

discipline are part of a continuous course of conduct beginning in 2017 and continuing through his retirement from CPD. All of this speech, whether it relates to Mr. Ahern's complaints as to the P320 or his refusal to state he pulled the trigger, centers on Mr. Ahern's paramount concern that Cambridge had selected a firearm that constituted "a threat to the people around it." Cambridge's Ex. B, Ahern Dep. at 348. Mr. Ahern was concerned not only for the safety of himself and his fellow officers, but, equally important, for the public at large. Whether CPD's use of the P320 risked the lives of its employees and its citizens is undoubtedly a matter of public concern. *Cf. Bettencourt*, 334 F. Supp. 3d at 484-85 (describing the types of issues that constitute matters of public concern).

Mr. Ahern spoke as a private citizen when he made these statements. His complaints were not limited to the confines of CPD. Mr. Ahern was vocal both inside and outside CPD. *See* Cambridge's Ex. B, Ahern Dep. at 221 (Mr. Ahern expressed concerns to "[m]y wife, my children, my family, my partners on the police department, [and] other members of the police department."); *id.* at 292 ("I conveyed [concerns] to George Sabbey, . . . Paul Ames, my wife, some friends, people both inside and outside the police department."). In approximately May 2017, Mr. Ahern voiced his concerns regarding "the safety of the firearm" with his sister, Susan Ahern, and his brother, Stephen P. Ahern, at a cookout held by Susan Ahern. *Id.* at 322-325. Susan Ahern was not employed by CPD; Stephen P. Ahern was. *Id.* at 325. In approximately the summer of 2017, at a cookout at CPD Officer Steve Kervick's home, Mr. Ahern similarly raised his concerns with members of the SRT, who were also at the cookout. *Id.* at 326-27.

These complaints are easily distinguishable from those in *Garcetti v. Caballos*, 547 U.S. 410 (2006). In *Garcetti*, a district attorney alleged retaliation based on a memorandum that he was charged to write pursuant to his employment as a district attorney. That the petitioner

5

"spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case . . . distinguishes [this] case from those in which the First Amendment provides protection against discipline." *Id.* at 421. Unlike the petitioner in *Garcetti*, Mr. Ahern did not have a formal responsibility to inform superiors or anyone else about his concerns regarding the P320. Indeed, from 2017 onward, CPD had already selected the P320 as its firearm of choice, and Mr. Ahern's comments could no longer be understood as affecting CPD's decision as to whether to purchase the firearm. To the contrary, as described in Section B, particularly after the May 2019 Discharge Incident, Mr. Ahern's colleagues felt he should cease commenting on the P320.

### B. Section 1983 and Ch. 149: Cambridge Retaliated Against Mr. Ahern

"[A] court 'should exercise particular caution before granting summary judgment for employers on issues as pretext, motive, and intent.'" *Tsai*, 2017 WL 3526252, at *2 (quoting *Adamson v. Walgreens Co.*, 750 F.3d 73, 84 (1st Cir. 2014)). Under the § 1983 inquiry, the causal query is whether "the protected activity 'played a substantial or motivating part in the retaliatory action.'" *Edwards*, 174 N.E.3d at 1168. By contrast, the "determinative cause standard applicable in employment discrimination causes" applies to Chapter 149 violations. *Id.* The "determinative cause" standard does not require that retaliatory animus be "the only cause," and therefore the presence of "other, potential nonretaliatory reasons" for the adverse action cannot defeat summary judgment. *See id.* at 1169. For purposes of demonstrating retaliation, "[t]he plaintiff need not produce direct evidence of defendants' motivation, but may instead rely upon circumstantial evidence." *McGunigle*, 132 F. Supp. 3d at 174; *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." (citation and quotation marks

6

omitted)); *see Allder v. Daniel O'Connell's Sons*, 20 F. Supp. 2d 210, 214 (D. Mass. 1998) (quoting *USPS Bd. of Gov'rs v. Aikens*, 460 U.S. 711, 716 (1983)) ("Direct evidence of intentional discrimination is rarely found in today's sophisticated employment world.").

### 1. The Sham Investigation

Mr. Ahern's complaints regarding the P320 influenced CPD's disproportionate and rushed response to the May 2019 Discharge Incident. Sargeant Joseph Murphy was tasked with conducting the investigation immediately following the May 2019 Discharge, yet he was junior to Mr. Ahern and therefore should not have had this responsibility. Deposition of Sargeant Joseph Murphy at 52-55 (attached at Ex. B); Deposition of Deputy Leonard DiPietro at 62-63 (attached at Ex. C); Cambridge's Ex. B, Ahern Dep. at 420.

The day after the May 2019 Discharge Incident, Deputy Leonard DiPietro, Sargeant Murphy, and Superintendent Stephen DeMarco met in a conference room at CPD Headquarters. At this point, the investigation of the May 2019 Discharge Incident had barely started. *See* Murphy Dep. at 30 (describing investigation as "preliminary"). Lieutenant Sil Ferreira, a Lieutenant of Cambridge's Professoinal Standards Unit, entered the room and told Superintendent DeMarco and Deputy DiPietro that, "[w]e have to find [Mr. Ahern] responsible for this." DiPietro Dep. at 49 (Ex. C). Sergeant Murphy was seated behind the door and Lieutenant Ferreira did not see him. Murphy Dep. at 27-28, 171 (Ex. B). Lieutenant Ferreira continued: "I got you both together, and . . . I just came from a meeting upstairs, and we're going to find Tom Ahern in violation of policy and procedures." *Id.* at 27 (Ex. B). "Upstairs" was a reference to the commissioner suite and the Professional Standards Unit (also referred to as Internal Affairs), which also conducted investigations. *Id.* at 21, 39.

Superintendent DeMarco then turned from Lieutenant Ferreira to Sargeant Murphy and said: "Finish your reports and find [Mr. Ahern] in violation." *Id.* at 27.  Sargeant Murphy refused because he had not yet conducted his investigation. *Id.* at 28.  Superintendent DeMarco then said: "Let me make it easy for you.  I'm ordering you to find him in violation." *Id.* Sargeant Murphy again refused.  Superintendent DeMarco said: "Finish your reports, give them to the deputy superintendent, and you [Deputy DiPietro] find him in violation." *Id.* Deputy DiPietro replied, "Fine, I'll find him in violation." *Id.* at 29.  Deputy DiPietro also said: "Why don't we take him out back and shoot him, then give him a fair trial?" DiPietro Dep. at 49 (Ex. C).

At that point, Lieutenant Ferreira and Superintendent DeMarco did not even know what violation Mr. Ahern had allegedly committed.  Murphy Dep. at 33-35 (Ex. B).  When Sargeant Murphy asked "what are we finding him in violation of," Superintendent DeMarco "paused for a bit" and then stated that they would find he had committed excessive force. *Id.* at 28-29. Sargeant Murphy explained, "you can't find someone in violation of the excessive force policy when they weren't using force on anyone." *Id.* at 29.  Sargeant Murphy left the room soon after, as Lieutenant Ferreira, Superintendent DeMarco, and Deputy DiPietro continued to discuss the incident. *Id.* ("It wasn't a comfortable situation, so it wasn't going to last that long.").

Sargeant Murphy has explained why he refused to find Mr. Ahern in violation that day. "I could not do what I was ordered to do. . . .  [A]t the very least, it's unethical, and at the worst, it could be illegal. . . .  It's predetermining an outcome an investigation.  It goes against the sanctity of the criminal justice system." *Id.* at 30.  Deputy DiPietro similarly testified that Lieutenant Ferreira's order that they find Mr. Ahern in violation was contrary to normal CPD practice and procedure: "[T]here's a process we follow, and we don't break those processes.  We

follow the rules of investigation." DiPietro Dep. at 49 (Ex. C). Sergeant Murphy had been on the job for 17 years and conducted thousands of investigations. Murphy Dep. at 32 (Ex. B). This was first and only time during this period that he was ever ordered to find a fellow officer, much less a superior, in violation before completing his investigation. *Id.*

CPD's departures from normal practice and procedure continued. Sargeant Murphy had been ordered to conduct a "Line Investigation," which is distinct from an "Internal Affairs," or Professional Standards Unit, investigation. *Id.* at 49.[2] During the meeting on May 20, 2019, Sargeant Murphy asked Lieutenant Ferreira and Superintendent DeMarco whether internal affairs would be taking over the investigation. *Id.* at 101-02. They said no. *Id.* After the morning meeting on May 20, 2019, while Sargeant Murphy was continuing to conduct his investigation, Lieutenant Ferreira and Lieutenant Phillip McDavitt, also with the Professional Standard Unit, stopped by Sargeant Murphy's office to ask him about the investigation. *Id.* In nearly three decades at CPD, Sargeant Murphy had never had this experience before. *Id.* at 102, 113. Sargeant Murphy asked them why they were asking about a pending investigation and asked that they leave. *Id.* at 104. Lieutenant McDavitt replied, "[W]e could do this upstairs. We know how comfortable you are up there," a reference to the Professional Standards Unit suite on the fourth floor. *Id.* 104-05. Sargeant Murphy stated, "[F]--- you, Phil" and told them to "get out of [his] office. *Id.*

Within the first couple months of Sargeant Murphy's investigation, Deputy Superintendent Dennis O'Connor, who reported directly to the CPD Commissioner, removed Mr. Ahern's P320 that had been used during the May 2019 Discharge Incident from the designated evidence locker without Sargeant Murphy's knowledge or consent. *Id.* at 81-83.

---

[2] There is a dispute of material fact over whether the Professional Standards Unit was immediately assigned the investigation. *See* Mr. Ahern's Responses to Cambridge SMF Nos. 32-35; *see also* Murphy Dep. at 101-02 (Ex. B).

9

Sargeant Murphy learned of the unexplained removal of the firearm when he went to the evidence room to retrieve the firearm, at which point the evidence technician informed him that Deputy O'Connor had removed the evidence. *Id.* at 81. Sargeant Murphy "was upset that a person that wasn't in the investigation, to my knowledge, was taking evidence that I logged in." *Id.* at 82. When Sargeant Murphy asked Deputy O'Connor why he had taken the firearm, Deputy O'Connor responded "[t]hat it was not your concern." Sargeant Murphy did not raise the issue with CPD Commissioner Branville Bard as he feared the impact such a confrontation would have on his career. *Id.* at 87-89 ("[I]t would not have been good for me to go see the commissioner and express my displeasure that evidence of an investigation that I was assigned was removed."). At this point, Sargeant Murphy felt "[t]he investigation was tainted." *Id.* at 109.

### 2. Cambridge's Rush to Judgment

The fact that Mr. Ahern removed his firearm from the holster in the SRT van, standing alone, was insufficient to warrant a finding that Mr. Ahern was in violation of CPD policy and procedures: an investigation was still required to determine why Mr. Ahern had removed the firearm and whether his actions were reasonable. *See* DiPietro Dep. at 79 ("Q: In other words, the reason that Lieutenant Ahern took [the firearm] out of the holster would affect whether it was improper to take it out of the holster, correct? Dep. DiPietro: Yes."). Under the clear language of Cambridge Policy & Procedure No. 403, an officer may remove a firearm "[f]or use in the performance of his/her duties." Docket Entry ("D.E.") 134-6 at 106 (Ex. 3 to Deposition of Commissioner Bard). This exception is not limited to exigent circumstances such as when an officer is facing a threat. For example, firearms are not permitted in the booking area and cell block area. Therefore, an officer typically would remove their firearm from their holster and

10

place it in a lock box when entering the area. Deposition of Officer Hector Vicente at 180-181 (attached at Ex. D).[3] In such instances, removing the holster would be in performance of their duties.

As expert Scott Reitz is expected to testify, Mr. Ahern's actions that day were reasonable. "It is not at all unusual nor atypical for a SWAT operator to conduct weapons 'chamber checks,' gear functioning checks, or weapon's functioning checks prior to and even en route (while in vehicles) to a SWAT call-up or warrant service." Scott Reitz Report at 6 (Ex. C to Mr. Ahern's Ombinus Opp. to Cambridge's Mots. to Preclude Testimony). In addition, once Mr. Ahern realized his firearm was no longer secure, "he was also reasonable to take steps to ensure the firearm was properly secured." *Id.* Mr. Ahern had no way to know that he would not be called to an exigent event – such as an assault, battery, shooting, or worse – within moments. *Id.* ("Particularly at a crowded event such as the MayFair Event, officers may have no more than a moments' notice to respond to a threat, as was the case with the Boston Marathon bombing in 2013."). Indeed, *had* Mr. Ahern been called to an emergency with his firearm loose in its holster, he risked his firearm falling from his holster, in a crowded area where anyone – even a child – could pick it up. As Reitz explained during his deposition,

> Q. And why was . . . that reasonable for . . . Lieutenant Ahern to do what he did in the van on that day?
>
> A. He was ensuring that the pistol was secured knowing that there was a possibility of an incident occurring that they may have to respond to as SWAT officers within the MayFair event, and he was ensuring that it was, in fact, secure in the holster so it was not lost or became dislodged if they had to rapidly deploy.
>
> Q. [W]hy is that, in your view, considered in use in performance of his duties?

---

[3] After the May 2019 Discharge Incident, CPD implemented a quick release system to allow officers to remove their entire holster, rather than removing the firearm from the holster. *See* Vicente Dep. at 180-81 (Ex. D). Even then, officers continue to remove their firearms from their holsters when they place them in the lockbox. *Id.* at 182.

> A. Well, because you're on duty. You're on a SWAT team. Your primary function is to immediately react to an incident to which line officers are either ill-prepared for or not trained to of a higher evolution such as an active shooter, such as a bombing, whatever it may be. So, that, I would consider to be an on-duty situation.
>
> Q. [Y]ou had a lot of questions from Mr. Woy and Ms. Wright noting that there was no emergency at the time that Lieutenant Ahern was performing the function check. Is it your view that a well-trained law enforcement officer should wait for an emergency to occur before being prepared to respond?
>
> A. No. Any seasoned officer would know, especially if you spend time in the field, that things happen very rapidly. They evolve very rapidly. They can degrade very rapidly. And ensuring that you're prepared to meet that demand, especially in a SWAT team level is absolutely reasonable.

Reitz Dep. at 239-40 (D.E. 137-3).

Reitz's expert analysis demonstrates that the question of whether an officer is acting in the "performance of his/her duties" is a nuanced one. It involves careful analysis of the circumstances. A day after the May 2019 Discharge Incident, and with the investigation having barely started, CPD, at the highest levels, had already found Mr. Ahern responsible. DiPietro Dep. at 49 (Ex. C) (Lieutenant Ferreira stating "[w]e have to find [Mr. Ahern] responsible for this"). CPD's rush to judgment underscores that the investigation against Mr. Ahern was a product of retaliation.

### 3. Cambridge's Continued Retaliation Against Mr. Ahern

The evidence of Cambridge's retaliatory intent is substantial. For one, Mr. Ahern was eminently qualified for the positions for which he was rejected. *See Acevedo-Diaz v. Aponte*, 1 F.3d 62, 70 (1st Cir. 1993) ("[P]laintiff's obvious qualifications can be circumstantial evidence of discriminatory animus.") (citation omitted). Prior to the discharge incident, Mr. Ahern had steadily risen through the ranks of CPD, attaining the rank of Lieutenant in 2017 and serving as a commander of Cambridge's elite SRT. Cambridge SMF Nos. 3-5; Mr. Ahern's Response to Cambridge Interrogatory No. 3 (Ex. A). He was "an excellent supervisor of the police work that

we were performing" and had "a very high police IQ." DiPietro Dep. at 11-12 (Ex. C); *see* Murphy Dep. at 19 (Ex. B) ("He was an excellent police officer."). Nevertheless, as discussed herein, when Mr. Ahern continued to voice concerns about the P320, he was abruptly stripped of responsibilities and respect. Mr. Ahern was told time and again that, if he falsely acknowledged that he pulled the trigger, he again would be a candidate for promotions. *See* Cambridge's Ex. B, Ahern Dep. at 376; 452-53; 479-80.

Other members of CPD recalled Mr. Ahern's complaints after the May 2019 Discharge Incident:

> Q: . . . After May 2019, did Lieutenant Ahern ever tell you about concerns with the P320?
> A: Yes.
> Q: And tell me about those conversations.
> A: That this P320 has these unintentional discharges that were taking place in . . . several different places. And if I can recall his words, the gun was unsafe. . . .
> Q: And how many times did he bring up his concerns about the P320?
> A: Many times. . . .
> Q: Okay. Did he bring up his concerns with others as well?
> A: Yes.
> Q: Who?
> A: I can't speak to actual names. I would say anyone that would listen.

DiPietro Dep. at 21-22 (Ex. C). Mr. Ahern's colleagues felt "[t]hat after the incident, that he should just keep his comments to a minimum" and that "[a]nytime you're involved in a disciplinary action, you should just keep things to yourself." *Id.* at 24-25.

Moreover, CPD hinged any resolution of the investigation on Mr. Ahern's falsely stating that he discharged the firearm. Mr. Ahern "was told repeatedly that [he] had pulled the trigger and [he] could be terminated if [he] didn't say [he] pulled the trigger." Cambridge's Ex. B, Ahern Dep. at 376. Later, Deputy O'Connor informed Mr. Ahern that he "should accept the discipline as presented if [he] wanted to remain viable for promotion." *Id.* at 452-53. In June 2019, at a family wedding, Stephen A. Ahern, Mr. Ahern's cousin and a CPD Deputy

Superintendent, informed Mr. Ahern that he would "be okay if [he] did the right thing and say [he] pulled the trigger or it caught on [his] clothing." *Id.* at 479-80. While Cambridge tries to confine CPD's insistence that Mr. Ahern state he pulled the trigger to the context of settlement discussions, such comments equally suggest that CPD wanted Mr. Ahern to stop complaining about the firearm across the board. Indeed, this interpretation is supported by Deputy DiPietro's sentiment that Mr. Ahern should have "[kept] things to [himself]."[4] DiPietro Dep. at 24-25 (Ex. C). Likewise, these statements make clear that it was not the May 2019 Discharge Incident itself that led to the retaliation; rather, it was Mr. Ahern's statements regarding the P320 prior to and following the incident that were a determinative cause of the retaliation.

Indeed, Mr. Ahern's complaints coincided with increasingly public and unsettling instances of uncommanded discharges of P320s in and around Cambridge, including those involving Somerville Police Department Officer Walter Collette in July 2019 (*see* Aug. 25, 2021 Civil Complaint (attached as Ex. E)); CPD Officer Jacques Desrosiers in October 2019 (*see* Nov. 1, 2019 CPD Incident Report (attached as Ex. F)); and CPD Detective David Albert in December 2019 (*see* Dec. 4, 2019 CPD Firearm Discharge Report of David Albert (attached as Ex. G)). Cambridge was concerned that increased attention to these incidents would raise the specter that "the City of Cambridge purchased the firearm that was defective, and how does that look for the [CPD]." DiPietro Dep. at 26 (Ex. C); *see* Cambridge's Ex. B, Ahern Dep. at 534 ("[I]t's clear that the timing of this email and the October 18th experience in my office with Dennis O'Connor and Jacques Desrosiers getting shot the same day, that the City had more egg on its face, and it

---

[4] Cambridge's insistence that the dissolution of a resolution discussions hinged on the length of suspension is without basis. Mr. Ahern offered a potential suspension of five days, the same amount that CPD Officer David Albert, who also experienced an uncommanded discharge of a P320, received. *See* Murphy Dep. at 134 (Ex. B); Cambridge's Ex. F, Bard Dep. at 68-69.

14

was clear as could be to me that that was because I refused to accept any discipline under those terms.").[5]

Cambridge's attempts to hush their use of a faulty and unsafe firearm is evident from how the May 2019 Discharge Incident was characterized in CPD and beyond. In an October 2019 email to police departments across the country, well before Cambridge's internal investigation was complete, Deputy O'Connor described the incident as "clearly operator error." Oct. 4, 2019 Email Correspondence (attached as Ex. H). Even as Mr. Ahern refused to falsely state he pulled the trigger, CPD blamed the incident on "operator error" during in-service trainings. Cambridge's Ex. A, Ahern Depo. at 141; Cambridge's Ex, B, Ahern Dep. at 485-90.

Eventually, CPD sought to discipline Mr. Ahern based on his statements alone, powerful evidence of Cambridge's retaliation being inextricably linked to Mr. Ahern's protected speech.[6] When Mr. Ahern confronted the officer who conducted the training, Hector Vicente, Officer Vicente told Mr. Ahern that he "had to . . . reassure the people in the department that the gun is safe." Cambridge's Ex. B, Ahern Dep. at 488; Vicente Dep. at 137-38 (Ex. D). As Mr. Ahern continued to raise concerns as to the safety of the P320 with Officer Vicente, Officer Vicente

---

[5] Cambridge's argument that alleged lack of retaliatory action in 2017 and 2018 ends the causation inquiry is therefore simply wrong. The reasonable inference is that Cambridge's motive to silence Mr. Ahern coincided with increasingly public instances of Cambridge and Somerville officers experiencing uncommanded discharges, beginning in May 2019, and Mr. Ahern's continued complaints about the safety of the P320 and his refusal to falsely agree that he pulled the trigger (which would have given Cambridge cover).

[6] Cambridge repeatedly focuses on the lack of express statements that CPD officers were retaliating against Mr. Ahern. Cambridge appears to expect that if its employees were indeed engaged in unlawful retaliation, they would have memorialized their retaliation in writing, or openly communicated their retaliatory intent to others within the CPD. Cambridge did not issue a document hold until 2023, years after litigation was anticipated and an obligation to preserve documents attached. *See Ortiz v. City of Worcester*, 2017 WL 2294285 (D. Mass. May 25, 2017) ("[T]he duty to preserve material evidence arises during the period before litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."). According to Cambridge's own Status Report, "the City no longer kept data of text messages from retirees and that certain current employees, while having cell phones, do not have the same cell phones as they did between 2017 and 21." Status Report (D.E. 98) at 9. In other words, Cambridge did not preserve data for work-issued phones belonging to Cambridge employees who retired or changed cell phones. Simply put, Cambridge cannot fault Mr. Ahern for failing to produce a direct writing evincing retaliation when it failed to fulfill its own discovery and preservation obligations.

15

reported those comments to Commissioner Bard. The Professional Standards Unit began an investigation on those very statements, which it described as "inappropriate and unprofessional behavior and conversations by Lieutenant Tom Ahern concerning the SIG Sauer P320." Vicente Dep. at 160-61, 165 (Ex. D). Officer Vicente was ordered to provide a report of Mr. Ahern's comments during the investigation and the dates, times, and witnesses involved in the discussions. *Id.* at 167. Officer Vicente had never before been ordered to provide a report of this type. *Id.* at 167-68.

Following the May 2019 Discharge Incident, Mr. Ahern was passed over for promotions. Cambridge's Ex. B, Ahern Dep. at 519-20. Each time, he was provided no explanation for why he did not receive the position. *Id.* at 521. Prior to the incident, Mr. Ahern had consistently been invited to provide firearms instruction to CPD. From 2020 onward, these invitations abruptly stopped. Cambridge's Ex. A, Ahern Depo. at 142-43. In a September 2019 email, Deputy Superintendent Stephen A. Ahern recommended that Mr. Ahern attend a training as to rescues in high threat environments. Despite the recommendation of a deputy superintendent, Superintendent Jack Albert ("Superintendent Albert") made clear he would not "approve pending hearing outcome." *See* Sept. 30, 2019 Email from Superintendent Albert to Manisha Tibrewal (attached as Ex. I); Cambridge's Ex. B, Ahern Dep. at 474-75. In a later email, Superintendent Albert told Commissioner Bard that he was "delaying response to several training requests sent by Deputy Ahern for SRT related trainings for Tom Ahern. If we are going to move forward with removing Tom from the SRT, I will deny the trainings and instruct Deputy Ahern to select another viable candidate to attend these trainings." *See* Oct. 18, 2019 Email from Superintendent Albert to Commissioner Bard (attached as Ex. J). Commissioner Bard confirmed, "Select another viable candidate." *Id.*

16

Mr. Ahern was pressured to resign from SRT, with Deputy O'Connor telling him that "the commissioner wanted [him] to step down as commander of . . . SRT." Cambridge's Ex. B, Ahern Dep. at 458. Mr. Ahern described that "[a]ll trainings were then eliminated for me. People were moved from my suite, so I was alone in the officer suite. I had responsibilities taken away from me . . . I was maligned from the top down." *Id.* at 535. By pressuring Mr. Ahern to leave his position in SRT and repeatedly denying him opportunities for training, Cambridge ensured that Mr. Ahern would not rise through the ranks of CPD. As Mr. Ahern explained, "[a] deputy superintendent is expected to be an expert in a field. My particular field was tactical operations. I needed these extra trainings to bolster my resume to make me a competitive candidate for the position." *Id.* at 559. Following a hearing as to the alleged violations, Mr. Ahern learned that "[t]he recommendation to the City from the police commissioner was to demote and terminate me." *Id.* at 497. At this time, it was clear to Mr. Ahern that he had no future at CPD due to Cambridge's retaliation, and he retired.

## CONCLUSION

Mr. Ahern was a good cop. He was well respected, cared about the job, and cared about the safety of the people he served and his colleagues. Yet when he sought to make public the highly problematic firearm that CPD chose as its duty weapon—a weapon for which he became one of many victims—CPD took to undermining Mr. Ahern and rushing to find him in violation of their policies. Such evidence is far more than is sufficient to survive summary judgment.

For the reasons stated herein, Cambridge's Motion for Summary Judgment (D.E. 135) should be denied.

          Respectfully submitted,

          */s/ Peter K. Levitt*
          Peter K. Levitt (BBO #565761)
          Michelle R. Pascucci (BBO # 690889)
          Pietro Conte (BBO # )
          Donnelly Conroy & Gelhaar, LLP
          260 Franklin Street, Suite 1600
          Boston, MA  02110
          (617) 720-2880
          pkl@dcglaw.com
          mrp@dcglaw.com


          */s/ Jeffrey S. Bagnell*
          Jeffrey S. Bagnell
          Federal Bar No. CT18983
          Admitted Pro Hac Vice
          Jeffrey S. Bagnell, Esq., LLC
          55 Post Road West
          Westport, CT  06880
          (203) 984-8820
          jeff@bagnell-law.com


          Counsel for Plaintiff Thomas R. Ahern

Dated:  April 5, 2024


## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 5, 2024.

          /s/ *Pietro A. Conte*
          Pietro A. Conte