# EXHIBIT B

1          UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2

3   THOMAS R. AHERN,

4   Plaintiff,

5   VS.                    NO.: 1:21-cv-11007-DJC

6   SIG SAUER, INC. AND CITY OF

7   CAMBRIDGE,

8   Defendants.

9   ~~~~~~~~~~~~~~~~~~~~~~~~~

10       DEPOSITION OF LIEUTENANT JOSEPH MURPHY

11                AUGUST 31, 2023

12                 9:58 A.M.

13

14        DONNELLY CONROY & GELHAAR, LLP

15      260 FRANKLIN STREET, SUITE 1600

16       BOSTON, MASSACHUSETTS 02110

17

18

19

20

21

22

23

24  Stephanie Mussen, Professional Shorthand Reporter



1    A.  I would go back to the answer I already
2  gave about the role I was in.  I would seek training
3  for that role and future things.
4    Q.  If you did no trainings during your time at
5  the Cambridge Police Department, if you never sought
6  out trainings like the LAPD training, you just did
7  your job, never applied for any outside trainings,
8  do you think that would be viewed negatively when
9  you were seeking advancement or have potential to be
10  viewed negatively when seeking advancement?
11    A.  I'm not sure I would have a basis of
12  knowledge of -- I don't know what that -- what they
13  were expecting or what they would think was positive
14  or negative.
15    Q.  What's your -- you worked with Tom for many
16  years and attended many trainings with him.
17      What was your impression of him as a
18  professional police officer?
19    A.  He was a competent professional police
20  officer.
21    Q.  What was your impression of him as a
22  firearms instructor?
23    A.  Again, competent and professional.
24    Q.  Did you when working with him have



 1  confidence in his handling of firearms?

 2       A.  I did.

 3       Q.  And what was his -- prior to the May 2019

 4  discharge incident, what would you say the overall

 5  view of him professionally was?

 6       A.  He was an excellent police officer.

 7       Q.  Did you hear anything after the May 2019

 8  discharge incident that led you to believe that that

 9  changed, that opinion changed after that incident?

10       A.  Yes.

11       Q.  What did you hear?

12       A.  It was the day afterwards, and I heard a

13  conversation between -- I was in a room, and Sil

14  Ferreira came up and addressed Steven DeMarco and

15  Leonard DiPietro, and I was sitting in the room when

16  he addressed them about that subject.

17       Q.  So this is May 20th?

18       A.  Correct.

19       Q.  Let me see that exhibit back.  Thank you.

20            Where was this room?

21       A.  It was in the third floor of 125 6th Street

22  in Cambridge.

23       Q.  Is that CPD headquarters?

24       A.  It is.



1        Q.   What kind of room was that?

2        A.   It's a conference room similar to this but

3   larger.

4        Q.   Can you describe the layout of CPD

5   headquarters just sort of floor by floor, generally?

6   What's on each floor?

7        A.   I can.

8        Q.   Would you?

9        A.   First floor is the front lobby, and there's

10  a records room and public interfacing room right off

11  the lobby.  There's the shift commander's office.

12  There's -- some subunits of support services will be

13  on the first floor.  There's some storage rooms.

14  There's the front desk area.  There's a report

15  writing area.

16           And then you can take the stairs halfway up

17  from -- between Level 1 and Level 2 is going to be

18  the prisoner processing detention areas, and then

19  you can go upstairs or take an elevator to the

20  second floor.  On that, it's going to be operations.

21  There will be the roll-call room.  There will be a

22  patrol sergeant's room.  There will be a

23  report-writing area for the officers.  There will be

24  break and lunchroom.



1    There would be a patrol officer command

2  staff suite with -- that would -- kind of

3  superintendent -- three to four deputy

4  superintendents, an administrative aide, and some

5  other employee offices in there.  There will be the

6  men's/women's locker room.  There would be a

7  workout/gym facility.

8    Again, you can take the stairs up or an

9  elevator to the third floor, and you would have the

10  criminal investigation section.  You have the

11  support services command staff being a

12  superintendent and one to two deputy

13  superintendents.  Each floor will have conference

14  rooms.  There will be -- at the time, there was -- a

15  special investigation unit was housed in that area

16  as well as there's -- family and social justice unit

17  is on there -- on the third floor.

18    The fourth floor up the stairs or the

19  elevator is the commissioner suite and support

20  staff.  There's personnel.  There's internal affairs

21  or Professional Standards, however you want to

22  address that.  There's the training academy.

23  There's training rooms, conference rooms, defensive

24  tactics rooms.  On either of these floors, there's



1  all types of other rooms that have storage things,

2  whether they're armories or lockers or equipment.

3      Q.  You're on the third floor because that's

4  where the Criminal Investigations Unit was?

5      A.  That's correct.

6      Q.  And you were in a conference room?

7      A.  I was.

8      Q.  Were there other people with you in the

9  conference room?

10     A.  Yes.

11     Q.  Who was there?

12     A.  At that time that I just spoke of?

13     Q.  At some point, Sil Ferreira came into the

14  room; correct?

15     A.  Correct.

16     Q.  Prior to him coming into the room, who was

17  in the room?

18     A.  I was sitting at the head of the table

19  pretty much similar to this.  Right here was the

20  Superintendent DeMarco, and sitting where I'm

21  sitting on the table is Deputy Superintendent

22  DiPietro.

23     Q.  So it's you, DeMarco, and DiPietro?

24     A.  Correct.



1      Q.   In the conference room?

2      A.   Correct.

3      Q.   Nobody else at that point?

4      A.   No.

5      Q.   And what are the three of you doing?

6      A.   I had -- just was on the laptop, and there

7   was the case assignments, and I had done the case

8   assignments.  And so just previous to that, there

9   was probably 20 to 30 people there, and I was

10  assigning cases out, and it would be on overhead

11  screens and monitors.  And then we had just

12  concluded that, and everybody piled out of the room

13  and left except for the three of us.

14     Q.   Okay.  And this is the day after the

15  May 19th shooting incident involving Lieutenant

16  Ahern?

17     A.   Correct.

18     Q.   So the three of you were sitting at the

19  conference room table?

20     A.   Yes.

21     Q.   And the door is closed?

22     A.   No.  It's open.

23     Q.   And Sil Ferreira comes in?

24     A.   He stands in the doorway out of my line of



1  sight.

2      Q.  Okay.  So why don't we do this.  Could you

3  draw for me -- doesn't have to be perfectly to

4  scale, but sort of a conference room table where the

5  door is, where each person is sitting.

6      A.  (Witness complying.)

7                  MR. LEVITT:  Make this Exhibit 2.

8                  (Exhibit 2, Drawing, marked for

9  identification.)

10                 MR. McKENDRY:  Note for the record

11 he wrote "me" for --

12                 THE WITNESS:  I can change that.

13                 MR. LEVITT:  I know who "me" is,

14 but go ahead.

15     Q.  Let's just get the -- who everybody is.

16 Actually, just go through their titles and names

17 again.

18     A.  Okay.  I was a sergeant detective, Joseph

19 Murphy.  I had just done case assignments, and I was

20 sitting at the head of the table in the Grainger

21 room, is the name of the room, G-R-A-I-N-G-E-R.

22     Q.  And with you?

23     A.  Immediately to my left on the side of the

24 table was Deputy Superintendent Leonard DiPietro.



1      Q.  Okay.

2      A.  The next down the table sitting where

3  Attorney McDonald is was Superintendent DeMarco.

4      Q.  What -- did Deputy Superintendent DiPietro

5  have certain responsibilities at that point?

6      A.  Yes, he did.

7      Q.  What were those, generally?

8      A.  He was the commanding officer for criminal

9  investigations.

10      Q.  And what responsibilities did

11  Superintendent DeMarco have at that point?

12      A.  He was the overall commander for support

13  services, which included criminal investigations and

14  other units.

15      Q.  So in terms of hierarchy, DiPietro would

16  sit sort of beneath DeMarco?

17      A.  Correct.

18      Q.  And what was Sil Ferreira's sort of title

19  at that point?

20      A.  He was a lieutenant in Professional

21  Standards or internal affairs.

22      Q.  And does that come under the auspices of

23  either DeMarco or DiPietro or both, or it sits

24  separately?



1                         MR. McKENDRY:  Objection.

2         A.  It's designed to sit separately.

3                         MR. McKENDRY:  You can answer.

4         A.  Sorry.  If you had the organization flow

5    chart, Professional Standards would have its own

6    direct line from the commissioner's office to there

7    and back up, and that's who they report to.

8         Q.  Okay.  And that's to maintain -- why is

9    that?

10        A.  For integrity of internal affairs and

11   Professional Standards oversight.

12        Q.  You're sitting at the table.  So Lieutenant

13   Ferreira -- is that the right way to pronounce it?

14        A.  Yes.

15        Q.  Lieutenant Ferreira comes to the door, and

16   you can't see him because he's standing outside the

17   door, and where you're located here in Exhibit 2,

18   he's outside of your sight line?

19        A.  Correct.

20        Q.  But by this drawing, it appears that he

21   could look in the door and see DeMarco and DiPietro?

22        A.  Correct.

23        Q.  And did you hear Sil Ferreira say

24   something?



1       A.  Yes.

2       Q.  What did you hear him say?

3       A.  He said, oh, I got you both together, and

4   then he said, I just came from a meeting upstairs,

5   and we're going to find Tom Ahern in violation of

6   policy and procedures.

7       Q.  What happened next?

8       A.  Superintendent DeMarco turned from him to

9   me, and he says, oh, it's good that you're here.  He

10  goes, finish your reports and find him in violation.

11      Q.  Who said that?

12      A.  Superintendent DeMarco.

13      Q.  And when he said, finish your reports and

14  find him in violation, who did you understand he

15  meant by "him"?

16      A.  Thomas Ahern.

17      Q.  And at that point, had you been assigned --

18  had you been previously assigned to conduct the

19  investigation of Tom Ahern's discharge on May 19th,

20  2019?

21      A.  Yes.

22      Q.  Who assigned you to do that?

23      A.  At the time, it was Deputy Superintendent

24  Robert Lowe.



1        Q.  So what did you say, if anything, when

2    DeMarco told you to find Tom Ahern in violation?

3        A.  I said, you can't do that, sir.

4        Q.  What happened next?

5        A.  He said, let me make it easy for you.  I'm

6    ordering you to find him in violation.

7        Q.  What was said after that?

8        A.  I said, you can't do that, sir.

9        Q.  What was said after that?

10       A.  He said, fine.  Finish your reports, give

11   them to the deputy superintendent, and you find him

12   in violation.  And when it was "you," he was talking

13   to Deputy Superintendent DiPietro.

14       Q.  Okay.  Who spoke after that?

15       A.  Deputy DiPietro.

16       Q.  What did he say?

17       A.  Fine.  I'll find him in violation.

18       Q.  What was said after that and by whom?

19       A.  So Ferreira stepped into the room and said,

20   oh, I didn't know you were here, talking to me.

21       Q.  Okay.  What was said after that?

22       A.  I said, for point of conversation, what are

23   we finding him in violation of?

24       Q.  And who responded to that, if anyone?



1      A.  Superintendent DeMarco.

2      Q.  What did he say?

3      A.  He said -- he paused for a bit, and he

4  goes, we'll do excessive force.

5      Q.  Okay.  Did anybody say anything in response

6  to that?

7      A.  I said, you can't find somebody in

8  violation of the excessive force policy when they

9  weren't using force on anyone.

10     Q.  Okay.  Did he respond to that, or did

11 anyone respond to that?

12     A.  I'm sure there was a group conversation at

13 that point.  I can't remember particulars.

14     Q.  After you told him -- after you told

15 DeMarco you can't find someone in violation of

16 excessive force policy when he didn't exert

17 excessive force on somebody, do you remember how

18 long you all remained in the room after that?

19     A.  It wasn't a comfortable situation, so it

20 wasn't going to be that long.

21     Q.  Okay.  Why wasn't it a comfortable

22 situation?

23     A.  Well, you have a command-level officer

24 being told by a subordinate that he's not going to



1   do what they asked him to do and what he ordered him

2   to do.

3        Q.  Because you were not agreeing to do what

4   was -- what you were ordered to do?

5        A.  I could not do what I was ordered to do.

6        Q.  And why not?

7        A.  Well, at the very least, it's unethical,

8   and at the worst, it could be illegal.

9        Q.  Can you explain why that is?

10       A.  It's predetermining an outcome of an

11  investigation.  It goes against the sanctity of the

12  criminal justice system.

13       Q.  At that point, the day after the shooting,

14  you had done some level of investigation, would you

15  say?

16       A.  Yes.

17       Q.  What sort of level of investigation had you

18  done at that point?

19       A.  Preliminary.

20       Q.  And what does that -- what did that entail?

21       A.  It would -- documenting the situation, how

22  I was there, who was there, and any initial

23  statements from those people, collecting any

24  evidence that has to do with the investigation,



1  documenting that information, photo imaging anything

2  that was there, meaning photograph, and basically,

3  the initial intake at a scene.  I treated it as a

4  scene.

5      Q.  Did you tell DeMarco that the investigation

6  was not finished?

7      A.  Yes.

8      Q.  What did he say?

9      A.  To finish my reports.

10     Q.  Meaning finish -- whatever you've done

11  already, finish your reports?

12                  MR. McKENDRY:  Objection.

13     Q.  What did you understand he meant by that?

14     A.  I can't say what he meant.

15     Q.  What does finish -- how do you take it?

16  What was your --

17     A.  What was my intent?

18     Q.  When he said "finish your reports," what

19  did you think he was asking you to do?

20     A.  I think he was telling me to write reports,

21  and I don't know what he was telling me.

22     Q.  Well, you said earlier he said, finish your

23  reports and find him in violation; right?

24     A.  I did.

1      Q.   Okay.  So what do you recall -- I

2  understand the meeting didn't last long after you

3  refused to do that.

4           Do you recall any further conversation --

5      A.   No.

6      Q.   -- than what you've recounted today?

7      A.   No.

8      Q.   At that point in 2019, how long have you

9  been involved in criminal investigations?

10     A.   As a supervisor or as a detective?

11     Q.   Both.

12     A.   Sixteen, 17 years.

13     Q.   Thousands of investigations?

14     A.   Yes.

15     Q.   Did you ever have anything like that happen

16 to you prior to that day?

17     A.   Could you clarify?

18     Q.   In your 16, 17 years conducting thousands

19 of investigations, did you ever have a

20 superintendent tell you to find a violation before

21 you finished your investigation?

22     A.   No.

23     Q.   You described it earlier as sort of a

24 predetermined outcome?



1      A.   Yes.

2      Q.   Did you ever have a superior officer prior

3  to that date instruct you to do -- conduct an

4  investigation which in your view had a predetermined

5  outcome?

6      A.   No.

7      Q.   So after you refused DeMarco's order to

8  find Tom Ahern in violation for excessive force and

9  he turned to Deputy Superintendent DiPietro and

10 said, fine, you find him in violation to DiPietro,

11 what did DiPietro say in response?

12     A.   I'll find him in violation.

13     Q.   Did you say anything at that point in

14 response to that?

15     A.   No.

16     Q.   Why not?

17     A.   It wasn't my place to say anything further.

18     Q.   I mean, you said that this, in your view,

19 was --

20     A.   Well, actually, let me go back for a

21 second.  After that, that's when I said, just for

22 conversation purposes, or somehow I segued it that

23 way, what are we finding him in violation of?

24     Q.   And that's when it got to excessive force?



1      A.   Correct.

2      Q.   And then you said you can't find him in

3  violation of excessive force; he didn't use

4  excessive force on another person?

5      A.   Correct.

6      Q.   What was the response to that?

7      A.   I think that it was conversation between

8  the two of them on what -- and maybe involving

9  Lieutenant Ferreira as far as what they were going

10  to find him in violation of.

11      Q.   Do you remember generally how that

12  conversation went?

13      A.   I don't.  I would have to say that I was

14  sliding out the doors at that point.

15      Q.   That's because it was an uncomfortable

16  situation?

17      A.   It could be described that way, yes.

18      Q.   So when you left your -- the three of them

19  were talking about what they were going to find Tom

20  in violation of?

21      A.   I don't have -- I can't say what they

22  talked about when I left.

23      Q.   No.  I'm not asking you to say what they

24  talked about after you left.  I was recounting your



```
 1  outside the chain of command?

 2       A.  Yes.

 3       Q.  And were you concerned that that also would

 4  be viewed negatively in terms of your career with

 5  the Cambridge Police Department?

 6       A.  Yes.

 7       Q.  When Sil Ferreira said at the beginning of

 8  this discussion in the Grainger room when he said a

 9  decision -- I'm glad I found the two of you here to

10  DeMarco and DiPietro, a decision has been made

11  upstairs; is that right?  Is that what he said?

12       A.  Yes.  I just came from a meeting upstairs.

13       Q.  Okay.

14       A.  And we're going to find Tom Ahern in

15  violation.

16       Q.  What did you understand or how did you

17  interpret his reference to a meeting upstairs?

18       A.  That Professional Standards with or without

19  the commissioner made the determination to find him

20  in violation of a policy and procedure.

21       Q.  Because upstairs includes both the

22  commissioner suite and the Professional Standards

23  suite?

24       A.  Correct.
```



```
 1        Q.  So Sil Ferreira was a lieutenant in

 2   Professional Standards.

 3            Can you give me the sort of hierarchy in

 4   Professional Standards at that time?

 5        A.  I believe there would be an admin person.

 6   There would be an officer or a detective assigned

 7   for background investigations.  There would be two

 8   sergeants.  There would be a lieutenant, and there

 9   was an attorney that ran -- still runs Professional

10   Standards.

11        Q.  So the lieutenant was Sil Ferreira?

12        A.  Correct.

13        Q.  Do you recall who the two sergeants were?

14        A.  Yes.  One was Phil McDavitt, and the other

15   one, I would have to look at my phone to get his

16   last name.

17        Q.  Maybe when we take a break, you could do

18   that for us.

19        A.  Sure.

20        Q.  Do you recall who the detective was?

21        A.  But that's different side within that

22   organization.  That's background investigations.

23        Q.  Got you.  Okay.  So thank you for that

24   clarification.
```



LT. JOSEPH MURPHY                                    August 31, 2023
AHERN vs SIG SAUER, INC., ET AL.                              45

1      Q.   You're good?

2      A.   I am.

3      Q.   So when did you get there?

4      A.   I'm estimating 10 a.m., maybe.

5      Q.   Okay.  And this was in the -- say, the

6  Harvard Square area of Cambridge?

7      A.   Yes.

8      Q.   And what was your role there?

9      A.   I had a squad of detectives, and we were

10 responsible -- if there was any criminal offenses

11 that occurred, we would do follow-up investigations.

12     Q.   At some point, did you become aware of a

13 firearm discharge involving Lieutenant Ahern?

14     A.   Yes.

15     Q.   How did you become aware of that?

16     A.   Deputy Lowe -- at the time, he was a deputy

17 superintendent -- called me.

18     Q.   What did Deputy Superintendent Lowe say?

19     A.   Told me to report to him.  He was a short

20 distance away, and I went up to him.

21     Q.   Did you have a conversation with him?

22     A.   I did.

23     Q.   Can you recount that conversation?

24     A.   He said that Tom Ahern's firearm discharged



1  in one of the SWAT vehicles.  We were standing next

2  to it, and he wanted me to conduct a line

3  investigation.

4       Q.  Conduct a what?

5       A.  Line investigation.

6       Q.  What's a line investigation?

7       A.  Internally, there's two forms of

8  investigations.  There's a line investigation and

9  there's an internal affairs investigation.  And when

10 something happens, whether it could be a car crash

11 or involving an officer or somebody hurt or any

12 range of things, the first thing that kicks in is a

13 line investigation.

14       And that is the investigation would

15 proceed, and that's where we'll use an example of an

16 officer is involved in a crash with another motor

17 vehicle.  That person would conduct the line

18 investigation, and they can make a determination if

19 it was like an avoidable accident or was it out of

20 policy or against procedure, but they would do the

21 investigation.

22      Q.  So Deputy Superintendent Lowe assigned you

23 to do the line investigation?

24      A.  Yes.



1       Q.  At that point in your career, how many line

2  investigations had you been the primary on, more or

3  less?

4       A.  More than five.

5       Q.  Okay.  More than 10?

6       A.  It could be, I mean, because it would

7  involve use of force.  It would involve car crashes.

8  It would involve some other things, but, you know,

9  not a lot.

10      Q.  Okay.

11      A.  Not like criminal investigations.

12      Q.  Would you say somewhere between five and

13  15?

14      A.  Okay.  I could agree to something like

15  that.

16      Q.  Now, that's primary.  Were you also

17  involved in some line investigations in more of a

18  support role?

19      A.  No.

20      Q.  So the way you said a line investigation,

21  sort of the -- you're investigating to determine you

22  said if it was avoid -- if something was avoidable

23  or out of policy?

24      A.  Correct.



1      Q.   And if you conduct an investigation -- let

2   me ask you, how long does it typically take to

3   conduct a line investigation?  Can you give me a

4   range of how those investigations go in your

5   experience?

6      A.   So it depends on the subject matter of the

7   investigation.

8      Q.   Yeah.

9      A.   A car -- an officer versus -- if they

10  struck somebody in a crosswalk with their cruiser,

11  then that wouldn't take me too long to conduct a

12  line investigation.

13     Q.   So if you're trying to determine if it was

14  you said out of policy, meaning violated Cambridge

15  Police Department policy?

16     A.   A line investigation, yes, that's what the

17  purpose is, within policy or out of policy.

18     Q.   And if you determine after your

19  investigation -- if your conclusion is that it's out

20  of policy, what happens next?

21     A.   You forward that up the chain of command.

22     Q.   Have you ever -- in your five to 15 line

23  investigations, have you ever concluded that a

24  particular incident was -- an officer was acting out



1   of policy?

2        A.  Yes.

3        Q.  It gets sent up the chain of command?

4        A.  Correct.

5        Q.  In those instances, what happens after

6   that, in your experience?

7        A.  I don't have any experience what happens

8   after that.

9        Q.  For example, as you said, there's a line

10  investigation versus an internal affairs

11  investigation.  If you conclude that something is

12  out of policy, in your experience, does that then go

13  to internal affairs?

14       A.  It's not a triggering event, no.

15       Q.  So you send it up the chain of command and

16  whatever happens happens?

17       A.  My understanding of the whole process when

18  you become a supervisor and they train you on that

19  is, the line investigation goes up.  So as the

20  patrol officer or the detective, something occurs.

21  There's a line investigation.  The next higher-level

22  person conducts that line investigation, and they

23  find within policy, out of policy, or neutral area.

24            I mean, I'm being very vague because of the



1  range.  They sign off, and then it goes up to the

2  next level.  In this case, it would go to a

3  lieutenant.  They would agree with the findings or

4  disagree with the findings.  Then they would send it

5  up, and it would go to a deputy superintendent, and

6  it goes up the rank just like that.

7       Q.  Does it go all the way to commissioner?

8       A.  In training, yes, things would go to the

9  commissioner, but for minor offenses, I don't know

10  the answer.

11      Q.  In terms of when you were trained on these

12  investigations, it would go all the way up the chain

13  to the commissioner?

14      A.  For something like this, yes.

15      Q.  For something like this being Lieutenant

16  Ahern's discharge?

17      A.  Correct.

18      Q.  Would at that point you be notified of

19  whether your recommendation -- your conclusion has

20  been validated, accepted?

21      A.  No.

22      Q.  So once you send it up, do you hear

23  anything more about it typically from an official

24  perspective?



1        A.  No.

2        Q.  You might hear about what happened through

3  the grapevine?

4        A.  Correct.

5        Q.  But your role is essentially done once you

6  send it up?

7        A.  Correct.

8        Q.  And in your training and experience, what

9  separates something going to a line investigation

10  versus an internal affairs investigation?

11        A.  Culpability for criminal offenses would

12  kick it into internal affairs.

13        Q.  When you say "culpability for criminal

14  offenses," I mean, the investigation hasn't taken

15  place yet, so do you mean an allegation of criminal

16  activity would kick something into an internal

17  affairs investigation?

18        A.  Yes, it would.

19        Q.  So if the allegation, for example, is that

20  a police officer is shaking down drug dealers, that

21  would go to internal affairs?

22        A.  Yes.

23        Q.  Or conducting home invasions, that would go

24  to internal affairs?



```
 1        A.  Correct.

 2        Q.  Car accident would go to a line

 3   investigation?

 4        A.  Correct.

 5        Q.  An accidental discharge would go to a line

 6   investigation?

 7        A.  Correct.

 8        Q.  What are some of the other things you

 9   experienced that go to line investigation either

10   directly or through your training?

11        A.  A use of force kicks in right away with a

12   line investigation, so the next-level supervisor

13   conducts that.  It's a line investigation.

14        Q.  Any use of force automatically kicks it in?

15        A.  Documentable use of force, so I mean,

16   what -- do you want to get down to the weeds with

17   this?

18        Q.  No, I don't.  Other examples?

19        A.  Of line investigations?

20        Q.  Yeah.

21        A.  Civilian complaints can be -- start as a

22   line investigation and remain all the way as a line

23   investigation.

24        Q.  So when Deputy Superintendent Lowe assigned
```



1  you to conduct the line investigation of Lieutenant

2  Ahern, did you say anything to him about that at

3  that time?

4       A.  I did.

5       Q.  What did you say?

6       A.  I questioned him.  I said, you want me to

7  do the investigation on my direct report supervisor?

8  I said, it's normally the next higher rank.

9       Q.  Meaning -- you said normally the next

10  highest rank, meaning someone who was one rank

11  higher than lieutenant?

12       A.  Correct.

13       Q.  How did Deputy Superintendent Lowe respond?

14       A.  He looked at me and said, I'm asking you to

15  conduct the investigation.

16       Q.  What, if anything, did you say?

17       A.  Yes, sir.

18       Q.  Did you have any further conversation with

19  Deputy Superintendent Lowe at that time?

20       A.  About that?

21       Q.  Let's start with that.  About that.

22       A.  No.

23       Q.  About anything else?

24       A.  Later in the morning.



1      Q.   Okay.   After Deputy Superintendent Lowe

2  assigned you to conduct the line investigation, what

3  did you do?

4      A.   I went straight over to the SRT vehicle

5  where the discharge occurred.

6      Q.   In the five to 15 line investigations that

7  you had previously conducted, were any of those of

8  an officer who held a higher rank than you?

9      A.   No.

10     Q.   Were any of those of your direct report?

11     A.   No.

12     Q.   Were those all of officers that were below

13 you in terms of the hierarchy?

14     A.   Yes.

15     Q.   What was your basis for telling Deputy

16 Superintendent Lowe that normally it's -- you don't

17 do a line investigation of your -- of a superior

18 officer or your direct report; it's -- usually the

19 person who conducts it is one higher in the

20 hierarchy?   What was your basis for knowing that?

21     A.   Normal procedure.

22     Q.   Had you been trained on that?

23     A.   Yes.

24     Q.   In your entire time at the Cambridge Police



1  Department, other than this one incident, have you

2  ever been asked to conduct a line investigation of a

3  superior officer?

4      A.  No.

5      Q.  Have you ever heard of anybody else being

6  asked to conduct a line investigation of a superior

7  officer?

8      A.  The only thing I'm aware of is a lateral

9  rank on a car accident.

10     Q.  Okay.  That's lateral, not superior?

11     A.  Correct.

12     Q.  Not a direct report?

13     A.  Correct.

14     Q.  How long did it take you to get from where

15 you were with Deputy Superintendent Lowe to SRT

16 vehicle, approximately?

17     A.  Here to the end of the table.

18     Q.  You conducted the investigation -- well,

19 you reported to the scene, and then why don't you

20 tell me what you saw.

21     A.  I treated it as a scene that I would

22 process like any scene.

23     Q.  Okay.  What does that mean?

24     A.  So I want to identify who are my potential



1  entity that would objectively examine it and make a

2  determination.

3      Q.  Because state police is more about

4  ballistics?

5      A.  State police is more about ballistics.

6      Q.  And BPD would be ballistics?

7      A.  Ballistics.

8      Q.  Have you sent firearms to an independent

9  lab in the past?

10      A.  Not for this, no.

11      Q.  So you go to retrieve the firearm.  You

12  want to take photos of it, document it, go to --

13  your plan is go to DiPietro and request it be sent

14  to an independent lab.  You go to the evidence room

15  for the firearm, and what happens?

16      A.  I was told by an evident tech that the

17  firearm was not in evidence.  It was taken out.

18      Q.  Who was that evidence tech?

19      A.  Kevin McGrath.

20      Q.  What did you do at that point?

21      A.  I asked him who took my evidence out.

22      Q.  What did he say?

23      A.  Deputy Superintendent O'Connor.

24      Q.  Was that unusual to you?



1        A.  Yes.

2        Q.  What did you do -- what did you do when you

3   found out that Deputy Superintendent O'Connor had

4   taken your evidence?

5        A.  When you're a professional investigator,

6   you -- your chain of evidence is critical, and so

7   yes, I was upset that a person that wasn't in the

8   investigation, to my knowledge, was taking evidence

9   that I logged in.  You get possessive and you think

10  of it as your evidence.

11       Q.  So when you found that out, what did you

12  do?

13       A.  At some point after that, I did have a

14  conversation with Deputy O'Connor.

15       Q.  And what did you say to Deputy O'Connor?

16       A.  I asked him why he took my evidence.

17       Q.  What did he say?

18       A.  That it was not my concern.

19       Q.  Was anybody else present during that

20  conversation?

21       A.  No.

22       Q.  Where was it?

23       A.  In the hallway, third or fourth floor.

24       Q.  After he told you that it was none of your



1  concern, what, if anything, did you say?

2       A.  Nothing.

3       Q.  Was he your superior?

4       A.  No.  He is a superior officer.

5       Q.  Superior officer, but not in your chain of

6  command?

7       A.  That's correct.

8       Q.  Okay.  You look like you wanted to say

9  something else.

10      A.  He could tell me and give me an order, and

11  I would have to obey it, a lawful order.

12      Q.  Superior officer, you got to obey him.

13  He's just not in your chain of command?

14      A.  Correct.

15      Q.  What was his area of responsibility at that

16  time?

17      A.  We're getting into a time and I don't know

18  which title he had.  He was a deputy superintendent.

19      Q.  Let me ask you, so I understand that you

20  don't recall how long after the incident it was that

21  you went to retrieve the firearm, and that can

22  impact maybe what Deputy Superintendent O'Connor's

23  role was.

24           Do you think that this was within a month



1  of the incident that you went to do this?

2      A.  It could have been, yes.

3      Q.  I know it could have been.

4      A.  I can't recall.

5      Q.  Okay.  Do you believe it was within two

6  months of the incident?  And look, just --

7      A.  I don't recall.

8      Q.  -- so you understand, I don't want you to

9  say a time period that you don't know.  Okay?  I'm

10 not trying to get you to do that, but I'm trying to

11 see if we can narrow the time frame down.

12         It wasn't a year later; correct?

13     A.  It was not a year later.

14     Q.  Would you say it was within a couple months

15 of the shooting?

16     A.  That would be my belief.

17     Q.  When Deputy Superintendent O'Connor told

18 you it was none of your concern, do you recall what

19 his sort of -- he was not in your chain of command.

20 What was his area at that time?

21     A.  He was a member of the command staff.

22     Q.  Okay.  How many deputy superintendents were

23 there at that time?

24     A.  I wouldn't be able to tell you that without



1        Q.   Did you complain to anyone that Deputy

2    Superintendent O'Connor had taken your evidence?

3        A.   No.

4        Q.   Why not?

5        A.   I'm not sure who I would complain to.

6        Q.   Well, you could go to the commissioner;

7    right?  He's above Deputy Superintendent O'Connor in

8    the food chain.  You can go to the commissioner and

9    say, this isn't right.  Deputy Superintendent

10   O'Connor is interfering with my investigation.  You

11   could do that; right?

12       A.   A person could do that, yes.

13       Q.   And I take it that's not something you

14   would do or you didn't do?

15       A.   I did not do that.

16       Q.   Why not?

17       A.   That's not -- would not have been a

18   comfortable avenue to take.

19       Q.   We all have to do things in life that

20   aren't comfortable sometimes; right?

21       A.   Maybe comfortable is not the correct word.

22       Q.   Yeah.  I mean, why didn't you go complain

23   to the commissioner?

24       A.   Because I didn't.



1      Q.  I understand you didn't and that it

2   wouldn't be comfortable.

3          Why wouldn't it be comfortable?

4      A.  I did not believe that it would be fruitful

5   or constructive.

6      Q.  Okay.  So it might not work?

7      A.  Correct.

8      Q.  Okay.  But you never know until you go?

9      A.  Correct.

10     Q.  So do you think it would have been a bad

11  career move?

12     A.  I don't think it would have been a good

13  one.

14     Q.  Why is that?

15     A.  It was -- the administration at the time,

16  it would not have been good for me to go see the

17  commissioner and express my displeasure that

18  evidence of an investigation that I was assigned was

19  removed.

20     Q.  Because the administration at the time

21  what?  Do you want to take a break and talk to your

22  lawyer?

23                    MR. McDONALD:  We can do that.

24                    THE WITNESS:  And I'd like to use



1  the facilities, too.

2                     MR. LEVITT:  Why don't we take

3  five.

4                     (Brief recess.)

5       Q.  So, Lieutenant Murphy, we're talking about

6  why you didn't go to Commissioner Bard and complain

7  that Deputy Superintendent O'Connor had taken your

8  evidence, and you said it would not be comfortable

9  or fruitful.

10          You tell me -- now that you've had some

11  time to reflect on it, why you didn't do that?

12      A.  I don't believe that Deputy O'Connor would

13  have gone to evidence, taken an item out of evidence

14  without the commissioner's knowledge.

15      Q.  Okay.  You still had the option of going to

16  the commissioner and saying, I don't know if you

17  knew or not, but this happened, and I disagree with

18  it because this is my investigation and that's my

19  evidence, and, you know, taking it out of evidence

20  can disrupt the integrity of the investigation; you

21  did have that option?

22      A.  I did.

23      Q.  You didn't take it?

24      A.  I did not.



1     Q.  Do you think that that is one of the

2  reasons why you didn't do that, because you felt

3  that that would be a bad career move?

4     A.  I do.

5     Q.  Just so it's clear, one of the reasons why

6  you did not go to the commissioner was that you

7  believed that that would have been a bad career

8  move?

9     A.  Correct.

10     Q.  What was it -- you started to say in one of

11  your answers that at that time -- I can't remember

12  if you referred to the command staff or the

13  administration, but you were going to say something

14  about the administration at that time called the

15  Bard administration and you stopped yourself.  What

16  were you going to say?

17     A.  I just believe it would have been futile to

18  go to Commissioner Bard at that time to question him

19  about why Deputy O'Connor took the gun out of

20  evidence.

21     Q.  Yes, I understand that.  You've said that,

22  but then you were going to say something.  You said

23  the administration at that time, and then you

24  stopped.  So you were going to say something about



1   Superintendent O'Connor about this?

2        A.  I did.

3        Q.  Where did that conversation take place?

4        A.  Somewhere in the building.

5        Q.  Was anybody else present?

6        A.  I don't believe so.

7        Q.  What led to that conversation?

8        A.  If you're in investigations, you have a

9   case queue, so it's a database that you're always

10  checking.  Cases get statuses.  They're either open.

11  They can be closed.  They can be adjudicated.  They

12  can be cleared, exceptionally cleared.  And you

13  periodically go through your cases to clear cases

14  out of that queue.

15          This was post the gun being taken out of

16  evidence, and I had stopped doing anything further

17  after that point, and then I wanted to just clear

18  this out of my case queue.  And so I went up to him

19  and confronted him and said, is criminal

20  investigations section done as far as this is

21  concerned?  And he said, yes.  And I said, is it

22  going to be internal affairs?  And he said, yes.

23  And I wrote this report, and I had a supervisor

24  review it and sign off on it.



LT. JOSEPH MURPHY                                   August 31, 2023
AHERN vs SIG SAUER, INC., ET AL.                           100

1      Q.  So if this report is dated October 25th,

2   2019, that at least -- that gets us to the point

3   where we can say that the incident that you referred

4   to earlier where Deputy Superintendent O'Connor took

5   the gun, your evidence, out of evidence occurred

6   prior to the date of this report?

7      A.  Correct.

8      Q.  After when Deputy Superintendent O'Connor

9   took the gun out of evidence, was your investigation

10  ongoing at that stage?

11     A.  Yes, it was.

12     Q.  And after he took the firearm from

13  evidence, did you continue your investigation?

14     A.  No.

15     Q.  Why not?

16     A.  Because the investigation circled around

17  that firearm.

18     Q.  Okay.  So what was your purpose in

19  confronting Deputy Superintendent O'Connor about the

20  status of the investigation?

21     A.  I wanted to clear that out of my case

22  queue.  I wanted it documented that I had nothing to

23  do with that investigation after that fact.

24     Q.  Why did you want that documented?



1      A.  Because the chain of evidence, and the

2   investigation wasn't -- it wasn't my investigation.

3   The evidence was removed.

4      Q.  Did you at this point in your investigation

5   have any reason to refer it to Professional

6   Standards yourself?

7      A.  No.

8      Q.  Am I correct that in the course of a line

9   investigation, you could, in theory, develop

10  evidence that would lead you to refer a matter to

11  Professional Standards?

12     A.  I have to back up on the last question.

13  While I was writing the original report on May 19th,

14  Sil Ferreira and Phil McDavitt came into my office.

15  They're assigned to internal affairs, and I at that

16  point said, are you taking this investigation as an

17  internal affairs so I can stop right now?  And they

18  said, no.  Continue what you're doing.

19     Q.  That --

20     A.  That would be the only thing where I did

21  offer it and say, are you taking this away?  But did

22  I refer it to internal affairs?  No.

23     Q.  Right.  They came into your office.  This

24  was on May 19th?



1        A.   On May 19th.

2        Q.   So Sil Ferreira and McDavitt --

3        A.   McDavitt.

4        Q.   -- came into your office and said, are you

5    taking this?

6        A.   Yes.

7        Q.   You weren't referring it to them; you were

8    asking if they were taking it?

9        A.   Correct.

10       Q.   And they said no?

11       A.   Correct.

12       Q.   Did they report to the scene of the

13   discharge?

14       A.   Not while I was there, if they did.

15       Q.   Was that unusual for them to come down to

16   your office like that?

17       A.   Those two, yes, that's unusual.

18       Q.   Did you have any further conversation with

19   them at that time?

20       A.   They would ask me -- as I was typing away

21   and cataloging evidence and uploading the photo

22   images, they would periodically ask me questions

23   about it, the incident.

24       Q.   So this is the day of the incident?



1       A.  It is.

2       Q.  You're in the middle of your investigation?

3       A.  Yes.

4       Q.  Preliminary investigation at this point?

5       A.  Yes.

6       Q.  Categorizing the evidence and writing up

7  your reports of your interviews?

8       A.  Yes.

9       Q.  Sil Ferreira and McDavitt --

10      A.  Yes.

11      Q.  -- come down to your office, start asking

12 you questions about your investigation?

13      A.  Yes.

14      Q.  And how many years have you been with the

15 CPD?

16      A.  Twenty-seven, 28.

17      Q.  And in your 27 years with the CPD, has that

18 ever happened before?

19      A.  No.

20      Q.  What do you recall them asking you?

21      A.  I don't recall specifics.  It would be just

22 bullet item questions, and they would want answers.

23      Q.  Can you give an example?

24      A.  I can't.



LT. JOSEPH MURPHY                                        August 31, 2023
AHERN vs SIG SAUER, INC., ET AL.                                    104

```
 1        Q.  But it was your recollection is it was
 2   bullet item questions about the incident?
 3        A.  It was.
 4        Q.  And about your investigation to date?
 5        A.  It was.
 6        Q.  Did you ask them why they wanted to know?
 7        A.  I reiterated asking them if they want the
 8   investigation.
 9        Q.  And they said no?
10        A.  Correct.
11        Q.  Did you ask them why they were questioning
12   you about it?
13        A.  We went back and forth like that, yes.
14        Q.  What did you say?
15        A.  At one point, I said, I'm trying to write
16   my report.  Can you leave?
17        Q.  What, if anything, did Ferreira or McDavitt
18   say?
19        A.  McDavitt said, well, we could do this
20   upstairs.  We know how comfortable you are up there.
21        Q.  What did you interpret the reference to
22   upstairs being?
23        A.  It was -- the month before, there was an
24   internal affairs investigation on a different
```



1  person, and I was called in as a witness, and it was

2  not a comfortable interview.

3       Q.  That was in the internal affairs

4  Professional Standards Unit suite on the fourth

5  floor?

6       A.  Yes.

7       Q.  Upstairs?

8       A.  Yes.

9       Q.  How did you respond to that statement by

10  McDavitt?  What did you say?

11       A.  I said, fuck you, Phil.

12       Q.  What did he say?

13       A.  And I stood up.  I said, get out of my

14  office.

15       Q.  What happened next?

16       A.  They got out of my office, and I closed the

17  door.

18       Q.  Did they both leave?

19       A.  Yes.

20       Q.  Do you recall any of the other conversation

21  between the three of you that day in your office?

22       A.  No.  It was just -- it was just asking

23  questions when you're trying to type and categorize

24  and write a report.

1      A.  No.

2      Q.  Are you aware of any of them being

3  investigated by Professional Standards?

4      A.  I was not told.

5      Q.  You don't know?

6      A.  I don't know.

7      Q.  Do you know if Dave Albert's shooting was

8  investigated by Professional Standards?

9      A.  Actually, that was, yes.

10     Q.  How do you know?

11     A.  Because he received a five-day suspension.

12  Yes, I did know about his.

13     Q.  What about Jacques Desrosiers'?

14     A.  I don't know what the status of that is.

15     Q.  Who else do you know was involved in an

16  accidental shooting discharge?

17     A.  With this weapon?

18     Q.  Any weapon.

19     A.  I do know years past there's been a couple

20  where -- different situations but where people have

21  been chasing somebody with their weapon out and then

22  trip and fall and stuff, and the weapon goes off.

23  There's a couple of those over the years.

24     Q.  Do you remember any of those being



1     A.   Matter of fact.  He says, you're here.  He

2  goes, finish your reports and find him in violation.

3     Q.   The entire time?

4     A.   When I -- if you want to call it pushback

5  about finding someone in violation before an

6  investigation is complete, his tone would be -- it

7  would be safe to say that it would have some

8  frustration.

9     Q.   Okay.  What about DiPietro?  What was his

10  tone during this entire reaction?

11     A.   Level.

12     Q.   I'm sorry?

13     A.   He was just level.

14     Q.   Okay.  How about Sil Ferreira?

15     A.   That's -- the only interaction we had was

16  he made a statement, and he turned and said, oh, I

17  didn't know you were in the room.

18     Q.   His tone, was it level?

19     A.   It was -- I didn't know that you were in

20  the room, just like that.

21     Q.   Didn't sound angry, heated, sarcastic,

22  anything like that?

23     A.   No.

24     Q.   Did Sil Ferreira say anything about asking

