# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3           CIVIL ACTION NO.:  1:21-CV-11007-DJC

4    _____

5    THOMAS R. AHERN,

6              Plaintiff,

7         vs.;

8    SIG SAUER, INC., and CITY

9    OF CAMBRIDGE,

10             Defendants.

11   _____

12

13

14                  DEPOSITION OF

15                 LEONARD DIPIETRO

16                 October 12, 2023

17                   10:07 a.m.

18

19          DONNELLY, CONROY & GELHAAR, LLP
              260 Franklin Street, Suite 1600
20             Boston, Massachusetts 02110

21

22

23                 Raymond Doan
                  Digital Reporter
24       Commission Expires: November 16, 2029



 1 | 2019?

 2 |      A.   Oh, at least, yes.

 3 |      Q.   Okay.  When did those Monday morning case

 4 | meetings start?

 5 |      A.   Somewhere around the beginning of 2018.  When

 6 | I assumed that position, I did an assessment of the

 7 | criminal investigation section and felt that this was a

 8 | necessary step that we needed to take.

 9 |      Q.   And during those case meetings, can you walk

10 | me through what you would discuss with

11 | Lieutenant Ahern?

12 |      A.   With Lieutenant Ahern, specifically, not the

13 | whole criminal investigation section?

14 |      Q.   Sure.

15 |      A.   I would check with him to make sure that he

16 | had knowledge of all the reports that were coming in

17 | for the day, which he did, and discussed the

18 | supervisory responsibilities that we had of those

19 | individual cases.

20 |      Q.   And what was your impression of

21 | Lieutenant Ahern during these meetings?

22 |      A.   Lieutenant Ahern was an excellent supervisor

23 | of the police work that we were performing.

24 |      Q.   Can you walk me through the reasons that he



LEONARD DIPIETRO                                    October 12, 2023
AHERN vs SIG SAUER, INC., ET AL.                              12

 1 | was an excellent supervisor?

 2 |     A.   He had a very high police IQ.

 3 |     Q.   What does that mean, a high police IQ?

 4 |     A.   He knew his job extremely well.  He was

 5 | knowledgeable in the law.

 6 |     Q.   And did you ever have social interactions

 7 | with Lieutenant Ahern outside of work?

 8 |     A.   I'm sure, at some event that was outside of

 9 | work, both Tom and I would have been present together.

10 | I can't recall when, where or --

11 |     Q.   But you weren't having family dinners with

12 | him?

13 |     A.   No.

14 |     Q.   For example, you -- you would see him at work

15 | events, but not anything beyond that?

16 |          MR. MCKENDRY:  Objection to form.

17 |          You can answer.

18 |          THE WITNESS:  Not that I can recall, no.

19 | BY MS. PASCUCCI:

20 |     Q.   And when did you -- when was it that Tom

21 | started working for you?  Would that have been in 2017,

22 | when you became deputy -- when you became deputy

23 | superintendent?

24 |     A.   He was already in that position, I believe,



 1  discharge in May of 2019, were you aware of concerns

 2  among Cambridge Police Department officers as to CPD's

 3  adoption of the P320?

 4       A.   No.

 5       Q.   Prior to May 2019, did Lieutenant Ahern ever

 6  tell you about his concerns with the P320?

 7       A.   I don't recall him ever having that

 8  conversation with me prior to 2019.

 9       Q.   Prior to May 2019, were you aware that he did

10  have concerns as to the P320?

11       A.   No.

12       Q.   Okay.  After May 2019, did Lieutenant Ahern

13  ever tell you about his concerns with the P320?

14       A.   Yes.

15       Q.   And tell me about those conversations.

16       A.   That this P320 had these unintentional

17  discharges that were taking place in -- excuse me -- in

18  several different places.  And if I can recall his

19  words, the gun was unsafe.

20       Q.   When did he tell you this?

21       A.   I don't recall when.

22       Q.   Where were you when he told you this?

23       A.   Could have been my office.  It could have

24  been his office.  It could have been in the conference



1 room.

2      Q.    Would he have shared anything with you at

3 out-of-work events?

4      A.    Not that I recall.

5      Q.    And how many times did he bring up his

6 concerns about the P320?

7      A.    Many times.

8      Q.    If you can estimate, how frequently?

9      A.    I cannot.

10      Q.    Okay.  Did he bring up his concerns with

11 others as well?

12      A.    Yes.

13      Q.    Who?

14      A.    I can't speak to actual names.  I would say

15 anyone that would listen.

16      Q.    And what's your basis for saying "anyone that

17 would listen"?

18      A.    After the incident, he was very likely to

19 bring up the fact that the firearm was -- there was a

20 problem with the firearm and the safety of it.

21      Q.    What was your reaction to his concerns?

22      A.    I understood his reasoning because of the

23 various events that had taken place surrounding this

24 weapon, social media, and even television reporting



1  about the firearm and my own concern about the firearm.

2      Q.   When you mentioned your own concern about the

3  firearm, what's that?

4      A.   That I was carrying this firearm that

5  reportedly had problems.  So there was a personal

6  concern.

7      Q.   Were you worried about carrying the gun

8  chambered?

9      A.   No.

10     Q.   And did you do any research into the -- into

11 the problems that Lieutenant Ahern had brought up with

12 you?

13     A.   I read the social media blogs or whatever you

14 call them, watched the television reporting.

15     Q.   And you had said earlier that he would bring

16 up his concerns with anyone that would listen.

17     A.   Not I brought them up, he brought them up.

18     Q.   Oh, no.  That he brought them up, that's what

19 I meant to say.  I misstated if I said that it was you.

20     A.   That's okay.

21     Q.   How frequently was he having these

22 conversations around the station?

23     A.   I can't speak to that.

24     Q.   Okay.  And what was the response among other



1  officers, other staff within the station?

2      A.    I can't speak to their concerns.

3      Q.    Was there ever a feeling of frustration that

4  Lieutenant Ahern -- that he was bringing up these

5  concerns?

6      A.    Can you repeat that?

7      Q.    Was there ever a feeling of frustration that

8  Lieutenant Ahern was repeatedly bringing up these

9  concerns about the firearm?

10     A.    I would not use the word frustration, no.

11     Q.    Well, what word would you use?  What was the,

12 you know, general feeling?

13     A.    That after the incident, that he should just

14 keep his comments to a minimum --

15     Q.    Why is it (crosstalk) -- oh, I'm sorry.  I

16 cut you off.

17     A.    -- seeing that he was facing a disciplinary

18 action.

19     Q.    And why should he keep his comments to a

20 minimum?

21     A.    It's just a good idea.

22     Q.    Why was it a good idea?

23     A.    Anytime you're involved in a disciplinary

24 action, you should just keep things to yourself.



1      Q.    Why is that, why should you keep things to

2  yourself during a disciplinary action?

3      A.    If there's a current investigation, it should

4  not be discussed, and the person under the

5  investigation should keep their comments to themselves.

6      Q.    Do you think there was any concern at

7  Cambridge Police Department what -- I'll withdraw the

8  question.

9           Were you aware that CNN had contacted

10  Cambridge Police Department in 2018 regarding its

11  adoption of the P320?

12      A.    No.

13      Q.    You were aware, however, of social media and

14  news articles about the P320?

15      A.    Yes.

16      Q.    Were you concerned about --

17      A.    Oh, sorry.  Can you repeat that?  I might

18  want to --

19      Q.    Sure.

20      A.    -- change my answer there.

21      Q.    You mentioned earlier having read news

22  articles about the P320, correct?

23      A.    Yes.

24      Q.    You had -- so you were aware that there were



1  news articles about the P320?

2       A.   Yes.

3       Q.   Do you think there would have been concern at

4  Cambridge Police Department about the news media's

5  reaction to CPD having a gun that was susceptible to

6  unintentional discharges?

7       A.   Yes.

8       Q.   And what would that concern have been?

9       A.   That the City of Cambridge purchased the

10 firearm that was defective, and how does that look for

11 the Cambridge Police Department.

12      Q.   Did anyone discuss those concerns?

13      A.   Not to me.

14      Q.   And what's your basis for saying that there

15 would have been that concern about public reaction to

16 having the P320?

17      A.   Social media.

18      Q.   And you mentioned earlier your concerns

19 regarding the P320.  Could a gun that is susceptible to

20 unintentional discharge put officers in danger?

21           MR. MCKENDRY:  Objection.

22           THE WITNESS:  Do I still have to answer?

23           MS. PASCUCCI:  Yes, yes, yes.

24           MR. MCKENDRY:  You can answer it, yes.



1  case management meeting in the morning.  We held our

2  case management meeting, discussed the case, the

3  weekend's cases, and it was common practice for the --

4  the supervisory staff to remain in the room after, so

5  that we could discuss the cases amongst ourselves going

6  forward, and that was the topic of conversation.

7       Q.   Was anyone else in the room at that point

8  that you're having -- that you're -- that that's the

9  topic of conversation, besides you,

10 Superintendent Demarco and Lieutenant Murphy?

11      A.   Sergeant Murphy.

12      Q.   Or Sergeant Murphy.  Thank you.

13      A.   At that time, no.  At that moment, no.

14      Q.   What were you guys saying about the incident?

15      A.   Just what had happened, cop talk.  The relief

16 that no one got hurt.  How did it happen, what actually

17 took place?  Who was there, who responded?  Why wasn't

18 I called?  There were other command staff members,

19 supervisory officers at the time that were present,

20 but --

21      Q.   You said, "Why wasn't I called?"  Why -- why

22 did that come up?

23      A.   I raised it.

24      Q.   And why did you raise it?



LEONARD DIPIETRO                                    October 12, 2023
AHERN vs SIG SAUER, INC., ET AL.                              47

1      A.   As a deputy superintendent, you're in 24/7.

2   And it is my opinion, as commanding officer of the

3   officer that was involved, I would have appreciated a

4   phone call after this happened.

5      Q.   Would you have expected to receive a phone

6   call?

7      A.   Yes.

8      Q.   In the past, if something like this had

9   occurred, had you received phone calls?

10     A.   Nothing like this has happened before.

11     Q.   Would you say that not receiving a phone

12  call, it was taken out of the proper chain of command?

13          MR. MCKENDRY:   Objection.

14          THE WITNESS:   No, because there was a deputy

15  superintendent that was present that day as the

16  commanding officer at the Mayfair.

17  BY MS. PASCUCCI:

18     Q.   Who was that?

19     A.   Deputy Superintendent Lowe.

20     Q.   Okay.  You said nothing like this had

21  happened at that -- I may be misstating it.  I believe

22  you said something -- nothing like this had happened

23  before during your time.

24     A.   No.



1      Q.   But if there -- you know, if an officer who's

2   under your command had, say, a car accident or another

3   event leading to a staff investigation, had you been

4   called in the past when that happened?

5      A.   Not always, no.

6      Q.   So you're in the morning meeting, you're

7   discussing the -- the morning meeting's elapsed, you're

8   discussing what happened.  At some point, does

9   Officer Ferreira come into the room?

10      A.   Lieutenant Ferreira, yes.

11      Q.   Then Lieutenant Ferreira, thank you.  And

12   what does he say when he comes into the room?

13      A.   Lieutenant Ferreira was assigned to PSU at

14   the time, so I assumed he had the investigation.  And

15   he made a comment -- I might not remember exactly the

16   words he used, but something to the effect is, "We have

17   to find him responsible for this."

18      Q.   Did you know, at the time, that

19   Sergeant Murphy had been investigating the incident?

20      A.   No.

21      Q.   When -- it's Lieutenant Ferreira at the time?

22      A.   Yes.

23      Q.   When Lieutenant Ferreira said, "We have to

24   find him responsible," how did you respond?



```
 1              MR. MCKENDRY:  You can answer.

 2              THE WITNESS:  No, I meant, like -- yeah, no.

 3  I --

 4              MR. MCKENDRY:  You can answer.

 5              THE WITNESS:  I -- I responded very

 6  sarcastically.

 7  BY MS. PASCUCCI:

 8      Q.   And what did you say?

 9      A.   "Why don't we take him out back and shoot

10  him, and then give him a fair trial?"

11      Q.   And what did Lieutenant Ferreira say in

12  response?

13      A.   I think he chuckled.

14      Q.   Why did you say that?

15      A.   Because there's a process that we follow, and

16  we don't break those processes.  We follow the rules of

17  investigation.  An incident took place, a very tragic

18  incident took place or could have been tragic.  It was

19  a bad incident.  And the -- and we needed to do our due

20  diligence in the investigation to assign it out and

21  conduct a thorough, complete investigation as to what

22  happened.

23              Many -- what really happened in the bread

24  truck that day needed to be investigated.  Witnesses
```



1  had to be interviewed.  Statements had to be collected.

2  Evidence had to be collected.  There's a process.  We

3  should not be breaking from that process and rushing to

4  a finding without that process first being conducted.

5       Q.   At the time that Lieutenant Ferreira made

6  that comment, had that process been conducted?

7       A.   I don't know if -- I doubt it.  It was less

8  than 24 hours later.  This was going to take a lot of

9  work, a lot of time, a lot of investigating, a lot of

10 people to interview.  Ballistics, the -- the firearm

11 itself had to be investigated.  It had to be

12 forensically checked.  I mean, there were lots of

13 things swirling around that you start thinking of when

14 something like this happens.

15           And, of course, has anyone spoken with those

16 individuals that were in the bread truck that day, and

17 Tom and everyone involved, as to their -- their

18 feelings, their -- their mental concerns?  They were

19 just involved in a tragic incident, also.  So we had an

20 issue with -- their mental health was a concern, too.

21 So we have stress team officers and such.

22           And, you know, like, when you're a

23 supervisor, especially at the rank of superintendent,

24 you have other responsibilities, that you have to kind



1  of really look at the big picture, not so narrow.  And

2  that's what I was seeing right then and there.  It was

3  very narrow.

4          I had my opinions as to what took place that

5  day and everything else, but let's pump the brakes.

6  You know, that's a common term, but I always used "slow

7  down."  I used that with my detectives when we had an

8  investigation, "slow down," especially involving

9  different kinds of investigations that were being

10 conducted.  "Slow down, do your due diligence.  Do the

11 investigation.  We're not rushing off here.  There's no

12 need to rush to any kind of judgment today."

13     Q.   When Lieutenant Ferreira made the comment of

14 "We have to find him responsible," if you know, did he

15 see Sergeant Murphy at that time?

16          MR. MCKENDRY:  Objection.

17          You can answer.

18          THE WITNESS:  I don't know if he saw him, no.

19 BY MS. PASCUCCI:

20     Q.   Did he appear surprised at all when he saw

21 Sergeant Murphy in the room?

22     A.   Yes.

23     Q.   And can you describe that to me?

24     A.   He was standing at the doorway, I think kind



1  of -- he was outside standing at the doorway, and then

2  he kind of looked in, surprised.

3      Q.   From outside the doorway -- can you tell me

4  how the room was arranged at that point?

5      A.   Door leads in, table runs north to south,

6  long table, and I normally sat at the head of the

7  table.  Superintendent Demarco always sat to my left,

8  and Sergeant Murphy was to the right, almost in the

9  corner.

10     Q.   So when -- so when Lieutenant Ferreira was at

11 the door, he would have seen you at the head of the

12 table, correct?

13     A.   I hope so.

14     Q.   Would he -- did you have a straight -- did

15 you have a straight shot at him, seeing him?

16     A.   No, he had a straight shot at me.

17     Q.   Okay.

18     A.   My back was to him.

19     Q.   Okay.  Got it.  Okay.  And would he have seen

20 Demarco -- would have been then Superintendent

21 Demarco --

22     A.   Yes.

23     Q.   -- at your left?

24     A.   He couldn't have missed him.  He had a



1  straight shot at him.

2      Q.   And where was Lieutenant Murphy in relation

3  to --

4      A.   Sergeant Murphy was off to the right.

5      Q.   Sergeant Murphy.  I'm sorry.

6      A.   He might -- like I said, he might have been

7  sitting at the table.  He could have been sitting in

8  the corner, literally in the corner.  I don't recall

9  exactly where he was.

10     Q.   So when Lieutenant Ferreira puts his head in

11 and sees Murphy, he appears surprised?

12     A.   I -- I don't want to put -- I can't speak to

13 his surprise or not surprise, or just -- I don't -- I

14 know he didn't see him initially.

15     Q.   Okay.  And -- but you said that he appeared.

16 What was the expression on his face when he did see

17 him?

18     A.   His eyes didn't bulge, his mouth didn't

19 change shape or anything like that.  He just kind of

20 glanced at him, like, there's another person in the

21 room.

22     Q.   What does he say at the point that he sees

23 Sergeant Murphy?

24     A.   I don't believe he said anything.  I can't --



 1  I really don't recall him saying anything else at that

 2  time.

 3       Q.   Did you -- at some point, did you say

 4  something to the effect of "Why don't we tell Joe"?

 5       A.   Why don't I tell Joe?

 6       Q.   Or "Why don't you tell Joe"?

 7       A.   I don't recall that.

 8       Q.   Okay.  What else was said at that point in

 9  the -- at the meeting?

10       A.   What else was said?

11       Q.   Yes.

12       A.   Superintendent Demarco did say, "Lenny, you

13  have to find him responsible."  And again, my response

14  was "Guys, we need to slow down, slow down."  I think

15  at that point, I may have made the comment, "We know he

16  had -- he had the firearm out of his holster.  Let's

17  deal with that."

18       Q.   When Superintendent Demarco said, "Lenny, you

19  have to find him responsible," he was talking to you,

20  correct?

21       A.   Correct.

22       Q.   And do you remember precisely what he said?

23       A.   Not precisely.  I was probably still being

24  sarcastic at that moment, because I felt we needed to



1  to be completed, almost like a packet.

2          I -- I could draw a better conclusion or

3  reference -- excuse me -- regarding a department motor

4  vehicle involved in an accident.  There are certain

5  reports that have to be made out.  The packet actually

6  has a template on the -- attached to the outside

7  envelope.  There's, like, seven documents that have to

8  be made out before it's completed.

9          And what's odd is that the officer tasked

10  with that does make a recommendation.  That

11  recommendation is that officer's recommendation.  It

12  doesn't mean that that's the final recommendation.

13  That's just the officer tasked with that initial report

14  and the completion of the requirements of that report.

15      Q.   Okay.  So to make sure I understand, here we

16  have a discharge of a firearm.  So in addition to an

17  investigation, there has to be an incident report just

18  based on the discharge of a firearm?

19      A.   Correct.

20      Q.   Okay.  And Sergeant Murphy would have been

21  tasked with doing that incident report?

22      A.   He was tasked with that --

23      Q.   Okay.

24      A.   -- I -- not should have been.  That's a



1  different story.  Sergeant Murphy was junior to

2  Lieutenant Ahern.  I would have rather have seen a

3  higher-ranking officer perform that task or at least

4  one of equal rank.

5      Q.   Do you know why it was that Sergeant Murphy

6  was (crosstalk) --

7      A.   I cannot answer that question.  The people

8  there made that decision that day.

9      Q.   When you say "people there," do you mean

10 people on the scene?

11     A.   The supervisors that were on the scene, the

12 deputy superintendent.

13     Q.   Would that have been Superintendent Lowe?

14     A.   Deputy Superintendent Lowe, yes.

15     Q.   Deputy Superintendent Lowe.  Thank you.

16 Okay.  So Sergeant Murphy, he was assigned to doing the

17 incident report, and it sounds like he was also

18 collecting evidence and creating a report with respect

19 to the staff investigation, correct?

20     A.   I don't know about that.  He was conducting a

21 detailed report.  Again, who was there, evidence,

22 statements, possibly.  Again, to complete the incident

23 report, not the PSU staff investigation.

24     Q.   Okay.  So you understood that -- that



```
 1              MR. MCKENDRY:  Objection.

 2              THE WITNESS:  We needed to investigate all

 3    the circumstances of this incident.

 4    BY MS. PASCUCCI:

 5         Q.    And when you say you needed to look at the

 6    circumstances, does that mean you needed to understand

 7    why the gun was taken out of the holster?

 8         A.    Yes.

 9         Q.    And is that something that you would consider

10    in determining whether it was improper to take the gun

11    out of the holster?

12         A.    Yes.

13         Q.    In other words, the reason that

14    Lieutenant Ahern took it out of the holster would

15    affect whether it was improper to take it out of the

16    holster, correct?

17         A.    Yes.

18         Q.    Okay.  So -- and how many conversations did

19    you have with Sergeant Murphy about the investigation?

20         A.    Not many.  Formal -- formal conversations

21    regarding any required staff work that he was given,

22    very, very little for the purpose of the investigation

23    being conducted independently by PSU.

24         Q.    Can you explain what you mean by that?
```

