# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
                                  CIVIL ACTION NO. 21-11006-DJC
 4   THOMAS R. AHERN,

 5         Plaintiff,

 6      vs.

 7   SIG SAUER, INC., AND CITY OF
     CAMBRIDGE,
 8
           Defendant.
 9   _____

10

11

12

13
                        DEPOSITION OF
14
                        HECTOR VICENTE
15

16                   October 19, 2023

17                      10:11 A.M.

18
                          Proceeding
19              Boston, Massachusetts 02110

20

21

22
                        Raymond Doan
23                    Digital Reporter

24
```



```
1        Q.   And it was you and -- was it you and Mushlin?
2        A.   Yes.
3        Q.   Officer Mushlin?
4        A.   Officer Mushlin -- or Sergeant Mushlin,
5    actually.
6        Q.   Sergeant Mushlin, okay.  Did you -- did you
7    have a meeting with Commissioner Bard to discuss that?
8        A.   It wasn't a meeting.  It was a -- a brief
9    conversation.  We can call it a meeting, but it was a
10   brief conversation.
11       Q.   Okay.  Was there anybody else present for that
12   conversation?
13       A.   No.
14       Q.   And where did that take place?
15       A.   His office.
16       Q.   So it was the three of you in his office?
17       A.   Yes.
18       Q.   His Chief of Staff wasn't there?
19       A.   No.
20       Q.   And what do you recall him saying to you and
21   Sergeant Mushlin?
22       A.   If there was any way that during in-service
23   training we can implement some type of firearm safety
24   course to assist the officers in light of what
```



1  transpired with the accidental discharge.
2       Q.   And I think you said earlier that your -- one
3  of the goals of that in-service training was to try to
4  gain confidence for officers who might have -- who might
5  have a doubt about the safety of the P320?
6       A.   That's correct.
7       Q.   Is that something that Commissioner Bard
8  relayed to you?
9       A.   Yes.
10      Q.   And I think you said that that was in light of
11 the -- the accidental discharges, correct?
12      A.   That's correct.
13      Q.   And was that also -- I -- I think you said it
14 was also that there was -- there were concerns among the
15 -- among some officers because of those accidental
16 discharges, about the safety of the firearm?
17      A.   Yes.
18      Q.   So your goal then, or you and Sergeant
19 Mushlin, your goal was to sort of assuage those
20 concerns?
21      A.   I wouldn't say assuage.
22      Q.   Let me -- let me rephrase it.  What I was
23 trying to say was assuage, which is you -- part of your
24 goal was to try to make people -- the officers feel more



1  comfortable about the safety of the firearm?
2       A.   Make them aware of the importance of firearm
3  safety.
4       Q.   Okay.  And part of that was trying to, for the
5  officers to gain -- for those officers who might have a
6  doubt about the safety of the P320, to gain more
7  confidence in the safety of the firearm?
8       A.   Yes.  Yes.
9       Q.   Did you have any discussions with Commissioner
10 Bard about what to say about the three accidental
11 discharges?
12      A.   I'm sorry.  I'm sorry.  Did you have any?
13      Q.   Did you, in your -- in your conversation or
14 meeting with Commissioner Bard, did you have any
15 discussion about what to say about the three accidental
16 discharges?
17      A.   No.  He was -- he was totally firm in not to
18 discuss the cases, as they -- they were open cases.  And
19 I think they're still open cases, so absolutely no -- no
20 discussion.
21      Q.   Do you recall in the in-service trainings that
22 there were some questions asked about the accidental
23 discharges?
24      A.   No.  Not to my knowledge.



1        A.    Yes.
2        Q.    Beneath that sentence, there's a list of
3   things, striker safety, disconnect safety three-point
4   take-down safety.  Do you see those?
5        A.    Yep.
6        Q.    Second from the bottom is tab trigger safety.
7        A.    Yep.
8        Q.    And -- and I'm just saying, is that -- is that
9   also something you cut and pasted from the SIG Sauer
10  website?
11             THE WITNESS:   That was -- that was cut and
12  paste as well, yep.
13  BY MR. LEVITT:
14       Q.    And that's back in August of 2018?
15       A.    Yes.
16       Q.    Let me show you number 6.  Officer Vicente,
17  have you seen this document before?
18       A.    Yes.
19       Q.    And it says it's a -- from Lieutenant
20  McDavitt, who, as you've said, is -- was the lieutenant
21  in charge of the PSU, correct?
22       A.    That's correct.
23       Q.    To Director James Mulcahy.  What position did
24  James Mulcahy hold at that time?



1    A.   He's actually the director of the professional
2    standards and oversees the training as well.
3    Q.   And it says that PSU is conducting an
4    investigation as a result of information received of
5    inappropriate and unprofessional behavior and
6    conversations by Lieutenant Tom Ahern concerning the SIG
7    Sauer P320?  Do you see that?
8    A.   Yes.
9    Q.   Is that information that -- well, let me see.
10   Let me continue on.  PSU has received information that
11   Lieutenant Ahern has had inappropriate, unprofessional,
12   and unproductive conversations with department Officer
13   Hector Vicente concerning the safety of the department-
14   issued SIG Sauer P320.  Do you see that?
15   A.   Yes, sir.
16   Q.   And it says, specifically, the lieutenant does
17   not believe that the firearm is safe and has spoken
18   about this with Officer Vicente in relation to the
19   officer of training duties as an officer; is that
20   correct?
21   A.   Is that --
22   Q.   Did I read that correctly?
23   A.   Yeah, that -- that's correct.
24   Q.   Okay.  And this refers to those conversations



1    he had with you, where he was complaining about you --
2    the in-service trainings?
3         A.   Yes.
4         Q.   And did you report those conversations to
5    someone?  Is that how this came about?
6         A.   Yes.
7         Q.   Who did you report it to?
8         A.   Commissioner Bard.
9         Q.   Did you do that in person, or by email, or on
10   the phone?
11        A.   We -- we had a meeting.  I had a meeting with
12   him relative to the SRT, what was going on with the SRT,
13   and then that came -- conversation came up.
14        Q.   Is that a meeting that you requested?
15        A.   No.
16        Q.   Is that a meeting that he requested?
17        A.   That -- I'm sorry, that's a meeting that I
18   requested, yes.
19        Q.   Okay.  And was anybody else at that meeting?
20        A.   No.
21        Q.   So it was you and Commissioner Bard?
22        A.   Yes.
23        Q.   In his office?
24        A.   Yes.



1	Q.	And why did you request the meeting?
2	A.	That was a meeting that at first -- there was
3	two parts.  One of them -- or one of the -- again, I
4	can't, unless I have the report in front of me to -- but
5	it was about the SRT.  There was a lot of stuff going on
6	with the SRT.
7	Q.	What report are you referring to?  You said,
8	"Unless I have the report in front of me."  What report?
9	A.	I think I wrote a 650 to Internal Affair
10	Lieutenant Phil McDavitt.
11	Q.	Okay.  About the SRT?
12	A.	About the SRT and about -- about Lieutenant
13	Ahern's and my conversation, my conversation with
14	Lieutenant Ahern.
15	Q.	And was that before your meeting with
16	Commissioner Bard, or after?
17	A.	Well, at the meeting.
18	Q.	What's that?
19	A.	That happened at the meeting.
20	Q.	You wrote the memo at the meeting?
21	A.	Nope.  That was after.  I'm sorry.
22	Q.	That's what I --
23	A.	Yeah.
24	Q.	So after your meeting with Commissioner Bard,



1  you wrote the memo to Lieutenant McDavitt?
2       A.   Yes.
3       Q.   Did Commissioner Bard suggest to you to write
4  the memo?
5            MR. MCKENDRY:  Objection.
6            THE WITNESS:  Yeah.  I was ordered.
7  BY MR. LEVITT:
8       Q.   He ordered you to write the memo?
9       A.   Yes.
10      Q.   And to the best of your recollection, what did
11 you discuss with Commissioner Bard?  What concerns did
12 you have about the SRT team that you wanted to discuss -
13 - - that you discussed with Commissioner Bard?
14      A.   We talked about the morale.  We talked about
15 the -- my resignation wasn't being accepted, something
16 about I didn't want him to think that we were trying to
17 create some type of coup or something like that.  That's
18 the best I can remember.
19      Q.   And when you say you didn't want him to think
20 you were attempting some kind of coup, is that because
21 multiple operators were -- had submitted their
22 resignation?
23      A.   Yes.
24      Q.   And you've described those reasons already



1    here today about why personally you wanted to resign,
2    correct?
3         A.    Uh-huh.
4         Q.    And it had to do with the political climate in
5    Cambridge, George Floyd, correct?
6         A.    Yes.
7         Q.    I think you said it had to do with your --
8    your own physical health, correct?
9         A.    Yes.
10        Q.    I think you described being burned out?
11        A.    Yes.
12        Q.    Not having -- you described not having the
13   proper equipment from the city?
14        A.    Yes.  Yes.
15        Q.    And all of these things sort of led you to not
16   want to continue with SRT?
17        A.    That's correct.
18        Q.    And you explained all that to Commissioner
19   Bard?
20        A.    Yes.
21        Q.    Okay.  And then you also told him about your
22   conversations with Lieutenant Ahern?
23        A.    Yes.
24        Q.    And what did you say about those?



1      A.   That Lieutenant Ahern has -- I've received
2   calls from Lieutenant Ahern concerned -- complaining
3   about I shouldn't be teaching the class about the P320,
4   that -- that the weapon isn't safe.  And I think it -- it
5   would -- I think he needed to know because there was a
6   friction going on.  I was under the impression that
7   Lieutenant Ahern was -- was he telling me, ordering me,
8   was he complaining?  And I got also Commissioner Bard on
9   the other end, oh, you've got to conduct that training.
10  So I need -- I needed to know where I stand in between
11  this, and --
12     Q.   Yeah.  You felt stuck in the middle?
13     A.   Yes.
14     Q.   Okay.  When Lieutenant Ahern called you and
15  complained about these -- you doing this, did he -- did
16  he raise his voice at you?
17     A.   No.
18     Q.   Did he yell at you?
19     A.   No.
20     Q.   Did he -- did he, in fact, tell you, you know,
21  I order you not to do this?
22     A.   No.  But he was persistent.
23     Q.   He called you multiple times?
24     A.   Yes.



1        Q.   Did you think that -- was it your idea that
2   going back to Exhibit, I think it's 7?
3             MR. MCKENDRY:  Yeah.
4   BY MR. LEVITT:
5        Q.   Was it your --
6             MR. MCKENDRY:  Six.
7             MR. LEVITT:  Thank you.
8             (Plaintiff's Exhibit 6 was marked for
9   identification.)
10  BY MR. LEVITT:
11       Q.   Was it your idea that PSU should open an
12  investigation of Lieutenant Ahern for inappropriate,
13  unprofessional, and unproductive conversations with you?
14       A.   No.
15       Q.   Did you ask Commissioner Bard to refer this to
16  professional standards?
17       A.   No.
18       Q.   Did you call professional standards and
19  complain about it?
20       A.   No.
21       Q.   Did you think it warranted a professional
22  standards investigation?
23            MR. MCKENDRY:  Objection.
24            THE WITNESS:  That's not my call.



```
 1   BY MR. LEVITT:
 2       Q.   Understood.  But I'm still asking your
 3   opinion.
 4            MR. MCKENDRY:  Objection.
 5            THE WITNESS:  I don't know how to answer that.
 6   That's above my pay rate.
 7   BY MR. LEVITT:
 8       Q.   Were you interviewed by professional standards
 9   in connection with this issue?
10       A.   No.
11       Q.   Did Director Mulcahy direct you to provide a
12   full, complete, and detailed P650 report within three
13   days relative to your knowledge of this incident?
14       A.   Yes.
15       Q.   And you did that?
16       A.   Yes.
17       Q.   And he ordered -- did he order that you
18   provide as much detail as possible, including dates,
19   times, and witnesses concerning these interactions with
20   Lieutenant Ahern?
21       A.   Yes.
22       Q.   In your -- I guess you've been with Cambridge
23   -- how long have you been with them?
24       A.   Like, 26 years now.  26 years.
```



1    Q.   In your 26 years with the Cambridge Police
2  Department, are there any other occasions where
3  professional standards ordered you to provide a report
4  of a conversation you had with another member of the
5  Cambridge Police Department?
6    A.   No.  Not to my knowledge.
7    Q.   Well, I'm asking you, yeah, to your knowledge.
8  I mean, do -- do you recall --
9    A.   No.
10   Q.   In -- in your -- let me just say it again,
11 just so we're clear here.
12        In your 26 years with the Cambridge Police
13 Department, do you recall any other occasion when the
14 professional standards unit ordered you to provide a
15 full, complete, and detailed report of a conversation
16 you had with another member of the Cambridge Police
17 Department?
18   A.   My question to you, conversation -- just
19 conversation?
20   Q.   What's that?
21   A.   Just conversation?
22   Q.   Well, I'm -- why don't I do this so that we're
23 completely clear.  In your 26 years as a Cambridge
24 Police Department, other than this instance with



1  Lieutenant Ahern, do you recall professional standards
2  unit asking you to provide a full, complete, and
3  detailed report, relative to your knowledge, actions,
4  observations in conversations, with respect to a
5  conversation you had with a member of the Cambridge
6  Police Department.
7      A.   No.
8      Q.   In your 26 years with the Cambridge Police
9  Department, do you ever recall the Commissioner ordering
10 you to report to professional standards about a
11 conversation you had with another member of the
12 Cambridge Police Department?
13     A.   No.
14     Q.   Take a look at Exhibit 3, please.  So this
15 started, if you look on Page 2, with a request from Phil
16 McDavitt, professional standards, on November 21st,
17 2019, to Tom Flynn.  Do you see that?  It says down at
18 the bottom, "Lieutenant Flynn?"
19     A.   Yes.
20     Q.   And were you copied on that original email
21 from I -- I think at the time it was Sergeant McDavitt?
22 The reason I ask is that I see that you responded to it
23 on December 7th, 2019, and I just don't see if you were
24 actually copied on it.



1     A.   We -- we change only -- we change only the
2  firearms safety into that.  But this stuff, we kept it
3  on a different notes that we have that we'd carry into
4  the classroom that -- it would allow us to actually
5  discuss every bullet.
6     Q.   Okay.  And then you had a separate PowerPoint
7  that you put up when you talked about firearm safety?
8     A.   Yes.
9     Q.   Okay.  And where is that PowerPoint?  Is that
10 on your desktop?
11    A.   That was on my desktop.
12    Q.   Okay.  It -- it looks like one of the things
13 you talked about in this in-service training was the
14 quick attachment holster release system?
15    A.   That's correct.
16    Q.   And was that a new department purchase for
17 everyone?
18    A.   Yes.
19    Q.   And when was that rolled out?
20    A.   That was rolled out at the same time that we
21 roll out holsters for everyone, new holsters.
22    Q.   Is that a certain time of year that you do
23 that?
24    A.   That would've been during in-service training.



1      Q.   And in-service training, I think you said is
2  typically at the first part of the year?
3      A.   Yeah.
4      Q.   January to May?
5      A.   January to May.
6      Q.   Okay.  And that's also a time where you give
7  out new equipment?
8      A.   Yes.
9      Q.   And so as I recall, you couldn't remember if
10  this was 2020 or 2021, but in one of those time periods,
11  Cambridge purchased the QLS for -- for everyone in the
12  department?
13      A.   That's correct.
14      Q.   And that is designed so that you can remove
15  your -- easily remove your weapon without removing it
16  from the holster?
17      A.   That's correct.
18      Q.   And it says here, an example would be going
19  into booking and removing the holster plus the firearm,
20  as opposed to removing the firearm from the holster?
21      A.   That's correct.
22      Q.   Because prior to the -- prior to the QLS, you
23  would -- when you go into booking, you'd have to remove
24  your firearm from the holster to put it in the -- is it



1  like a little safe?
2       A.   Yes.
3       Q.   Okay.  I take it when you would do that, you
4  would practice the safety tips that we discussed
5  earlier, you'd have your finger on the slide?
6       A.   Yep.
7       Q.   And make sure you weren't pointing it at
8  anyone?
9       A.   That's correct.
10      Q.   So that you could safely remove it and put it
11 into the -- into the slide?
12      A.   Yep.  Yep.
13      Q.   Okay.  And so, is Cambridge now using this --
14 or are all the officers using the -- the QLS?
15      A.   Not -- not everybody.  I still see officers
16 taking their weapon out of the holster and placing them
17 in the -- a locker system.
18      Q.   Okay.  Employing those safety tips we just
19 discussed?
20      A.   Correct.
21      Q.   And this -- this system, it says, works with
22 nearly all, I have a hard time with this word,
23 Safariland holsters?
24      A.   Yep.  Yep.



```
 1        Q.    Okay.  Do you know if it works with the triple
 2   retention holster?
 3        A.    It works for all of them.
 4        Q.    It does work for them?
 5        A.    Yeah.
 6        Q.    Did you ever receive a notice that you should
 7   not delete documents in connection to this
 8   investigation?
 9        A.    If I received it?  Yes.
10        Q.    Do you remember when?
11        A.    I don't know.
12        Q.    And do you -- do you have a personal and a
13   work phone?
14        A.    A personal and a work phone?  I have a
15   personal, not a work phone.
16        Q.    Okay.  You use your work -- you use your
17   personal phone for everything in work?
18        A.    Yes.  Yeah.
19        Q.    And do you -- do you text on your personal
20   phone for personal and for work?
21        A.    Yes.
22        Q.    Did you -- do you use any other sort of
23   messaging services, like WhatsApp, or anything like
24   that?
```

