### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS AHERN,<br><br>       Plaintiff,<br><br>       v.<br><br>SIG SAUER, INC. and<br>the CITY of CAMBRIDGE,<br><br>       Defendants. | Case No. 21-cv-11007-DJC |

### MEMORANDUM AND ORDER

**CASPER, J.**                                                    **December 16, 2024**

## I.     Introduction

Plaintiff Thomas Ahern ("Ahern") has filed this lawsuit against Defendants Sig Sauer, Inc. ("Sig Sauer") and the City of Cambridge ("Cambridge") asserting claims against Sig Sauer for negligence (Count I), breach of implied warranty of merchantability (Count II), negligent infliction of emotional distress (Count III), violation of Mass. Gen. L. c. 93A, §§ 2, 11 ("Chapter 93A") (Count IV), and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a) ("MMWA") (Count VI), and claims against Cambridge for violation of Ahern's First Amendment rights pursuant to 42 U.S.C. § 1983 (Count V) and violation of the Massachusetts Whistleblower Act ("MWA"), Mass. Gen. L. c. 149 § 185 (Count VII),  arising from his statements about the safety of the P320 pistol and discipline against Ahern for same.  D. 42.  Cambridge has moved for summary judgment, D. 134, and has also moved to exclude the opinions from two of Ahern's proffered expert witnesses, Scott Reitz and Sheldon Wishnick, under Fed. R. Evid. 702.  D. 137;

D. 139.  Sig Sauer has moved to join Cambridge's motion to exclude Reitz's opinion.  D. 148.  Sig Sauer also has moved for summary judgment,  D. 144, and has moved to exclude the testimony of Ahern's other, proffered expert witnesses, Timothy Hicks, Peter Villani, and James Tertin, under Fed. R. Evid. 702.  D. 141; D. 142; D. 143.  For the reasons stated below, the Court DENIES Cambridge's motion for summary judgment, D. 134.  The Court ALLOWS Sig Sauer's motion to join Cambridge's motion to exclude the opinion by Reitz, D. 148.  The Court DENIES Cambridge's motion to exclude the testimony of Reitz, D. 137, in part and ALLOWS it in part. The Court DENIES the motion to exclude the testimony of Sheldon Wishnick, D. 139.  The Court DENIES Sig Sauer's motions to exclude the proffered opinion of Timothy Hicks, D. 141; ALLOWS the motion to exclude the opinion of Peter Villani, D. 142, in part and DENIES it in part; and DENIES the motion to exclude the opinion of James Tertin, D. 143 in part and ALLOWS it in part.  The Court DENIES Sig Sauer's motion for summary judgment, D. 144.

## II.    Standard of Review

### A.    <u>Summary Judgment</u>

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  <u>Santiago–Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000); <u>see</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  <u>Borges ex rel. S.M.B.W. v. Serrano–Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010).

The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### B.    Motions to Exclude Expert Opinion

An expert opinion is admissible if (1) "scientific, technical, or other specialized knowledge will help the trier of fact," (2) the expert is qualified "by knowledge, skill, experience, training, or education" to testify on that subject, (3) the expert's proposed testimony is based upon "sufficient facts or data," (4) that testimony is the product of "reliable principles and methods" and (5) the expert reliably applies "the principles and methods to the facts of the case." Fed. R. Evid. 702. As a threshold question, the Court must first determine whether the witness is sufficiently qualified by "knowledge, skill, experience, training, or education" to give her proffered opinion.  Fed. Ins. Co. v. Pentair Residential Filtration, LLC, No. 12-10853-RGS, 2013 WL 6145531, at *3 (D. Mass. Nov. 21, 2013) (quoting Fed. R. Evid. 702) (internal quotation marks omitted).  As the "gatekeeper," Milward v. Acuity Prods Grp., Inc., 639 F.3d 11, 14 (1st Cir. 2011) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)), the Court must next determine whether the specific testimony offered in the case "both rests on a reliable foundation and is relevant to the task at hand."  In re Nexium (Esomeprazole) Antitrust Litig., 842 F.3d 34, 52 (1st Cir. 2016) (quoting Daubert, 509 U.S. at 597 (internal quotation marks omitted)).  "The reliable foundation requirement necessitates an inquiry into the methodology and the basis for an expert's opinion."  Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012).  This requirement "seeks to ensure that there is an adequate fit between the expert's methods and his conclusions" by determining whether the expert's conclusions "flow rationally from the methodology employed."  Id. at 32 (citations omitted).  "[S]o long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than

excluded for fear that jurors will not be able to handle the scientific complexities." Milward, 639 F.3d at 15 (internal quotation marks and citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (internal quotation marks and citation omitted).

## III.   Factual Background

The Court draws the following facts from the parties' statements of undisputed facts, responses to the same and accompanying exhibits, D. 136; D. 144-3; D. 150; D. 153.

Ahern was an officer of the Cambridge Police Department from 1993 until he retired on January 5, 2023.  D. 144-3 ¶ 1; D. 150 ¶ 1; D. 136 ¶¶ 1-2; D. 153 ¶¶ 1-2.  Ahern was promoted to Lieutenant in 2017 and held that rank when he retired.  D. 136 ¶¶ 3-4; D. 153 ¶¶ 3-4.  Between 1995 and 2021, Ahern served as part of Cambridge's Special Response Team ("SRT"), which is also referred to as Cambridge's SWAT team.  D. 136 ¶ 5; D. 153 ¶ 5.

### A.   The Sig Sauer P320 Firearm

In July 2017, Cambridge purchased the P320 firearm ("P320") manufactured by Sig Sauer as the new duty firearm for all Cambridge police officers.  D. 136 ¶¶ 8-9; D. 153 ¶¶ 8-9.  Prior to Cambridge receiving the firearms in 2018, Sig Sauer implemented a voluntary upgrade program for the P320 that made design changes including changing the firearm's striker seal and lightening the trigger.  D. 136 ¶ 12; D. 153 ¶ 12.  The P320s that Cambridge received were the post-upgrade models.  D. 136 ¶ 14; D. 153 ¶ 14; see D. 149-23.

### B.   May 19, 2019 Discharge Incident

On May 19, 2019, Ahern was assigned as the Deputy Incident Commander of the SRT team to oversee a Mayfair event in Harvard Square.  D. 144-3 ¶ 2; D. 150 ¶ 2;  D. 136 ¶ 15; D.

153 ¶ 15.  Ahern, while in the parked SWAT van with six other officers, performed a function check on his pistol by bringing the P320 firearm "up a little bit" and "reseating it" in the holster. D. 136 ¶ 18; D. 153 ¶ 18; see D. 144-3 ¶ 4; D. 150 ¶ 4.  Ahern repeated this process several times, but Ahern's P320 would not re-secure in the holster.[1]  D. 144-3 ¶ 8; D. 150 ¶ 8; D. 136 ¶ 20; D. 153 ¶ 20.  When Ahern's P320 would not reseat, he withdrew the firearm completely from the holster and held the firearm in the SUL position, meaning a "low ready position" across his body and looked into his holster.  D.144-3 ¶ 9; D. 150 ¶ 9; D. 136 ¶ 21; D. 153 ¶ 21.  As Ahern looked into the holster, the P320 discharged.  D. 144-3 ¶ 10; D. 150 ¶ 10; D. 136 ¶ 22; D. 153 ¶ 22.  At the time Ahern's P320 discharged, four other members of the Cambridge Police Department and two members of the Cambridge Fire Department were in the rear of the SWAT van.  D. 136 ¶ 23; D. 153 ¶ 23.  The bullet hit Ahern's cellphone case that had been in his left pants pocket and lodged in a ballistic helmet that was inside the SWAT van.  D. 136 ¶ 24; D. 153 ¶ 24; see D. 144-3 ¶ 11; D. 150 ¶ 11.  Ahern suffered a bruise from the incident, D. 144-3 ¶ 15; D. 150 ¶ 15, and also claims emotional distress, mental anguish, inconvenience, loss of enjoyment of life, lost earnings and lost earning capacity as a result of the incident.  Id.

### C.    Investigation Following the May 2019 Discharge

Following the May 2019 discharge incident, a member of the Cambridge investigation unit was sent to investigate the circumstances surrounding the discharge.  D. 136 ¶¶ 27-28; D. 153 ¶¶ 27-28.  The Professional Standards Unit ("PSU") is one of the teams that conducts investigations

---

[1] Ahern disputes the number of times that Defendants allege he reseated the gun in the holster but Ahern has inconsistently stated the number of times he adjusted the P320 prior to pulling out the gun.  See D. 144-3 ¶ 8; D. 150 ¶ 8; D. 136 ¶ 20; D. 153 ¶ 20; compare D. 134-1 at 21 (stating he took the gun out of the holster "four or five, six times") with D. 134-1 at 47 (stating that a report where Ahern testified he reseated the gun "three to four" times would be more accurate).  Nevertheless, it is undisputed that he did so multiple times.

concerning alleged violations of Cambridge policies.  D. 136 ¶¶ 25-26; D. 153 ¶¶ 25-26.  A

member of the investigations unit, Sergeant Joseph Murphy ("Murphy") was sent to the scene to

investigate the circumstances surrounding the discharge, and "primarily the use of force."  D. 136

¶ 28; D. 153 ¶ 28.  A day after the incident, on May 20, 2019, and prior to the completion of the

investigation, Lieutenant Silverio Ferreira ("Ferreira") informed Murphy that he should find Ahern

in violation for the discharge.  D. 136 ¶ 98; D. 153 ¶ 98.

Ahern was interviewed by PSU on May 30, 2019 in connection with the discharge incident.

D. 136 ¶ 37; D. 153 ¶ 37.  On June 3, 2019, PSU issued a Final Report of Investigation which

stated the Ahern had violated Police Department Policy & Procedures No. 403, Section VIII,

Paragraph C which sets forth four circumstances when an officer can remove the firearm from the

holster.[2]  D. 136 ¶¶ 39-40; D. 153 ¶¶ 39-40.  Following the June 2019 report, Commissioner Bard

had a settlement agreement prepared by various City officials concerning the discharge incident

for Ahern's consideration.  D. 136 ¶¶ 41-42; D. 153 ¶¶ 41-42.  The proposed settlement agreement

stated that "Ahern admits to taking his fully loaded firearm out of his holster on May 19, 2019"

and "Ahern discharged the firearm."  D. 136 ¶ 45; D. 153 ¶ 45; see D. 134-6 at 95.  The proposed

settlement agreement imposed disciplinary action including suspension without pay for thirty

working days.  D. 136 ¶ 47; D. 153 ¶ 47.  On August 19, 2019, Deputy Superintendent Dennis

O'Connor ("O'Connor") presented Ahern with the proposed settlement agreement related to the

discharge incident.[3]  D. 136 ¶¶ 48, 50; D. 153 ¶¶ 48, 50.  On September 13, 2019, Ahern's union

---

[2] The Court notes that these four circumstances include:  (1) for use in the performance of his/her duties, (2) to clean the firearm, (3) to store the firearm and (4) at the direction of a superior officer conducting firearms inspections.  See D. 134-6 at 101.

[3] Ahern disputes that O'Connor informed Ahern only of the settlement agreement on August 19, 2019 as he contends that O'Connor also informed Ahern that the commissioner wanted him to step down as a commander of the SRT team.  See D. 153 ¶ 48; D. 134-2 at 67.

attorney proposed changes to the settlement agreement, specifically to the language that would have Ahern acknowledge that he discharged the P320, and to reduce the discipline to suspension without pay for one working day.  D. 136 ¶¶ 52-53, 55; D. 153 ¶¶ 52-53, 55.  Commissioner Bard did not accept the revised changes and communicated to Ahern that negotiations would be futile based upon the proposed revisions.  D. 136 ¶¶ 56, 58; D. 153 ¶¶ 56, 58.  Following the settlement discussions, the PSU team continued the investigation into the discharge incident and interviewed the remaining individuals who were present in the SWAT van at the time.  D. 136 ¶¶ 60-61; D. 153 ¶¶ 60-61.

On October 18, 2019, O'Connor went to Ahern's office to request an answer about the proposed settlement agreement and Ahern told O'Connor that he would not accept the proposal in its current form because he would not say that he discharged the firearm but he would accept discipline for taking his firearm out of the holster and a one-to-two-day suspension based upon same.  D. 136 ¶¶ 62-63, 65; D. 153 ¶¶ 62-63, 65.  The conversation turned heated and O'Connor told Ahern "Go ahead. Take the suspension" and Ahern responded "Fine; I will go ahead."  D. 136 ¶¶ 66-67; D. 153 ¶¶ 66-67.  A disciplinary hearing was held on November 19, 2021 at Cambridge City Hall concerning the findings of PSU's investigation.  D. 136 ¶ 70; D. 153 ¶ 70.  On December 4, 2019, the PSU issued a Final Report of Investigation and Findings that found Ahern's actions on May 19, 2019 violated Cambridge's Policy 403, Section VIII, Paragraph B, which is a separate violation than the First PSU Report issued, based upon Ahern's handling of the firearm.[4]  D. 144-3 ¶ 12; D. 150 ¶ 12; D. 136 ¶¶ 68-69; D. 153 ¶¶ 68-69; see D. 134-6 at 110.  Ahern retired from

---

[4] Cambridge Policy 403, Section VIII, B states in relevant part that "[a]ll personnel shall exercise caution and the utmost care in handling of department issued firearms at all times."  See D. 134-6 at 110.

the police department on January 5, 2023, which was before any disciplinary decision was issued by the City.[5]  D. 136 ¶ 71; D. 153 ¶ 71; see D. 134-2 at 72.

### D.    Ahern Voiced Safety Concerns Before and After The May 2019 Incident Regarding the P320

Prior to the May 19, 2019 discharge incident, Ahern had voiced concerns about the safety of the P320 as early as 2017 and prior to Cambridge purchasing the firearms.  D. 136 ¶¶ 74-75; D. 153 ¶¶ 74-75.  Specifically, Ahern was concerned about the P320 discharging without a trigger pull following a video he saw which purportedly showed a P320 being dropped and discharging. D. 136 ¶ 74; D. 153 ¶ 74.  Ahern voiced concerns both to Cambridge police department's leadership as well as other members of the police department both inside and outside of work, such as to SRT team members in 2017.[6]  D. 136 ¶¶ 75-78; D. 153 ¶¶ 75-78.  Ahern continued to express concerns in 2018 concerning the safety of the P320, including after he was added to an email that solicited feedback on any safety concerns given the modifications Sig Sauer made to the firearm after the voluntary upgrade program.  D. 136 ¶¶ 82-83; D. 153 ¶¶ 82-83.

Following the May 2019 incident, Ahern raised safety concerns about the P320 to members of the police department through various channels, including emailing articles about un-

---

[5] The Court notes that Ahern testified that the commissioner recommended that Ahern be demoted and terminated.  See D. 134-2 at 72.  The City has not issued a disciplinary decision.  Id.

[6] Ahern contends that he also expressed his concerns about the safety of the P320 to his family members such as his wife, and children as well as his brother who was also a member of the Cambridge Police department and his sister, who was not a member.  See D. 134-2 at 8, 34.

commanded discharges of P320.  D. 136 ¶¶ 84-87; D. 153 ¶¶ 84-87.  Ahern continued to express

concerns about the P320 until 2023 when he left the police department.  D. 136 ¶ 85; D. 153 ¶ 85.

### E.    Ahern's Opportunity for Training and Advancement Before and After the May 2019 Incident

Before the May 2019 incident, but after he had voiced concerns about the P320, Ahern

stated that he did not think aspects of his employment had changed within the police department.

D. 136 ¶ 92; D. 153 ¶ 92.  Prior to the May 2019 incident, but after the time Ahern began voicing

concerns about the P320 safety, Ahern was approved to attend various trainings in 2018 and 2019,

including weapons training in August 2018, attending a course to become a certified armorer in

the P320 in 2018, criminal format training in 2018, Mid-Level Command training in March 2019,

and radiological monitoring detection in April 2019.  D. 136 ¶ 88; D. 153 ¶ 88.  After the May

2019 incident, there were at least three instances where Ahern was denied training requests.  D.

136 ¶ 115; D. 153 ¶ 115.  Specifically, in an October 2019 email, Ahern was denied a training

request because of the pending disciplinary procedures.  D. 136 ¶ 116; D. 153 ¶ 116.  Ahern was

also initially denied a training request for the Meta Leadership Training in January 2020, that was

eventually approved.  D. 136 ¶¶ 121-22; D. 153 ¶¶ 121-22.

Ahern has also twice applied for and has been denied promotion to Deputy Superintendent

after the May 2019 incident.[7]  D. 136 ¶ 126; D. 153 ¶ 126.  One of the applications for promotion

was in March 2021.  D. 136 ¶ 127; D. 153 ¶ 127.  Ahern was not provided any reasons for why he

was not selected.  D. 136 ¶ 130; D. 153 ¶ 130.  In April and July 2021, Ahern asked to step down

from his role as SRT Commander based at least in part on his "belief" that his presence was

---

[7] Ahern cannot recall the exact date of the second application but testified that it was sometime in the fall of 2022 and he retired before the interview for that position.  See D. 134-2 at 82-83.

"hurting SRT."[8]  D. 136 ¶ 131; D. 153 ¶ 131.  In July 2021, Commissioner Bard moved all other

unit and Police Department members to another suite apart from Ahern, isolating him from other

department staff.  D. 136 ¶ 135; D. 153 ¶ 135.  On April 25, 2022, Ahern received a written

reprimand from Commissioner Christine Elow for an incident that occurred on July 28, 2021.[9]  D.

136 ¶ 137; D. 153 ¶ 137.  Ahern has not seen any written document stating that he was not selected

for promotions or asked to step down from his role as commander of SRT due to statements he

made about the safety of the P320.  D. 136 ¶¶ 114, 125, 129; D. 153 ¶¶ 114, 125, 129.

**IV.    Procedural History**

Ahern instituted this action on June 16, 2021.  D. 1.  Ahern asserted claims against Sig

Sauer for strict product liability (Count I), negligence (Count II) breach of the implied warranty of

merchantability (Count III), breach of implied warranty of fitness for a particular purpose (Count

IV), negligent infliction of emotional distress (Count V), intentional infliction of emotional distress

(Count VI), violation of Mass. Gen. L. c. 93A, §§ 2, 11 ("Chapter 93A") (Count VII), and violation

of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a) ("MMWA") (Count IX) and claims

against Cambridge for a violation of Ahern's First Amendment rights pursuant to 42 U.S.C. § 1983

---

[8] Ahern disputes that Cambridge can rely upon his interrogatory responses to form the basis for a statement of fact, but Ahern signed a verification "under penalty of perjury" that the interrogatory responses were "true and correct," D. 134-9 at 22, and Ahern has cited to no contradictory evidence to dispute this fact.  Further, the Court notes that Ahern has admitted to other statements of fact that exclusively rely upon the interrogatories.  See D. 153 ¶ 135.

[9] Ahern disputes this statement of fact as incomplete because he states that he also filed a grievance as to the violation and had been placed on a "Brady List" but he does not contest that he received this written reprimand in April 2022.  See D. 153 ¶ 137; D. 134-9 at 16.

(Count VIII) and violation of the Massachusetts Whistleblower Act, Mass. Gen. L. c. 149 § 185 (Count X).

The Court allowed Sig Sauer's motion to dismiss as to all claims against it except for Count VII (the c. 93A claim), and dismissed Counts II-VI and IX (denying Counts II-III, V and IX without prejudice) and provided Ahern with leave to amend. D. 36. Ahern filed an amended complaint, asserting claims against Sig Sauer for negligence (Count I), breach of implied warranty of merchantability (Count II), negligent infliction of emotional distress (Count III), violation of Mass. Gen. L. c. 93A, §§ 2, 11 ("Chapter 93A") (Count IV), and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a) ("MMWA") (Count VI), and claims against Cambridge for violation of Ahern's First Amendment rights pursuant to 42 U.S.C. § 1983 (Count V) and violation of the Massachusetts Whistleblower Act, Mass. Gen. L. c. 149 § 185 (Count VII). D. 42.

Sig Sauer has now moved for summary judgment and to exclude the testimony of Ahern's three proffered expert witnesses, Timothy Hicks, Peter Villani and James Tertin, under Fed. R. Evid. 702. D. 141; D. 142; D. 143; D. 144. Cambridge also has moved for summary judgment and to exclude the testimony of two other of Ahern's proffered expert witnesses, Scott Reitz and Sheldon Wishnick, under Fed. R. Evid. 702. D. 134; D. 137; D. 139. Sig Sauer has also moved to join Cambridge's motion to exclude Reitz's testimony. D. 148. The Court heard the parties on the pending motions and took these matters under advisement.[10] D. 161.

_____

[10] Following the motion hearing, Ahern moved to submit supplemental briefing concerning the motions to exclude Hicks, Villani and Tertin, which Sig Sauer opposed. D. 162; D. 164. Ahern and Sig Sauer also submitted several notices of supplemental authority concerning the motions to exclude Hicks and Tertin and Sig Sauer's motion for summary judgment, and responses to same, D. 163; D. 166; D. 167; D. 168; D. 169; D. 170; D. 171; D. 177; D. 178. The Court allows the motion for supplemental briefing, D. 162, *nunc pro tunc*, and the Court has considered D. 162-1 along with the notices of supplemental authority in deciding the pending summary judgment and Daubert motions.

## V.    Discussion

### A.    **Cambridge's Motion for Summary Judgment**

Ahern contends that Cambridge retaliated against him for voicing safety concerns about the P320 firearm and his refusal to admit that he discharged the firearm by subjecting Ahern to discipline and other adverse actions in violation of the First Amendment pursuant to 42 U.S.C. § 1983.  D. 152 at 2.  Ahern also asserts that Cambridge retaliated against him in violation of the Massachusetts Whistleblower Act, Mass Gen. L. c. 149 § 185 for the concerns he raised about the P320.  Id.

#### *1.    First Amendment Retaliation, 42 U.S.C. § 1983 (Count V)*

Generally, "[c]laims of retaliation for the exercise of First Amendment rights are cognizable under § 1983."  Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 9 (1st Cir. 2005) (internal quotation marks and citation omitted).  Where a public employee contends that his government employer took an adverse employment action that violates his First Amendment rights, the First Circuit has articulated a three-part inquiry.  Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011).  First, the Court "must determine whether the employee spoke as a citizen on a matter of public concern" and, second, "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (alterations in original) (internal quotation marks and citations omitted).[11]  These first two

---

[11] The Court notes that the parties do not substantially address the second factor in the analysis, often referred to as the Pickering balancing test, which asks the Court to balance "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 135 (1st Cir. 2022) (quoting Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007)).  Ahern asserts in a footnote that a "reasonable jury could conclude that Mr. Ahern's interest in commenting on Cambridge's use of a firearm that risks the lives of citizens and employees

elements are questions of law to be decided by the Court.  See Guilloty Perez v. Pierluisi, 339 F.3d 43, 51 (1st Cir. 2003).  If they are established, the analysis turns to the third element, wherein "the employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision." Decotiis, 635 F.3d at 29 (internal quotation marks and citation omitted).  Even then, "the employer may still escape liability if it can show that it would have reached the same decision even absent the protected conduct."  Id. at 30 (internal quotation marks and citation omitted).

Here, Cambridge challenges the first and third elements, arguing that it did not retaliate against Ahern in violation of his First Amendment rights because (1) Ahern did not speak as a citizen on a matter of public concern concerning his refusal to admit that he discharged the P320, and (2) Ahern's complaints about the safety of the P320 were not a substantial or motivating factor in any alleged disciplinary action or adverse employment act.  D. 135 at 1-2.  Cambridge characterizes Ahern's complaints into two theories of retaliation:  (1) complaints about the safety of the P320 and (2) refusing to accept discipline for the May 2019 discharge incident.  Id. at 3. Ahern asserts that his complaints and refusal to accept discipline should be viewed as a "continuous course of conduct" relating to the overall "threat" of the P320.  D. 152 at 4-5.  The Court agrees that the allegations in the complaint are broad enough to support Ahern's "continuous course of conduct" theory and analyzes Ahern's claim predicated on that theory.  See D. 42 ¶¶ 22, 57-58 (alleging that refusal to promote Ahern was related to Ahern's "complaints about the safety of the P320, both before and after" Cambridge contracted with Sig Sauer to receive the firearms

---

outweighs Cambridge's interest in using that same firearm."  See D. 152 at 3 n.1.  As neither party has sufficiently briefed the second factor, the Court declines to consider the merits of the second factor for the purposes of deciding the motion for summary judgment.

and "Ahern's refusal to accept discipline" for the May 2019 discharge incident as Ahern refused to admit that he pulled the trigger).

a)   <u>Ahern Spoke as a Private Citizen on a Matter of Public Concern</u>

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." <u>Lane v. Franks</u>, 573 U.S. 228, 241 (2014) (internal quotation marks and citations omitted). In determining whether the speech touched upon a matter of public concern, the Court considers the "content, form, and context of a given statement, as revealed by the whole record." <u>Firenze v. N.L.R.B.</u>, 993 F. Supp. 2d 40, 48 (D. Mass. 2014) (quoting <u>Connick v. Myer</u>, 461 U.S. 138, 147-48 (1983)). Cambridge's argument primarily focuses on Ahern's speech concerning refusing to accept discipline for the P320 as a matter of personal discipline, rather than as an employee speaking on a matter of public concern.[12] <u>See</u> D. 135 at 3-12. Although matters related to internal, disciplinary matters usually are of personal, not public, concern, <u>Firenze,</u> 993 F. Supp. 2d at 49 (concluding that the "majority of [plaintiff's] grievances stemmed from an ongoing personal and professional disagreement the plaintiff had with his supervisor," "[e]ach of [his] grievances dealt only with an issue personal to [plaintiff], and contested discipline received regarding [his] work and/or attitude specifically" and concluding, under the circumstances, that "[a]ny statement that [plaintiff] would have made" regarding his multiple grievances "do not address a matter of public concern"), here, the Court considers the context of Ahern's speech as Ahern refused to accept discipline, in part, because of the threat he complained of concerning the P320. The Court

---

[12] Cambridge also notes that it does not concede that Ahern, even in the general context of raising concerns about the P320, was speaking as a private citizen upon a matter of public concern. <u>See</u> D. 158 at 5 n.3.

concludes that Ahern's speech concerning the safety of the P320 is a matter of public concern, as whether a firearm that the police department uses is safe has implications for the community. See Hagen v. City of Eugene, No. 10-cv-6100-AA, 2011 WL 679472, at *4 (D. Or. Feb. 14, 2011) (concluding that where the officer continued to voice his safety concerns to fellow officers and supervisors due to lack of responsiveness by management, that lack of responsiveness "reflects upon the competency of the police department" which "is surely a matter of great public concern" and denying summary judgment to the city) (internal quotation marks and citation omitted).

The Court has also considered whether Ahern spoke as a private citizen or as part of his duties as a police officer concerning the safety of the P320. The First Amendment distinguishes between a citizen's speech, which triggers protection, and employee speech, which may be disciplined by the employer. Lane, 573 U.S. at 237. When a public employee speaks pursuant to employment responsibilities, "there is no relevant analogue to speech by citizens who are not government employees." Garcetti v. Ceballos, 547 U.S. 410, 424 (2006). "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane, 573 U.S. at 240. In considering this question, the First Circuit has identified several non-exclusive factors, including "whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at [his] place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it official significance); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech." Gilbert v. City of Chicopee, 915 F.3d

74, 82 (1st Cir. 2019) (quoting Decotiis, 635 F.3d at 32 (internal quotation marks and citations omitted)).

Considering these factors, the Court concludes that the balance of same indicate that Ahern was speaking as a private citizen.  Ahern first learned about the Omaha Outdoors video, which showed a P320 discharging when it was dropped, from a fellow SWAT team member in relation to Cambridge's decision to switch to a new firearm, and there is some indication that his particular concern was gained through specialized knowledge as Ahern testified that the video concerned him because as a police officer he has "dropped [his] firearm on a number of occasions."  D. 136 ¶ 74; D. 153 ¶ 74; see 134-1 at 39, 42.  Ahern's speech concerning the safety of the P320 was not confined to work, however, as even prior to the May 2019 discharge incident, Ahern voiced his concerns about the safety of the P320 "both inside and outside the police department."  See D. 136 ¶¶ 75-78, 82-83; D. 153 ¶¶ 75-78, 82-83; D. 134-2 at 8, 26, 34-35.  Ahern testified that his comments between 2017 to 2018 concerning Cambridge's purchase of the P320 "weren't that broad" and within the department he only spoke with the "people immediately around me, with the SWAT team and my partners and my superiors in my chain."  D. 134-1 at 44.  The record also indicates that Ahern spoke with Cambridge's legal counsel, Jim Okheye, with the purpose of influencing City's decision not to purchase the P320.  Id.

After the May 2019 incident, Ahern continued to voice his concerns relating to the P320 up the chain of command to leadership as well as to other officers, and specifically commented on the police department's decision to continue trainings on the P320 in 2021.  See D. 136 ¶¶ 84-87; D. 153 ¶¶ 84-87.  Although this "type of communication—complaints or concerns made up the chain of command—is the quintessential example of speech that owes its existence to a public employee's official responsibilities" and thus is generally not protected under the First

Amendment, Gilbert, 915 F.3d at 83, the record does not reflect that Ahern was required to report

on this topic, general gun safety concern (as the plaintiff in Gilbert wrote a report in response to

an "order," would have been disciplined if he did not do so and his report concerned workplace

conduct involving other colleagues at work) as part of his duties. Cf. Hagen v. City of Eugene,

736 F.3d 1251, 1259-60 (9th Cir. 2013) (concluding that police officer who complained about

accidental firearm discharges did not speak as a private citizen because plaintiff had "an official

duty to report his safety concerns" as required by the City's manual and complained within the

chain of command about work-related safety issues).

In considering the context of this speech, in 2017, the police department was considering

whether to switch and use the P320 as the firearm for the police department.  D. 136 ¶¶ 8-9; D.

153 ¶¶ 8-9.  Although he was aware that Cambridge was looking at new firearms for the officers,

Ahern was not tasked with reviewing potential firearms to purchase like other police officers in

the department, which supports that Ahern's speech was not directly related to his job

responsibilities.  See 134-1 at 37-38; cf. Garcetti, 547 U.S. at 422 (concluding that public employee

"did not act as a citizen when he went about conducting his daily professional activities, such as

supervising attorneys, investigating charges, preparing filing" or "writing a memo that addressed

the proper disposition of a pending criminal case").  Finally, there is no evidence in the record that

Ahern was paid to speak about the safety concerns with the P320 or he had any role speaking

publicly on behalf of the police department or Cambridge.  For all these reasons, the Court

concludes that Ahern was speaking as a private citizen concerning the safety of the P320.

> b)    Whether Ahern's Speech was a Substantial and Motivating Factor
>        Raises Factual Questions for the Jury

Whether speech constitutes a "substantial and motivating factor" is a question of causation

and is generally analyzed in two steps.  Salmon v. Lang, 57 F.4th 296, 308 (1st Cir. 2022) (noting

the application of the <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287(1977) ("<u>Mt. Healthy</u>") burden-shifting test). At step one, "the plaintiff must [first] show that the employer would not have taken adverse action but for plaintiff's speech." <u>Id.</u> (internal quotation marks and citation omitted). If a plaintiff meets this burden, the burden shifts to the employer "to severe the causal link." <u>Id.</u> (internal quotation marks and citation omitted). That is, a defendant "may then avoid liability by showing that it would have undertaken the adverse employment action regardless of the plaintiff's protected conduct." <u>Delaney v. Town of Abington</u>, 890 F.3d 1, 6 (1st Cir. 2018) (citing <u>Mt. Healthy</u>, 429 U.S. at 287). An adverse employment decision includes an action the employer takes that would "deter a reasonably hardy individual from exercising his constitutional rights." <u>Salmon</u>, 57 F.4th at 308 (internal quotation marks and citation omitted).

Ahern contends that Cambridge retaliated against him for voicing his concerns about the safety of the P320 by the following adverse acts: (1) Cambridge's approach to the May 2019 discharge investigation that departed from normal procedure and alleged "rush to judgment" for finding Ahern in violation of the police department policies; (2) denial of promotion; (3) instituting an internal investigation into Ahern for comments he made in 2021 concerning continued training on the P320; (4) denial of training opportunities, particularly after the May 2019 discharge incident; and (5) pressuring Ahern to resign as SRT commander by taking away responsibilities. D. 152 at 7-17. Cambridge contends that summary judgment is appropriate because there is no genuine dispute of material fact that Ahern's speech concerning the safety of the P320 was not a "substantial and motivating factor" as to any of these actions because Ahern has not adduced

sufficient evidence of a connection between his speech and any alleged retaliatory acts.  See D. 135 at 12-19.

Ahern argues that Cambridge's handling of the investigation into the May 2019 incident and "rush to judgment" for finding Ahern responsible are indicative that Ahern was retaliated against for the comments he made concerning the P320.  D. 152 at 7-12.  Cambridge counters that a two-year gap between when Ahern first raised his concerns in 2017, for which the record does not indicate that Cambridge took any action against Ahern, and then the investigation in 2019 is too large a gap to provide causation.  See D. 158 at 12, 15-16.  Although the Court recognizes that record does not reflect that Ahern suffered adverse events prior to the May 2019 discharge incident, Ahern, however, has adduced sufficient evidence that Cambridge's approach to the investigation differed from its normal approach to investigations, such as by assigning a more junior officer to investigate as compared to an officer of equal or higher rank.  D. 136 ¶ 28; D. 153 ¶ 28; see D. 152-3 at 21; D. 134-6 at 25-26 (Commissioner Bard testifying that he could not point to another incident during his time at Cambridge where a junior ranked officer investigated a more senior officer in a similar situation).  Further, it is undisputed that there were discussions of finding Ahern liable for the discharge prior to the investigation concluding.  See D. 136 ¶ 98; D. 153 ¶ 98.  For example, Ahern has adduced evidenced that the day after the May 2019 discharge there were discussions amongst some of the police officers and a superintendent allegedly stated that the officers investigating the incident needed to find Ahern responsible prior to the conclusion of the incident.  See D. 152-2 at 12-15; D. 152-3 at 13-14.  The record reflects that Murphy, the police officer in charge of the investigation, refused the order to find him in violation, claiming it would be "predetermining" the findings of the investigation.  D. 152-2 at 15.  Murphy further testified that this was the first time in his sixteen years of being involved in investigations that a

superintendent had ordered him to find a violation prior to the conclusion of the investigation.[13]
Id. at 17.  Although Cambridge claims that there is no direct evidence that Cambridge's approach
to the investigation was based upon Ahern's speech, D. 135 at 13-14, on this record, there is at
least circumstantial evidence that a reasonable jury could find that Cambridge's approach to the
investigation, which differed from the past investigations and for which there was an alleged
predisposition for finding Ahern in violation of policy, provided an inference for a retaliatory
motive based upon Ahern's speech concerning the safety of the P320.  See Bruce, 34 F.4th at 140
(reasoning that there was a dispute of fact concerning whether plaintiff's speech was a substantial
factor in their termination particularly where " the record does not contain any evidence that would
compel a reasonable juror to conclude that [plaintiff] would have been terminated had he engaged
in the same conduct but not given an unauthorized interview").

Moreover, Ahern further argues that Cambridge was motivated to retaliate against him
because of increasing reports of discharges, involving two officers within Cambridge.  D. 152 at
14-15.  The record indicates that these discharges occurred in October 2019 and December 2019,
and at least one police officer, DiPietro, indicated that Cambridge would be concerned with any
news media attention about Cambridge potentially purchasing a defective firearm, id.; D. 152-3 at
10; D. 152-6; D. 152-7, which is what a reasonable jury could choose to credit or not credit

---

[13] The Court notes that the record reflects that Ferreira was unaware that Ahern had
expressed concerns about the P320 prior to the May 2019 discharge incident, D. 134-4 at 67, and
Commissioner Bard, who was involved in ordering the investigation and settlement discussions
with Ahern, was also unaware of anyone raising concerns to him about the P320 prior May 2019
discharge incident.  D. 134-6 at 8.  These facts, however, still contribute to a factual dispute
concerning whether a reasonable jury could find that there was a causal connection between
Ahern's speech and Cambridge's approach to the investigation and Ahern's discipline, particularly
where Cambridge has not indicated a reason for its departure from a typical investigation.  See
McGunigle v. City of Quincy, 835 F.3d 192, 203 (1st Cir. 2016) (noting that "the causation element
may be established through direct or circumstantial evidence").

regardless of whether DiPietro shared this concern or shared it with others.  See D. 158 at 6-8; D. 152-3 at 10; D. 158-7 at 4.

As to denial of promotions, it is undisputed that Ahern was denied a promotion to Deputy Superintendent for which he applied in March 2021.  D. 136 ¶¶ 126-27; D. 153 ¶¶ 126-27.  It is also undisputed that in the two years prior to the investigation in which Ahern voiced his concerns concerning Cambridge's decision to switch to the P320 there were no aspects of Ahern's employment that changed, and the record indicates that Ahern received a promotion to Lieutenant at some point in 2017.  D. 136 ¶¶ 3, 92; D. 153¶¶ 3, 92.  Cambridge contends that there is no direct evidence that there is a causal connection between Ahern being denied promotion and his speech concerning the P320 because Ahern was not provided any reasons for why he was not selected and he has never seen anything in writing confirming that he was not selected based upon his speech. D. 136 ¶ 130; D. 153 ¶ 130; see D. 135 at 14.  The record does reflect, however, that in July 2019 O'Connor indicated to Ahern if he took responsibility for the May 2019 discharge, Ahern would "remain viable" for promotion.  See D. 134-2 at 66-67.  Although this conversation took place a few years prior to Ahern's denial of the promotion, Ahern did not accept the settlement proposal that included him stating he discharged the firearm and continued to voice safety concerns, including around the time he was denied the promotion.  D. 136 ¶¶ 65-67, 70, 85; D. 153 ¶¶ 65-67, 70, 85; see also D. 158-1 at 7 (Department Armorer Officer Hector Vicente ("Vicente") testifying that in 2021 there were rumors that Ahern was expressing concerns about the safety of the P320 that "just was getting to everybody").  For example, in March 2021, Ahern voiced concerns about the safety of the P320 to Vicente who was conducting a training concerning the P320.  D. 158-1 at 6-8, 12.  Vicente provided a report of his conversation with Ahern to Commissioner Bard, who had ordered the training, that resulted in Cambridge opening a

professional standards internal investigation into Ahern.  D. 158-1 at 8; D. 158-6 at 2-3.  The fact that it was well-known that Ahern was voicing concerns and the separate investigation into Ahern concerning speech about the safety of the P320 reflect a genuine dispute of material fact concerning whether the denials of promotion constituted adverse employment events.

Finally, the Court has also considered whether Cambridge exerting pressure on Ahern to step down from being SRT commander in April and July 2021 constituted an adverse event.  The record indicates that the speech related to Ahern being potentially removed or asked to step down as SRT commander occurred in the fall of 2019, shortly after the discharge incident and in the context of the proposed settlement discussions for the May 2019 discharge incident.  See D. 134-6 at 37.  Ahern points to a discussion with O'Connor in August 2019 concerning the settlement agreement terms in which he told Ahern that Commissioner Bard wanted him to step down as SRT commander.  See D. 134-2 at 67.  There is also record evidence that there were discussions concerning denying Ahern SRT related trainings[14] and moving forward with another candidate if Cambridge intended to remove Ahern as SRT commander.  See D. 134-6 at 36.  Ahern also stated that Commissioner Bard moved all unit and department members to a suite apart from Ahern on or about July 2021, and in 2020 Ahern was no longer tasked with selecting Cambridge interns.  See D. 134-9 at 16.  As the discussions concerning Ahern's removal as SRT commander took

---

[14] It is perhaps a much closer question whether the alleged denial of other training requests by Ahern constitute adverse actions here and whether there is a causal connection between Ahern's speech and such denial.  It is undisputed that Ahern continued to receive training prior to the discharge event as well as some training opportunities after the discharge event.  D. 136 ¶ 88; D. 153 ¶ 88.  After the May 2019 incident, there were at least three instances where Ahern was initially denied training requests.  D. 136 ¶ 115; D. 153 ¶ 115.  In an October 2019 email, Ahern was specifically denied a training request because of the pending disciplinary procedures.  D. 136 ¶ 116; D. 153 ¶ 116.  Ahern was also initially denied a training request for the Meta Leadership Training in January 2020, that was eventually approved.  D. 136 ¶¶ 121-22; D. 153 ¶¶ 121-22.  There is also no indication that any of these trainings were required for promotion.  See D. 134-2 at 84.

place in 2019 and Ahern only stepped down as SRT commander in July 2021, it may be debatable whether Ahern ultimately persuades a jury of a sufficient causal connection. In light of the full record and taking all inferences in Ahern's favor as the Court must at this stage, however, the Court concludes that there are sufficient factual disputes concerning whether Ahern stepping down as SRT constituted an adverse employment event.

For all the reasons, on the present record, the Court concludes that there are genuine disputes of fact concerning whether Ahern's speech was a substantial and motivating factor in the subsequent adverse employment actions Ahern experienced. Wagner v. City of Holyoke, 241 F. Supp. 2d 78, 94 (D. Mass. 2003) (denying summary judgment and reasoning that the disputed facts "require the court to give responsibility for resolving this issue to a jury" and whether the police department would have taken the same actions absent the police officer's speech), aff'd, 404 F.3d 504 (1st Cir. 2005). Accordingly, the Court denies summary judgment for Cambridge as to Count I.

### 2.    *Massachusetts Whistleblower Act (Count VII)*

The Massachusetts Whistleblower Act ("MWA"), in relevant part, protects against retaliation for an employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice" that the employee "reasonably believes poses a risk to public health, safety or the environment." Mass. Gen. L. c. 149 § 185(b)(1). To prevail under the MWA, Ahern must prove that (1) he "engaged in an activity protected by the [MWA]," such as the disclosure of an unlawful or unsafe activity, policy, or practice of his employer; "(2) the protected activity was the cause of an adverse employment action, such that the employment action was retaliatory; and (3) the retaliatory action caused [him] damages." Salmon, 57 F.4th at 318–19 (internal quotations and citations omitted). To establish causation under the second element, a

plaintiff must show that a retaliatory animus "was a 'determinative' or 'but for' cause of an adverse employment action, even if it was not 'the only cause.'" Id. (citations omitted). "[A] plaintiff's burden of proof under the [MWA] closely parallels his burden for First Amendment discrimination under Mt. Healthy." Stuart, 989 F.3d at 35 (internal quotation marks and citation omitted).

Here, Ahern contends that his complaints about the safety of the P320, which he believed was a "threat" to public safety, was a "determinative cause" in not being promoted and otherwise being subjected to other adverse actions by Cambridge. See D. 152 at 2, 5, 7-17. Cambridge contends that Ahern has failed to adduce evidence that Cambridge would not have taken the alleged retaliatory actions "but for" him raising safety concerns about the P320. See D. 135 at 20. As discussed above, there is a genuine dispute of material fact of whether his speech concerning the safety of the P320 was a "determinative cause" of the alleged adverse actions and Cambridge has not adduced conclusive evidence that it would have taken the same actions absent Ahern's speech. See Edwards v. Commonwealth, 488 Mass. 555, 573-74 (2021) (concluding that whether defendant would have dismissed the plaintiff "but for" the protected activity was a genuine question of material fact because adverse action taken against an otherwise satisfactory performing employee in the aftermath of an employer becoming aware of employee's protected activity can provide an inference of causation). Accordingly, the Court denies Cambridge's summary judgment motion as to Count II.

### B.    Cambridge's Motions to Exclude Expert Testimony Offered under Fed. R. Evid. 702

Cambridge moved to exclude Ahern's two proffered experts, Scott Reitz ("Reitz"), who would opine on Cambridge's interpretation of its policy and the reasonableness of Ahern's actions relating to the May 2019 incident, and Sheldon Wishnick ("Wishnick"), who would opine on

Ahern's potential economic loss from choosing to resign from the police force and failure to be promoted to Deputy Superintendent.[15]  D. 137; D. 139.

        *1.  Scott Reitz*

Ahern proffers Reitz as an expert to opine on safe firearms handling and police procedures. See D. 154 at 2.  Reitz offers two primary opinions:  (1) that the actions Ahern undertook on the date of the incident were reasonable and did not violate Cambridge Policy and Procedure No. 403 and (2) that it was "highly improbable that [Ahern] would have placed his finger upon the trigger surface in an unintentional manner."[16] Id. at 6-7; see D. 137-2 at 6-7.  Cambridge seeks to exclude Reitz's opinions on the basis that he is (1) not qualified to offer his opinions, (2) his opinions are unreliable and unsupported by any scientific or factual basis and (3) Reitz's opinions are not relevant to the retaliation claim and/or that their admission would run afoul of Fed. R. Evid. 403.[17]

---

[15] Sig Sauer moved to join Cambridge's motion to exclude Ahern's proffered expert, Reitz, to the extent Reitz would opine on whether Ahern would have placed his finger upon the trigger surface in an unintentional manner.  D. 148 at 2.  Ahern opposed this motion citing, among other reasons, that Sig Sauer's motion did not comply with Local Rule 7.1(a)(2) which states that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue."  L.R. 7.1(a)(2).  Although it appears that Ahern is correct that Sig Sauer failed to attach a Rule 7.1 certification to its motion, D. 148, there is no prejudice from Sig Sauer joining Cambridge's motion that offers substantively the same grounds for relief.  See D. 138 at 15-16.  The Court declines to deny Sig Sauer's motion on this basis and allows the motion to join Cambridge's motion.

[16] The Court notes that Reitz has proffered an initial report, D. 137-1, and an amended report, D. 137-2, but there does not appear to be substantive differences in Reitz's conclusions and the primary difference appears to be that the Amended Report included review of Ahern's deposition transcripts.  See D. 137-2 at 3.

[17] Cambridge also seeks to exclude Reitz's report for failure to comply with Fed. R. Civ. P 26, contending that the written report was not prepared and signed by the witness.  D. 138 at 19; Fed. R. Civ. P. 26(a)(2)(B) (requiring an expert disclosure to be accompanied "by a written report prepared and signed by the witness").  Although the reports do not appear to be signed, D. 137-1; D. 137-2, Cambridge has cited no support for the premise that Reitz did not author them.  Rather, Reitz testified that he did spend time preparing the report.  D. 137-3 at 4-5.  As the Court has considered Reitz's report on the merits, the Court declines to exclude Reitz's opinion on this basis.

D. 138 at 1-2. The Court concludes that Reitz is qualified to give an opinion about the reasonableness of Ahern's actions on May 19, 2019, but not as to the other of his proffered opinions.

a)      Reitz's Qualifications

Reitz is a former police officer who served in the Los Angeles Police Department SWAT division for over twenty-six years and was a tactical firearms instructor for the entire department. D. 137-2 at 4. After the LAPD, Reitz established the International Tactical Training Seminars ("ITTS") which provides training for law enforcement and military personnel, including for the Cambridge's SRT in 2015 and 2016. Id. Reitz confirms that his area of expertise is in "deadly force" and that he has not served on an internal review board or been involved in investigating and evaluating police misconduct or violations of police policies. See D. 137-3 at 10-11, 30.

b)      Limits of the Opinion to be Offered by Reitz

Here, the Court holds that as a police officer with significant training and years of experience, Reitz is qualified to opine on whether Ahern's actions conformed with a reasonable police officer's actions. See Rivera v. City of Worcester, No. 12-cv-40066-TSH, 2014 WL 2781338, at *4 (D. Mass. June 17, 2014) (reasoning that "[a] law enforcement officer's testimony satisfies the Daubert reliability requirement if the officer is qualified by training and experience to offer an opinion") (internal quotation marks and citation omitted); see also Andersen v. City of Chicago, 454 F. Supp. 3d 808, 813 (N.D. Ill. 2020) (concluding that expert who had spent significant time training law enforcement and had spent nearly two decades as a law enforcement officer was sufficiently qualified to opine on police practices generally, even if he had little experience investigating homicides). To the extent, however, Reitz opines on how Cambridge conducted its investigation or applied its policies, the Court concludes that Reitz is not qualified

to opine on Cambridge's interpretation of its policy because he does not have experience with Cambridge's policies, has no experience in interpreting police policies and has never been involved in determining whether a police officer violated a policy.  See D. 137-3 at 10-11;[18] see also Becerra v. Schultz, 499 F. Supp. 3d 1142, 1150 (D. Wyo. 2020) (limiting expert's testimony to the reasonableness of a police officer's conduct "in the context of his own training and experience as a police officer" but expert could not opine on whether the police officer's conduct violated national or local policies); Levin v. Dalva Bros., Inc., 459 F.3d 68, 78 (1st Cir. 2006) (recognizing that "a district court acts properly by excluding opinions that are beyond the witness's expertise"); Andersen, 454 F. Supp. 3d at 813-14 (excluding former police officer's opinion concerning whether there was a false confession as there is nothing in his experience that qualifies him as an expert even though he was qualified to opine on police practices generally). Accordingly, Reitz may offer an opinion limited to discussing whether Ahern acted reasonably under the circumstances.[19]

As part of that opinion, however, Reitz may not offer an opinion that it is "highly improbable that [Ahern] would have placed his finger upon the trigger surface in an unintentional matter."  D. 137-2 at 7.  The Court agrees that Reitz has not identified sufficient data, studies or

---

[18] Cambridge also challenges Reitz's qualifications to offer an opinions on "the mechanical complexities of the P320," D. 138 at 11, but it does not appear from the expert report that Reitz is proffering any opinions as to this matter.  See D. 137-1; D. 137-2; D. 154 at 8-15.

[19] Cambridge's challenge that Reitz's opinions concerning the reasonableness of Ahern's actions are unreliable because his opinions are solely predicated upon personal experience and are not based upon studies or other data do not warrant exclusion.  D. 138 at 14-16.  Reitz bases his opinion on the reasonableness of Ahern's actions, here, largely on his professional experience as a LAPD SWAT team member where he participated in "hundreds" of "warrant services, hostage rescues, and barricaded suspect situations."  See D. 137-2 at 7.  Cambridge's contentions can be explored on cross-examination, but do not warrant wholesale exclusion of Reitz's opinion.  See United States ex rel. Bawduniak v. Biogen Idec, Inc., No. 12-cv-10601-IT, 2022 WL 2662678, at *9 (D. Mass. July 8, 2022).

experience that would sufficiently explain the basis for this opinion.  D. 138 at 15-16.  Reitz states

that one basis for his opinion in this case is his "professional experience with Lt. Ahern" as he

instructed him in advanced pistol classes from April 13 to 17, 2016 and from June 2 to 4, 2017, as

well as two classes concerning Special Response Teams in 2015 and 2016.  D. 137-2 at 5.  "While

an expert may. . . testify solely on the basis of experience, he must explain how that experience

leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and that

that experience is reliably applied to the facts."  McGovern ex rel. McGovern v. Brigham &

Woman's Hosp., 584 F. Supp. 2d 418, 426 (D. Mass. 2008) (internal quotation marks and citation

omitted).  Here, the Court agrees that Reitz's opinion as to the high improbability that Ahern would

have placed his finger upon the trigger surface in an unintentional manner is unsupported by any

professional experience with Ahern or otherwise.  D. 137-2 at 7; see D. 137-3 at 57-58.

Accordingly, Reitz's opinion concerning whether Ahern would have placed his fingers on the

trigger surface is too speculative to be reliable and is therefore excluded.

c)    The Limits of Reitz's Opinions May Be Helpful to the Jury

As the Court previously concluded, there is a genuine dispute of fact concerning whether

Cambridge's actions after the May 2019 incident were retaliatory.  Although Reitz does not and

shall not offer an opinion concerning the investigation itself, Reitz's opinion concerning whether

Ahern acted reasonably during the May 19, 2019 discharge incident could assist a jury in deciding

whether it is more likely than not that Cambridge had a sufficient basis for seeking to discipline

Ahern for violation of its 403 policy (e.g., Reitz's opinion that Ahern alleging checking his firearm

to determine that it was safely secured was within "the performance of his duties," D. 137-1 at 6-

8; D. 137-2 at 6-8, which bears upon whether the jury might conclude the police department had

legitimate reason to believe that Ahern violated the 403 policy) or, as Ahern alleges, its conduct

was a pretext for penalizing him for speech concerning the P320.  Accordingly, the Court limits Reitz's opinion as to the reasonableness of Ahern's actions on the May 19, 2019 incident to the extent described above.  Such opinion is relevant for at least the reason explained above and the probative value of same is not outweighed by any unfair prejudice to either Defendant under Rule 403.

### 2. *Sheldon Wishnick*

Cambridge also moves to exclude Ahern's proffered damages expert, Sheldon Wishnick. Wishnick offers two damages values that is predicated upon the economic loss from Ahern's alleged denied promotion to Deputy Superintendent and re-employment:  (1) $454,336, the "present value of future loss," based upon continued employment in his current position at Bose as a Senior Manager of Workplace Services through an anticipated retirement date at age 65; and (2) an alternative calculation of $820,654 that assumes Ahern worked at Bose as Head of Security and that he had previously received a promotion as Deputy Superintendent.  D. 140-1 at 2.  Since Cambridge does not dispute Wishnick's qualifications to render such opinion, the Court turns to determining whether the specific testimony offered in the case "both rests on a reliable foundation and is relevant to the task at hand."  In re Nexium (Esomeprazole) Antitrust Litig., 842 F.3d at 52 (quoting Daubert, 509 U.S. at 597 (internal quotation marks omitted)).

### a) Cost Calculation Based Upon Present Value of Future Loss

Cambridge primarily challenges Wishnick's opinion of the "present value of future loss" as contradictory to the underlying facts.  See D. 140 at 3-5.  Specifically, Cambridge challenges

Wishnick's calculation based upon a retirement age of 65, where Ahern represented that he would retire at age 60.  See id.

Cambridge contends that Wishnick's calculation is unreliable because Ahern purportedly told Wishnick that he was only planning to work at Cambridge until age 60, "absent this dispute," and, therefore, it was inappropriate for Wishnick to assume a retirement age of 65.  See D. 140 at 4; D. 140-3 at 2.  Here, Wishnick stated that he assumed a retirement age of 65 because it a "conservative representation" and it was his understanding that Ahern would have continued at Cambridge beyond the age of 60 if he had received the promotion.  See D. 140-2 at 7-8.  Ahern has since attested that he intended to work at Cambridge beyond the age of 60 if he was promoted to Deputy Superintendent.  See D. 154-2.  The Court recognizes that Ahern's initial email to Wishnick is not clear as it does not address Ahern's likely retirement age if he had been promoted. See D. 140-3.  Here, Cambridge's critique of the factual assumptions of an otherwise reliable methodology "go[es] to the weight of the proffered testimony, not to its admissibility."  Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007) (internal citations omitted); see Updike v. Am. Honda Motor Co. Inc., No. 21-cv-01379-PHX-DJH, 2024 WL 4182232, at *16 (D. Ariz. Sept. 13, 2024) (concluding that damages assessment concerning the present value of loss was not subject to exclusion because defendant's challenges, such as how long decedent would have worked, go to the factual assumptions and affect the weight, not admissibility).  The Court, therefore, declines to exclude Wishnick's opinion as to the present value of future loss on this basis.

b)    Wishnick's Alternative Loss Calculation

Cambridge also challenges Wishnick's alternative loss calculation of $820,654 as predicated on unsupported factual assumptions because Wishnick presumes that Ahern would have received the Head of Security position at Bose if he had been promoted.  See D. 140 at 5-7.

30

Cambridge challenges that Wishnick did not verify the facts and figures that he was provided by Ahern and his counsel in terms of how much a person in Head of Security is compensated and whether that position was available at the time Ahern applied for a position at Bose.  Id. at 6-7. Ahern, however, has attested that at the time he applied to Bose, the Head of Security position was available and that he was informed by a consultant that he did not meet the qualifications for the position based upon his rank as a lieutenant.  See D. 154-2 at 3.  On this record, the Court concludes that Cambridge's challenges to Wishnick's factual assumptions can be explored through vigorous cross-examination.  See Iconics, Inc. v. Massaro, 266 F. Supp. 3d 461, 476-77 (D. Mass. 2017) (declining to exclude damages opinion as being unsupported by sufficient facts or data and reasoning that expert was permitted to rely upon counsel for certain assumptions); E.E.O.C. v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 469 (S.D.N.Y. 2004) (reasoning that defendant's issues with Wishnick's assumptions, "from the amount of [claimant's] projected income to the appropriate comparators to be used," and inputs provided by counsel are the types of issues that should be tested through cross-examination).

c)      Wishnick's Consideration of Mitigating Circumstances

Cambridge also contends that Wishnick's methodology is not based upon sufficient facts and data because he applied a two percent increase in salary without verifying that Bose increases its employee's salaries at that rate and failed to consider mitigating circumstances and other income streams for Ahern that could have contributed to fluctuations in Ahern's income.  See D. 140 at 7-8.  Wishnick's assumption of two percent increase was based upon a "conservative representation of increases in inflation and productivity and the economy," but acknowledged that he had no information that Bose relied upon that increase in their salaries each year.  See D. 140-2 at 9.  Here, as Cambridge does not challenge Wishnick's methodology but rather a specific input and the

accuracy of Wishnick's numbers, Cambridge's arguments go to the weight and not the admissibility of Wishnick's opinion. See Crowe, 506 F.3d at 18.

Further, the fact that Wishnick did not calculate mitigation damages based upon Ahern's second income in his plumbing business does not render his methodology unreliable. Although Wishnick acknowledged that the information could have factored into his calculations, D. 140-2 at 10-11, neither party has put forward any evidence concerning the amount of time or money that Ahern receives from this second income. See D. 154 at 7 n.2. The Court, therefore, declines to exclude Wishnick's opinion on this basis. Accordingly, for all the reasons discussed, the Court denies Cambridge's motion to exclude Wishnick's opinion.

## C.    **Sig Sauer's Motion for Summary Judgment**

Sig Sauer moves for summary judgment primarily based upon their motion to exclude Ahern's proposed experts that would opine on the manufacturing and design defect claims because Ahern's claims for (1) negligence, (2) breach of implied warranty of merchantability, (3) negligent infliction of emotional distress, (4) violation of Chapter 93A and (5) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. 2308(a) ("MMWA") all depend upon Ahern's ability to a manufacturing or design defect for the P320. D. 144-1 at 2, 12-17. Sig Sauer argues that if the experts are not excluded, the Court should still grant summary judgment as to Ahern's failure to warn claim,[20] (Count I and II), Chapter 93A claim (Count IV) and MMWA claim (Count VI). D. 144-1 at 19-21.

The parties agree that Ahern's claims are premised upon a design and manufacturing defect theory that will require expert testimony, D. 144-1 at 2; D. 149 at 1, Hochen v. Bobst Grp., Inc.,

---

[20] Ahern clarifies that he is only pursuing claims on a basis of a manufacturing and design defect, D. 149 at 6 n.6, and therefore the Court denies Sig Sauer's summary judgment motion to the extent it is based upon a failure to warn theory as moot, D. 144-1 at 17-18.

290 F.3d 446, 451 (1st Cir. 2002);  Morse v. Ford Motor Co., No. 08–11930–RGS, 2010 WL

2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect

(such as this case), expert testimony is required because the answers to the highly technical and

specialized questions raised by such claims lie outside the knowledge of most lay jurors"); Alves

v. Mazda Motor of Am., Inc., 448 F. Supp. 2d 285, 297 (D. Mass. 2006) (concluding that the

plaintiff would need to introduce expert testimony to prevail on her design defect and breach of

warranty claims), and therefore, whether summary judgment is appropriate as to these claims will

depend upon the admissibility of Ahern's proffered experts' opinions.

### 1.    Sig Sauer's Motions to Exclude Experts Offered Under Fed. R. Evid. 702

Sig Sauer has moved to exclude all three of Ahern's proposed manufacture and design

experts as failing to satisfy the prerequisites for admission under Fed. R. Evid. 702.  D. 141; D.

142; D. 143.   Ahern's three proffered experts would opine on the issues of design and

manufacturing defects of the P320 and, specifically, that the firearm is "susceptibility to discharge

without a trigger pull."  D. 149 at 4.

### a)    Sig Sauer's Motion to Exclude Timothy Hicks

Sig Sauer has moved to exclude all opinions by Timothy Hicks ("Hicks").  D. 141.  Ahern

intends to call Hicks to testify that Ahern's P320 had several defects and that "a combination of

some or all of the defective conditions" contributed to it firing un-commanded including that (1)

the P320's internal safety components are manufactured using a Metal Injection Molding ("MIM")

process and do not have "secondary machining" performed which caused misalignment between

the sear and the striker and with both parts being out of specification, the striker became

disconnected from the sear without a trigger pull, (2) internal components, such as the face of the

safety lock tab and vertical stop face on the striker body do not meet the drawing specification,

which fails to prohibit the striker from moving forward, without the trigger being pulled, (3) the language of the Sig Sauer's owner manual and patent filed by Sig Sauer confirm that impulses imposed over the course of the firearms lifetime can cause internal components to fail, and (4) without an external safety, a minor amount of trigger movement from vibration, shock, impulses or something coming into contact with the trigger, can disable the safety lock. See D. 141-7 at 8, 23-24; D. 151 at 5.

In conducting his analysis, Hicks was present for an inspection of Ahern's P320 pistol in October 2022, which included taking 3D CT scans, measurements and photographs, including photographs when the firearm was disassembled. D. 141-7 at 7. Hicks was present for a functional test of Ahern's firearm which measured the trigger force pull. Id. Functional tests such as subjecting the firearm to shock, vibration, impact and other forces was not undertaken due to "similar incidents in the field" (i.e., the risk of discharge of the firearm without a trigger pull) of which some have been caught on video. Id. at 4. Hicks obtained images and measurements of the individual components, and based upon these measurements, Hicks opined that Ahern's firearm had several design and manufacturing defects consistent with other P320s he had examined, including (1) "[t]he sear and striker pin components, the engagement of which is a critical feature of this design, are produced using a [MIM] process and do not have any secondary machining performed on the small engagement surfaces;" (2) the sear and striker pin exhibited inconsistencies on the surfaces which can minimize the actual contact surface area and the parts exhibited a raised area called "rollover" that can make a firearm more susceptible to "an uncommanded discharge;" (3) there is vertical misalignment of the sear and striker which makes the striker foot unable to engage with the sear face surface that indicates that a shock or impulse could cause the striker to move and not retain the sear that would result in a discharge; and (4) that Sig Sauer's design

specifications did not match the safety lock. D. 141-7 at 8-17, 23-24. Based upon his observations, education and experience, Hicks summarized his opinion:

> There are two features within the design of the P320 that must fail to allow an un-commanded discharge to occur. These are defined as 'internal safety features' by Sig Sauer. First, the striker needs to be released from the sear, which based on defects discussed in this report, is a precarious interface. Due to the minimal amount of contact between the two components (sear and striker), any vibration, impulse, inertia, or jostling of the firearm can cause the striker to be released from the sear. Second, the safety lock, which also exhibits defects and a compromised surface with the striker stop, does not stop the striker from making contact with the cartridge in the chamber. Because of the uncontrolled, or "sloppy" mechanism of the P320 firearm, un-commanded discharges will occur."

Id. at 24.

Sig Sauer challenges both Hicks's qualifications and the reliability of his methodology in coming to his conclusions on two grounds. First, it contends that Hicks is a mechanical engineer and has spent his career in the automotive industry and does not have the "necessary training, experience, knowledge, or skill to opine on issues of firearm design or manufacture." See D. 141-1 at 5-11, 14-15. Second, Sig Sauer contends that Hicks's opinion is unreliable because it is based solely on his observations and measurements of internal components made during a visual inspection, but Hicks has not tested his hypothesis that the alleged "deviations" could cause the pistol to discharge without a trigger pull. Id.

Hicks is a Principal Engineer who has spent almost twenty years in the automotive industry where he was responsible for the design, manufacturing, testing and validation of vehicle systems. D. 141-7 at 3. Hicks holds a master's degree in engineering sciences and a bachelor's degree in mechanical engineering and is licensed in multiple states. Id. at 28-29. He is a member of the American Society of Mechanical Engineers, the National Society of Professional Engineers, and the Society of Automotive Engineers for which he currently serves as Chairman in Chicago. Id. at 29. Hicks received a Sig Sauer P320 armorer certification in 2022. Id. at 28. In his current role

as a consultant, Hicks conducts numerous investigations and certification tests on firearms and firearm safety devices, pursuant to California and Massachusetts regulations (as he holds Certificates of Eligibility from the California DOJ Bureau of Firearms and Massachusetts Firearms Records Bureau Executive Office of Public Safety), and for incidents involving firearms.  Id. at 3.

The fact that Hicks's primary experience in the automotive industry does not necessarily render him unable to opine on the design and manufacture of the P320 as he has performed numerous investigations and certification tests on firearms and firearm safety devices.  See D. 141-7 at 3.  As Ahern notes, the First Circuit has declined to "constrain a trial court to admit testimony only from mechanical engineers who have had design experience with the specific machine in question."  DaSilva v. Am. Brands, Inc., 845 F.2d 356, 361 (1st Cir. 1988) (holding trial court did not err when it allowed expert testimony from mechanical engineer with twenty-three years of experience who was familiar with the fundamental engineering principles of the machine and had prior experience with the operation of the specific machine in question); see also One Beacon Ins. Co. v. Electrolux, 436 F. Supp. 2d 291, 299 (D. Mass. 2006) (concluding that even though expert was "lacking detailed expertise in electrical dryers, [the expert] possesses sufficient expertise to testify regarding the design, manufacture, assembly, repair and operations of dryers").  Other courts have similarly held that Hicks is qualified to opine on manufacturing defects related to the P320.  See Guay v. Sig Sauer, Inc., 610 F. Supp. 3d 423, 433 (D.N.H. 2022) (concluding that Hicks was qualified to opine on the P320 design and manufacturing because "Hicks has specific training and experience with gun design and components even if the bulk of his experience is in the automotive industry"); Green-Berrios v. Sig Sauer, Inc., No. 22-cv-1002 (JAG)(HRV), 2024 WL 1829269, at *4 (D.P.R. Feb. 27, 2024), report and recommendation adopted, No. 22-cv-1002, D. 97 (D. Mass. Apr. 23, 2024); Mayes v. Sig Sauer, Inc., No. 19-cv-00146-GNSHBB, 2023 WL

2730264, at *2 (W.D. Ky. Mar. 30, 2023), amended, No. 19-cv-00146-GNSHBB, 2023 WL 3854266 (W.D. Ky. June 6, 2023) (concluding that "Hicks'[s] wide breadth of engineering experience and capabilities" makes him qualified to opine on the mechanical topics such as a the mechanics of firearm).  As concluded in Guay, "Hicks is a mechanical engineer with substantial experience, and he specializes in the technicalities of product performance and failure" and, "[a]ccordingly, his training and experience provide a basis for expertise in the mechanical workings of a product, including a gun."  Guay, 610 F. Supp. 3d at 433; see Green-Barrios, 2024 WL 1829269, at *4 (citing and agreeing with analysis in Guay).

In addition to being qualified to give the opinions that he proffers, the Court also declines to exclude his opinion on the other grounds that Sig Sauer presses.  Sig Sauer  challenges Hicks's opinion as *ipse dixit*, Rodriguez v. Hosp. San Cristobal, 91 F.4th 59, 70 (1st Cir. 2024) (noting that nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"), and asserts that his methodology is unreliable because it is based solely upon his observations and measurements of internal components made during a visual inspection but Hicks has not, in any form, tested his hypothesis that the alleged "deviations" he observed could cause the pistol to discharge without a trigger pull.  See D. 141-1 at 2, 16-21.  In addition to testing, Sig Sauer also challenges Hicks's opinion as unreliable because of the lack of peer review and publication, no determination of the potential rate of error, and the fact that Hicks's methodology has not been accepted by the community.  See id. at 20-21.

First, this Court disagrees that the opinion is excludable as *ipse dixit* (i.e., "meaning an opinion rendered without any basis beyond the expert's conclusion itself," Guay, 610 F. Supp. 3d at 433).  As summarized above, Hicks's opinions are based upon his observations of the internal

components of the P320 and his explanation, based upon extensive, mechanical engineering experience and training, of how the variables, misalignments between components and manufacturing deviation from drawings could allow the firearm to have an uncommanded discharge. D. 141-7 at 23-24. "Because these are objective, observable characteristics of the guns, Hicks's opinion is not premised on his *ipse dixit*" and "as a mechanical engineer, Hicks is qualified to explain his understanding of physics and mechanics to the jury (just as Sig Sauer's experts may likewise explain their own understanding." Guay, 610 F. Supp. 3d at 433-34; Green-Berrios, 2024 WL 1829269, at *5; see Quilez-Velar v. Ox Bodies, Inc., 823 F.3d 712, 719 (1st Cir. 2016), (stating that "this circuit has never adopted a rule that an expert himself must have tested an alternative design, much less by building one").

Second, Sig Sauer's critique of Hicks's opinions for lack of testing is not a basis here to exclude the opinions, particularly where Hicks has explained the reasons why he did not conduct such testing. As Hicks explained, he did not conduct certain functional tests (i.e., testing "vibration, impulse, impact, and other inertial forces" or drop tests) because such tests have resulted in unmanned discharge of the firearm (a safety hazard) and "would potentially cause spoliation of the subject firearm." D. 141-7 at 4; D. 141-9 at 121-22. (explaining that it would be difficult to simulate real-world scenarios to test his conclusion). It is somewhat ironic that Sig Sauer seeks to exclude Hicks's opinion on this basis when the patent for the P320 notes the risk of same from an impulse or sudden impact, D. 141-7 at 7, where its own, disclosed testing reflects only limited, functional testing. Id. at 18; D. 142-6 at 15; see Green-Berrios, 2024 WL 1829269, at *6 n.3 (noting that "[w]here physical testing is not feasible, observations coupled with expertise generally may form the basis of an admissible expert opinion") (internal quotation marks omitted) (quoting Allstate Indem. Co. v. Dixon, 932 F.3d 696, 701 (8th Cir. 2019)).

Third, as much of Sig Sauer's grounds for exclusion rely on cases in which Hicks's opinions have been excluded, the Court finds the foundation for his opinions here more well-founded and the legal analysis in <u>Guay</u> and <u>Green-Berrios</u> more persuasive.  The Court is aware that Hicks has proffered same or similar methodology and conclusions concerning unintended P320 discharges in other cases that were excluded under Rule 702.  <u>Hilton v. Sig Sauer</u>, No. 21-cv-00441-MJT, attached at D. 141-2 at 10-12 (faulting Hicks for not performing testing, because his theory concerning the misalignment has not been tested, subjected to peer-review, he did not identify a known error rate and there is not a generalized acceptance of his theory); <u>Mayes</u>, 2023 WL 2730264, at *7 (concluding that Hicks's opinions because "they are not based on tested or otherwise corroborated theories" concerning the amount of rollover needed to cause an un-commanded discharge); <u>Jinn v. Sig Sauer. Inc.</u>, No. 20-cv-1122-PGGRWL, 2023 WL 5972507, at *2 (S.D.N.Y. Sept. 13, 2023) (excluding Hicks's proffered opinion since "[o]ther than through *ipse dixit*," Hicks opinion does not connect the alleged "real-world replication" (videos of discharges from P320s) data to his conclusion that the P320 at issue in the case was defective).  The court is not persuaded by these rulings for a number of reasons.  First, the Court disagrees that Hicks's opinion is *ipse dixit* where, as discussed above, his opinions are grounded in his inspection of the internal components of the P320 in question, his application of mechanical engineering principles informed by extensive experience, his firearms experience, and consideration of P320 drawings and Sig Sauer's own testing.  Second, to the extent that those courts were critical of the lack of testing that Hicks conducted, Hicks has sufficiently explained why such testing was not feasible as discussed above.  Third, the basis for Hicks's methodology and ultimate opinion has changed as he did not have access to Sig Sauer's drawings and other engineering documentation in the <u>Jinn</u> and <u>Mayes</u> case.  <u>See</u> D. 141-9 at 134-38.

Fourth and finally, this Court finds the reasoning of two other district courts in this Circuit more persuasive in admitting the opinion of Hicks in other cases regarding the P320, Green-Berrios v. Sig Sauer, Inc., 2024 WL 1829269, at *5; Guay, 610 F. Supp. 3d at 433, for the reasons explained above.

For all of these reasons, the Court denies Sig Sauer's motion to exclude Hick's opinion, D. 141.

### b)    Sig Sauer's Motion to Exclude Peter Villani

Sig Sauer also has moved to exclude opinions from Peter Villani ("Villani").  D. 142. Ahern has proffered Villani as an expert to opine on design and manufacturing defects of the P320, and intends to call Villani to testify that the P320 is defective due to manufacturing defects he observed including (1) excess molding that causes insufficient "positive contact" between the striker foot and the sear and can cause a firearm to discharge, (2) molding defect that can cause the safety lock to jump over the striker stop during an un-commanded discharge, (3) uneven engagement on the sear's positive contact surface which prevents proper engagement and (4) Sig Sauer's component drawings do not match the examined parts as seen in the safety lock tab.  See D. 151 at 16; D. 142-6 at 2-15.

Villani opines that Ahern's "P320 discharged without a trigger pull."  D. 142-6 at 2.  In coming to this conclusion, Villani attended the October 2022 inspection of Ahern's P320 firearm with Hicks where the firearm was subjected to a CT scan, Villani took photographs of Ahern's firearm and compared it to other P320s he has examined in similar cases.  Id. at 3.  Villani concludes that the defects that he observed of the internal parts of the sear, striker foot and body safety lock, "lead to an unintended discharge as the excess material viewed on these parts can cause a lack of positive contact between them."  Id. at 15.  Villani opines that this excess molding

material has been present in the other P320 firearms that he has inspected which similarly had un-commanded discharges.  Id. at 4, 15.  Villani states that this excess raised molding material renders the P320 susceptible to un-commanded discharges from forces such as an "impulse."  Id. at 3.  He notes that Sig Sauer's 2018 patent states that the sear can be inadvertently displaced due to an impulse supports his theory.  Id. at 16.  Villani further opines that quality control could alleviate the manufacturing problems (i.e., that the examined parts of the P320 did not match Sig Sauer's own component level drawings).  Id. at 15-16.

Sig Sauer challenges both Villani's qualifications and reliability of his methodology in coming to his conclusion because (1) Villani is not an engineer and he has no education or training in firearm design or manufacturing, and (2) Villani's opinion is unreliable because, like Hicks, it is based solely on his observations and measurements of internal components made during a visual inspection but he has not tested his hypothesis and does not rely on any articles or journals that support his theory.  See D. 142-1 at 3.

As to his qualifications, the Court concludes that Villani has the requisite experience and qualifications to opine on the defects that he observed in his inspection of the P320.  Villani has worked since 2001 as a firearms instructor, armorer and primary evidence custodian at the Department of Veteran Affairs, which includes examining and maintaining firearms used in his department.  D. 142-7 at 2.  Villani holds a P320 armorer certification from Sig Sauer and has completed the Department of Veterans Affairs Law Enforcement Police Officer training.  Id. at 4, 10.  Between 1995 and 1999, Villani handled a shooting range where he routinely maintained and repaired firearms.  Id. at 3.  This background and experience evinces familiarity perhaps with the use, maintenance and examination of firearms, even if he does not hold a degree in engineering (as Ahern's other expert, Hicks, does).  See D. 142-7; D. 151 at 14.  Given his specialized

experience, D. 142-7, he "has valuable and significant expertise in inspecting and handling firearms, including the P320" and such will be helpful to a lay jury as "the subject matter about which Villani plans to testify—the mechanical components of the P320 and guns like the P320—is beyond the knowledge the average person possesses." Guay, 610 F. Supp. 3d at 429-30. Given the limits of his opinion (i.e., about his examination of the P320, his observations of the components and the issues that conditions of same may have caused, D. 142-6 at 15-16, conclusions 17, 20) he will be testifying "within his specific band of expertise." Id. at 430.

To the extent, however, that Villani offers an opinion beyond this band to opine about the manufacturing process and how Sig Sauer's process could be altered to prevent these problems, D. 142-6 at 15-16, conclusions 18-19, that opinion is in the province of engineering expertise. Moreover, contrary to Ahern's suggestion otherwise, D. 151 at 15, the court in Guay concluded that "Villani did not identify any relevant experience about identifying the underlaying cause of the defects he identified or about how they might be fixed" and, accordingly, held that "although Villani has sufficient experience to opine about what he saw and what he concluded when he conducted his examinations . . . "he does not have sufficient experience to opine about the mold or casting process and whether a machining process would have prevented the problems he identified." Guay, 610 F. Supp. 3d at 430.

To the extent that Sig Sauer relies upon the opinions of other courts to exclude Villani's opinions, see Jinn, 2023 WL 5972507, at *7 (concluding that "Villani's qualifications are insufficient to sustain his offering opinions both on whether the P320 is defectively designed or manufactured and on whether any purported defect or combination of defects caused Jinn's accident") (internal quotation marks omitted); Mayes, 2023 WL 2730264, at *4 (concluding that "Villani's lack of design and manufacturing experience renders him unqualified to offer opinions

regarding alleged design and manufacturing defects"); <u>Frankenberry v. Sig Sauer, Inc.</u>, No. 19-cv-02990-JD, 2022 WL 22887079, at *5 (D.S.C. Feb. 4, 2022) (reasoning that Villani is not qualified to opine on manufacturing and design defects because "Villani's opinions regarding manufacturing defects extend beyond the scope of an armorer" and his qualifications extend to "troubleshoot[ing] gun malfunctions and giv[ing] instructions on their safe use"), the Court does not find them inconsistent with the scope of its ruling here.

For all these reasons, the Court allows Sig Sauer's motion to exclude Villani's opinion in part and denies it in part to the extent explained above.

c)    <u>Sig Sauer's Motion to Exclude James Tertin</u>

Sig Sauer also has moved to exclude the opinion from James Tertin ("Tertin").  D. 143.  Ahern has proffered Tertin as an expert to opine on design and manufacturing defects of the P320, and Tertin opines as to five factors that render the P320 defective:  (1) a precarious engagement between sear and striker, (2) that the sear and striker are non-qualified MIM parts, (3) spring charge connection between striker and sear, (4) the P320 is a single action pistol and (5) the lack of an effectively designed safety.  <u>See</u> D. 151 at 11 (citing Tertin deposition).  Tertin opines that the P320 as a single-action pistol is defectively designed because it exclusively relies on two internal safeties and is not equipped with an external safety and the "inclusion of a manual thumb safety" (as is provided on the military P320 model) would be a safer, alternative design.  D. 143-3 at 17.  Tertin further opines that the P320 sear is held in the vertical position by springs alone which are susceptible to being compressed when dropped or via other forces and could cause an un-commanded discharge.  <u>Id.</u>  Tertin also agreed with Hicks's opinion that based upon his examination of the exemplar P320 that there was no machining of the surface of the sear and that the striker contact which could increase the likelihood of an un-commanded discharge.  <u>Id.</u> at 4.

In reaching his conclusions, Tertin did not examine Ahern's P320 and instead purchased a new P320, which he used for testing and evaluation.  Id. at 2.  Tertin conducted a test of the internal safeties to determine if a trigger pull is the only mechanism by which the P320 can fire.  Id. at 7. To perform the test, Tertin cut out the back of the gun to make the striker visible, pulled the trigger halfway and manually depressed the sear, which caused the P320 to discharge without a trigger pull.  Id. at 5-7.  Tertin claimed that this test indicates that the P320 does not function as Sig Sauer claims, as Sig Sauer has previously stated that if the sear moves out of position without the trigger being pulled, the intercept notch would come back up and catch the striker.[21]  Id. at 6.

Sig Sauer primarily challenges Tertin's opinions on causation as unreliable and inadmissible because (1) Tertin's test that he performed on an exemplar P320 where he manually disengaged both safeties is not a simulation of what happened in Ahern's case, and (2) the fact that Tertin has altered his opinion from the prior eight similar cases he has testified in that the P320 can discharge without a trigger pull based solely on crediting Ahern's account of the events.  See D. 143-1 at 2, 11-14.  Sig Sauer also challenges Tertin's opinions concerning the P320's "short trigger" and external safety opinions as irrelevant because Tertin's theory of the un-commanded discharge is that the P320 discharged without a trigger pull.  Id. at 13-14.

First, as to the contrast between Tertin's opinions in other cases concerning the P320 firearm discharges and that the P320 cannot discharge without a trigger pull, see D. 143-2 at 22-24; D. 151-10 at 5, and his present opinion that the P320 can discharge without a trigger pull where Ahern alleges same,  D. 143-1 at 9; see D. 143-2 at 22-23; see, e.g., Colwell v. Sig Sauer, Inc., No.

---

[21] Tertin performed this test based upon statements by Sig Sauer's lead designer, Sean Toner, in a different case of what could happen that "if the sear was discharged from the striker." See D. 143-2 at 14-15.  Tertin acknowledges that Toner's statement did not necessitate that the sear continue to be manually pressed down and that Tertin conducted his test this way because "that was the easiest way I could graphically show 'dislodged.'"  See id. at 15.

21-cv-1200 (BKS/ML), 2024 WL 4216047, at *5 (N.D.N.Y. Sept. 17, 2024)  (recognizing that Tertin "testified in his deposition that the trigger must be actuated for the P320 to discharge"), such is not a basis for excluding his opinion here.  Such inconsistency with prior opinions can be explored on cross-examination.

As to a reliable basis for his conclusion here that the P320 is defective, that has been shown here as to his observations regarding the engagement between the sear and the striker, their MIM condition, and the nature of the connection between same and the lack of an effectively designed, internal safety. D. 143-3 at 17-18.  The Court also disagrees with Sig Sauer that there is an analytical gap between Tertin's opinion and the application to the facts of Ahern's case.  See Rodríguez, 91 F.4th at 70–71 (internal citation omitted).  Although the test that Tertin conducted to understand whether the P320 can discharge by pulling the trigger halfway and manually depressing the sear to move the striker safety out the way, does not necessarily replicate real-world conditions, see D. 143-2 at 7, 14-15, he explained that this was the only feasible way he could duplicate the sear becoming dislodged.  See id. at 14-15; Catatao v. Sig Sauer, Inc., No. 22-cv-10620, 2024 WL 4011964, at *2 (D. Mass. June 24, 2024) (declining to exclude Tertin's opinion in which he conducted an experiment indicating that a key was able to pull the trigger in a P320 but was unable to pull the trigger in a Glock, which was fitted with an external safety as his methodology was reasonably tied to the facts of the case); Lang v. Sig Sauer, Inc., 21-cv-04196-ELR, at *28-29 (N.D. Ga. Sept. 28, 2023) (attached at D. 166-1) (denying motion to exclude Tertin's opinion as to a tabbed trigger where he adequately explained how such could have prevented the accident because the plaintiff was pulling the gun up when it discharged, which the opposite direction the firearm need to be moving for the tabbed trigger to be disengaged).

It is a closer call as to whether the portion of Tertin's opinion about the addition of an external safety is relevant where Ahern has testified that the discharge occurred without a trigger pull.  D. 143-1 at 13-14; D. 143-3 at 17.  Tertin admits that one such external safety, a tabbed trigger, would not have prevented Ahern's gun from discharging.  See D. 143-2 at 61-63 (admitting that a tabbed trigger was not a factor where Ahern's gun discharged without a trigger pull).  Tertin admitted that another potential, external safety, a manual thumb safety, also would not have stopped the gun from discharging because the manual thumb safety would not disengage the connection between the sear and the striker id. at 89-90, and a third form of an external safety that Tertin identifies in his report, a grip safety, D. 143-3 at 12, also would not have prevented the May 19, 2019 discharge.  D. 143-2 at 90; cf. Colwell, 2024 WL 4216047, at *5 (excluding Tertin's opinion that a manual safety would have prevented the P320 from discharging because "there is nothing in the record to demonstrate that a manual safety would have been engaged if the P320 had one" and Tertin's opinion therefore amounted to "pure speculation") (internal quotation marks and citation omitted);  Davis v. Sig Sauer, Inc., No. 22-cv-00010-GFVT, 2024 WL 54595, at *2 (E.D. Ky. Jan. 4, 2024) (granting motion to exclude where "Tertin's conclusion that the lack of a manual safety was the proximate cause of Mr. Davis's accident is pure speculation"); Herman v. Sig Sauer Inc., No. 21-cv-1038-R, 2023 WL 5827054, at *4 (W.D. Okla. Sept. 8, 2023) (excluding Tertin's opinion "that a manual safety most likely would have prevented the accident [is] speculative and inadmissible").  Still, the crux of Tertin's opinion is that the P320's *internal* safety was defective, D. 143-3 at 9-10, not that any particular, external safety would have prevented the discharge.[22]  Accordingly, the Court will allow the admission of Tertin's opinion to that extent and

---

[22] This also appears to be part of Hicks's opinion as to how the internal safety can become disabled.  D. 141-7 at 24.

to the extent of his opinions about the components of P320, operation of the P320 and other single-action pistols and the results of his testing of a P320, but not as to the three external safeties that, by his own admission, would not have prevented the discharge that Ahern alleges here. Accordingly, the Court denies Sig Sauer's motion to exclude Tertin's opinion, D. 143, in part and allows it in part to the extent explained above.

### 2. Sig Sauer's Motion for Summary Judgment

Ahern has predicated each of his claims against Sig Sauer on a manufacturing and design defect theory, D. 149 at 1; see D. 42 ¶¶ 163, 171, 175, 183, 202, and therefore, the viability of those claims depend upon establishing a design and manufacturing defect.

### a)     Negligence and Breach of Implied Warranty of Merchantability

To succeed on a claim for breach of warranty and negligence on a theory of manufacturing and design defect, Ahern must prove that "(1) that the defendant manufactured or sold the product; (2) that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold; (3) that at the time of his injury, the plaintiff was using the product in a manner that the defendant intended or that could reasonably have been foreseen; and (4) that the defect or unreasonably defective condition . . . was a legal cause of the plaintiff's injury. Alves, 448 F. Supp. 2d at 300 (citing Lally v. Volkswagen Aktiengesellschaft, 45 Mass. App. Ct. 317, 337 (1998)). A plaintiff alleging a defective design must "prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented" his injury. Catatao, 2024 WL 4011973, at *2 (internal quotation marks and citation omitted). In a case such as this where the defect concerns a firearm, "[t]he nature of the defect or breach of warranty and its causal relation to the [injury is] complex," and a plaintiff must introduce expert testimony. See Hochen, 290 F.3d

at 451; see also Mayes, 2023 WL 2730264, at *9 (holding that expert testimony is required because "[t]he inner workings and mechanics of the P320 are not 'matters of general knowledge,' but instead involve a complex and technical understanding of firearms, engineering, and physics to fully determine whether a defect exists"). Although the expert opinions offered by Ahern will, no doubt be subject to vigorous cross examination, there remains a disputed issue of material fact regarding causation, such that summary judgment in Sig Sauer's favor is not warranted.

b) <u>Similarly, Summary Judgment is Not Warranted as to Ahern's Other Remaining Claims</u>

Where Ahern's negligent infliction of emotional distress, c. 93A and MMWA claims are predicated on the same theories as the negligence and breach of warranty claims, summary judgment is also not warranted on the basis of causation for the reasons stated above. See One Beacon Ins. Co., 436 F. Supp. 2d at 297 (concluding that "[i]nsomuch as summary judgment is inappropriate under the breach of warranty claim . . . summary judgment is likewise inappropriate under the chapter 93A claim").

There also is no separate ground, as Sig Sauer contends, to grant it summary judgment on the c. 93A claim. Here, where Ahern's breach of warranty claim survives summary judgment and where it also disputed whether Sig Sauer engaged in unfair and deceptive acts. To the extent that "a mere breach of warranty" may not necessarily be enough to sustain a c. 93A claim, the showing of "a breach of warranty 'plus,' where that 'plus' is conduct [by the defendant], which, if true, would render the breach repugnant to the milieu of the commercial marketplace." Utica Nat. Ins. Grp. V. BMW of North America, LLC, 45 F. Supp. 3d 157, 161 (D. Mass. 2014) (internal citation omitted). Although hotly disputed, the evidence of the voluntary upgrade program, other reported incidents of un-commanded discharges and other evidence in this case, D. 149 at 12-13, lend

48

support to Ahern's c. 93A claim.  Accordingly, the Court denies summary judgment as to this claim on this separate challenge as well.

As Sig Sauer's separate challenge to the MMWA claim on the grounds that the P320 is not consumer product under 15 U.S.C. § 2301(1), D. 144-1 at 20, which triggers MMWA protection, that challenge also does not warrant summary judgment in its favor.  Under § 2301(1), a "consumer product" is defined as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes."  Id.  On this record, the P320 meets this definition.  Although Ahern's use of the firearm was in professional capacity, the record otherwise supports that the P320 is a consumer product as it distributed broadly in the United States and Canada, mostly through distributors, but is sold directly to consumers in New Hampshire.  D. 149 at 14 (citing deposition testimony).  As to the other ground challenging the MMWA claim, there remain disputed issues of fact as to whether Sig Sauer disclaimed an implied warranty of merchantability, see D. 149 at 15-16, and summary judgment to Sig Sauer as to this claim is not warranted.

For all these reasons, the Court denies Sig Sauer's motion for summary judgment.

## VI.    Conclusion

For the foregoing reasons, the Court rules as follows.  The Court DENIES Cambridge's motion for summary judgment.  D. 134.  The Court ALLOWS Sig Sauer's motion to join Cambridge's motion to exclude the testimony of Scott Reitz, D. 148.  The Court DENIES Cambridge's motion to exclude Reitz's testimony to the extent Reitz opines on the reasonableness of Ahern's action in removing the P320 from its holster and otherwise ALLOWS the motion the motion to exclude, D. 137.  The Court DENIES Cambridge's motion to exclude the testimony of Sheldon Wishnick, D. 139.  The Court DENIES Sig Sauer's motion to exclude the proffered

opinions of Timothy Hicks, D. 141; ALLOWS the motion to exclude the opinion of Peter Villani, D. 142, in part to the extent that he proffers an opinion about Sig Sauer's manufacturing process or how it could be changed, but otherwise DENIES it; and ALLOWS the motion to exclude the opinion of  James Tertin, D. 143, in part to the extent he opines as to the three external safeties that, by his own admission, would not have prevented the discharge that Ahern alleges here, but otherwise DENIES the motion.  The Court DENIES Sig Sauer's motion for summary judgment, D. 144.

**So Ordered.**

/s Denise J. Casper
United States District Judge